UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Contour Design, Inc.

    v.                                        Civil No. 09-cv-451-JL
                                              Opinion No. 2010 DNH 011

Chance Mold Steel Co., Ltd.
and EKTouch Co., Ltd.

**MEMORANDUM OPINION**

Contour Design, Inc., moves for a temporary restraining

order preventing the defendants, Chance Mold Steel Co. and

EKTouch Co., from marketing a product known as the "ERGO Roller,"

which they allegedly developed by misappropriating Contour's

trade secrets.[1]  This court has subject-matter jurisdiction over

---

[1]Contour originally filed a motion seeking a temporary
restraining order ex parte.  See Fed. R. Civ. P. 65(b).  The
court scheduled a hearing on that request for 10 a.m. on January
5, but, as a result of Contour's efforts to notify the defendants
of both the motion and the hearing, their newly retained counsel
appeared at the appointed time and requested a continuance so
that they could file a response.  The court afforded them until 8
p.m. that day to do so, with the hearing to take place at 1:30
p.m. the following afternoon.  This schedule was intended to
provide the defendants with an opportunity to respond while
maintaining the court's ability to grant effective relief, if
warranted.  As discussed infra, the conduct that Contour sought
to enjoin was scheduled to commence on January 7, 2010.
    Though the defendants filed an objection to the motion by
the appointed deadline, they filed supplementary materials later
that night, the next morning, and even the next afternoon just
before the hearing, viz., a declaration from their president,
Hsiu-Yuan Nien.  The court has considered these materials despite
their late arrival.  At the hearing, the defendants nevertheless
objected that, because they had insufficient time to respond, the

this action between Contour, a Delaware corporation with its
principal place of business in New Hampshire, and the defendants,
Taiwanese corporations, under 28 U.S.C. § 1332(a)(2) (diversity).
After a hearing, the court grants Contour's motion.  Though the
parties have provided the court with only limited facts so far,
they show that Contour is likely to succeed on the merits of its
claim that the defendants have misappropriated one of its trade
secrets.  Given the nature of that claim, the remaining criteria
for issuing a temporary restraining order are readily satisfied.

I.   **Background**

For purposes of Contour's motion, the court makes the
following findings of fact, see Fed. R. Civ. P. 52(a)(2), based
on the verified complaint and affidavit submitted by Contour's
president, Steven Wang, and the documents and declaration
submitted by the defendants.  See Asseo v. Pan Am. Grain Co., 805
F.2d 23, 26 (1st Cir. 1986) (noting with approval that

---

court could not grant a preliminary injunction, but only a
temporary restraining order.  But see Fed. R. Civ. P. 65(a)(1)
(authorizing a preliminary injunction "on notice to the adverse
party").  Out of sensitivity to the defendants' predicament, the
court has styled its order as a temporary restraining order and
has therefore provided for its expiration in 14 days from the
date of its issuance.  See Fed. R. Civ. P. 65(b)(2).

"[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings").

Contour designs, manufactures, and sells ergonomically friendly "computer pointing devices," including the "Roller Mouse" series.  The products from this line feature a wide roller bar incorporated into a component placed centrally below the keyboard, as opposed to the configuration of a traditional computer mouse, which has a narrow trackball incorporated into a smaller component placed to one side of the keyboard.  In 1995, Contour engaged defendant Chance to manufacture its ergonomic products, based in part on assurances that it would "establish a production line exclusively for Contour and that all of [its] ideas, trade secrets, products, specifications and know-how would remain secret from others and that Chance would not manufacture any similar products for any other person or entity."

To that end, Contour and Chance executed a "Non-Disclosure Agreement" (the "NDA"), dated June 15, 1995 and set to expire on June 15, 2015.  The NDA recited that Contour "has certain inventions, designs, methods, samples, market information[,] concepts and ideas," defined as the "Confidential Information," that relates "to consumer mouse products," defined as "the Product."  The NDA further recited that Chance "desired to receive some of the Confidential Information to evaluate the

desirability of entering into a manufacturing and distribution arrangement with [Contour] for the Product."

Chance agreed in the NDA to preserve the confidentiality of the Confidential Information, to make no use or disclosure of it without Contour's prior written consent, and that Chance had been granted no right or license in any trade secret by its receipt of the information.  Chance further agreed not to "produce, manufacture or otherwise commercially exploit the Product" without Contour's prior agreement.  And Chance acknowledged that its breach of the NDA will cause Contour "irreparable harm for which no adequate remedy exists at law, and that upon any such breach or threatened breach [Contour] shall be entitled to injunctive relief.  The NDA provided that Colorado law "shall apply to [its] performance and interpretation."[2]

---

[2]Despite this provision, the parties' submissions rely solely on the New Hampshire version of the Uniform Trade Secrets Act (and caselaw from other jurisdictions interpreting their versions of that Act).  The court treats that as a tacit agreement that New Hampshire law applies, at least at this preliminary stage of the litigation.  See Anderson v. Century Prods. Co., 943 F. Supp. 137, 150 n.2 (D.N.H. 1996).  In any event, under New Hampshire choice-of-law rules, which apply in a diversity action brought here, a contractual provision to apply a particular jurisdiction's law controls only if "'the contract bears any significant relationship to that jurisdiction.'" Stonyfield Farm, Inc. v. Agro-Farma, Inc., 2009 DNH 150, 10 (quoting Hobin v. Coldwell Banker Residential Affiliates, Inc., 144 N.H. 626, 628 (2000)).  There appears to be no relationship at all between Colorado and the manufacturing agreement, which calls for a Taiwanese company to produce goods in that

Chance and Contour subsequently signed a "Manufacturing and Supply Agreement," dated December 1, 1996.  This agreement contained a confidentiality provision, expressly "[i]n addition to" the NDA, requiring Chance to maintain secrecy over all confidential information provided to it by Contour "in connection with the design and manufacture of molds and/or the Products," a term defined as "various types of computer mechanisms and mouse." The agreement called for Chance to "manufacture, process and assemble the Products," setting forth a schedule for delivery of the Products over a maximum two-year period, at which point the agreement was to expire, though the confidentiality provision "shall survive the termination or expiration of the agreement."

The manufacturing agreement also contained a "Penalty" provision stipulating that if "any Products . . . are found to have been directly or indirectly manufactured, sold or delivered by [Chance] . . . in violation of this Agreement," then Chance will pay the greater of (a) the "gross sales price of all such

---

jurisdiction for a Delaware corporation with its principal place of business, at least at that point, in California.

    Moreover, given the uniform nature of the Trade Secrets Act, there is no reason to believe that Colorado would interpret its version any differently from the way New Hampshire--or any other state--would interpret its version of the Act.  In the absence of an actual conflict between the potentially applicable law of another jurisdiction and its own, New Hampshire simply applies its own law.  See Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 13 (1988).

Products or items manufactured, sold or delivered during the term of this Agreement" or (b) 20,250,000 New Taiwan dollars.[3]

There is no dispute that this manufacturing agreement terminated when Chance delivered all of the goods required of it. As Contour proceeded to develop additional ergonomic mouse products, however, Chance continued to serve as the exclusive manufacturer of those products.  Contour provided the designs and technical information for these products to Chance, including at meetings where Chance employees worked with Contour to implement its designs.[4]  Chance continued to maintain secrecy over the confidential information provided by Contour.

In 2006, Contour designed the most recent installation in its ergonomic mouse series, the "Roller Mouse Free," which represents an improvement over prior models in its "open bar"

---

[3]The manufacturing agreement also provided that it "shall be governed by and construed in accordance with the laws of the Republic of China."  Because neither party has argued Chinese law--or any other law but New Hampshire's--at this point, see note 2, supra, the court need not yet consider the potential applicability of this provision.

[4]In his declaration submitted just before the hearing, Yuan denies that Contour provided any designs, alleging that it was Chance's engineers who designed the products.  Viewed in the light most charitable to Chance, this statement seems to suggest that the "designs" for Contour's products were Chance's because its engineers figured out how to make them.  As discussed infra, though, even if that characterization is accurate, it does not follow that Contour's concepts for the products, even if not fully realized, are not protectable trade secrets.

design, i.e., there is no housing around the roller.   Contour
characterizes the "concept, design and specifications" of the
Roller Mouse Free as a trade secret, noting that it generally
"has expended large sums of money in the design, development, and
marketing of its products."[5]   As reflected in drawings shown to
Chance, Contour originally designed the Roller Mouse Free to have
a removable roller bar to allow for easier cleaning.   But due to
delays in engineering this feature, as well as staff turnover at
Chance, Contour ultimately decided to defer including a removable
roller until the next "Roller Mouse" release.   Contour told
Chance of that decision in August 2008.

Within a few months, however, Contour learned that defendant
EKTouch was marketing a mouse called the "ERGO Roller," which
Contour characterizes as "significantly similar to the Roller
Mouse Free"--but with the elusive removable roller.   EKTouch has
been offering its product at a much lower price than what Contour
charges for the Roller Mouse Free, though Contour does not know
of any sales of the ERGO Roller to any of Contour's distributors,
or to anyone in the United States at present.   EKTouch, however,

---

[5]As the defendants point out, Contour's president does hold
a patent for a "Tray Mounted Cursor Control Input Device for
Integration with Computer Keyboard."   U.S. Patent No. 7,199,792
(filed Nov. 20, 2001).   But the patent does not appear to embody
the open bar design or, more importantly, the removable roller
bar described _infra_.

has agreed to meet with at least one of Contour's distributors in Las Vegas at the Consumer Electronics Show, scheduled to take place from January 7 through January 10, 2010, leading Contour to suspect that EKTouch plans to use that stage for the American premiere of the ERGO Roller.  That distributor, in fact, has contacted Contour to express doubt about their continuing relationship in light of the ERGO Roller's availability.

Contour charges that, because EKTouch and Chance have the same main principal, business address, and telephone number listed on their corporate filings, Chance must be manufacturing the ERGO Roller for it--which the defendants have not denied.[6] Contour further claims that this amounts to a misappropriation of its trade secrets by both defendants, presumably because one or both of them used those secrets in designing the product.

Contour therefore asks for a temporary restraining order preventing either defendant "from showing, selling, marketing, distributing, discussing or displaying" the ERGO Roller at the Consumer Electronics Show or, for that matter, "to any person . . . within the United States."  Contour has historically been the only "centrally located Ergonomic Mouse manufacturer"

---

[6]In Yuan's declaration, in fact, he states that he is "the President of Chance Mold/EK Touch" and suggests that EKTouch did not even come into existence until 2009.

8

(parenthetical omitted) to appear at the Consumer Electronics Show, and invited a number of its customers to attend this year. Unless the defendants are restrained from hawking the ERGO Roller at the show, Contour fears that its relationships with these customers will be jeopardized.

## II.  __Applicable legal standard__

In deciding whether to issue a temporary restraining order, this court examines (1) the plaintiff's likelihood of success on the merits of its claim, (2) the risk of irreparable harm to the plaintiff absent the injunction, (3) how that threatened harm balances against the harm that granting the motion threatens to cause the defendant, and (4) any effect the ruling would have on the public interest.  <u>See</u>, <u>e.g.</u>, <u>Naser Jewelers, Inc. v. City of Concord</u>, 513 F.3d 27, 32 (1st Cir. 2008).  While all four factors must be considered, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits."  <u>New Comm Wireless Servs. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002).

That point is particularly apt here because, as discussed <u>infra</u> at Part III.A, (1) irreparable harm to the plaintiff is generally presumed to follow from the violation of intellectual property rights (and has been shown here in any event),

(2) injunctions to protect those rights are generally considered to serve the public interest, and (3) the balance of harms presumptively favors Contour (assuming it can show a likelihood of success on the merits).  So Contour's motion, like most motions for preliminary relief, hinges on its likelihood of success on the merits.  As discussed at Part III.B _infra_, Contour has made a sufficient showing in that regard to justify the issuance of its requested restraining order.

### III. <u>Analysis</u>

### A. Irreparable harm, balance of harms, and the public interest

First, there is no serious question that the harm Contour faces without an injunction would be irreparable.  As Contour points out, New Hampshire's version of the Uniform Trade Secrets Act specifically authorizes an injunction against misappropriation, N.H. Rev. Stat. Ann. § 350-B:2, I, and a number of courts have held--due to this provision in the Uniform Act or otherwise--that irreparable harm can be presumed to follow from such conduct.[7]  <u>See</u>, <u>e.g.</u>, <u>Union Nat'l Life Ins. Co. v. Tillman</u>,

---

[7]Pointing out that § 2 of the Act provides that "[i]n exceptional circumstances, an injunction may condition future use upon the payment of a reasonable royalty," N.H. Rev. Stat. Ann. § 350-B:2, II, the defendants argue that they should be permitted to market the ERGO Touch at the Consumer Electronics Show subject to this limitation.  Under the Act, though, "[e]xceptional

143 F. Supp. 2d 638, 641-42 (N.D. Miss. 2000); <u>Inflight
Newspapers, Inc. v. Magazines In-Flight, LLC</u>, 990 F. Supp. 119,
123-24 (E.D.N.Y. 1997); <u>PepsiCo, Inc. v. Redmond</u>, No. 94-6838,
1996 WL 3965, at *28-*29 (N.D. Ill. Jan. 2, 1996); <u>cf.</u> <u>Capital
Tool & Mfg. Co. v. Maschinenfabrik Herkules</u>, 837 F.2d 171, 172-73
(4th Cir. 1988) (noting that, while irreparable harm is not
essential to an injunction against a violation of the Act, a
court can still consider that factor in deciding whether to grant
injunctive relief).

That rule is consistent with authority from the court of
appeals that presumes irreparable harm in cases of trademark
infringement, <u>see</u> <u>I.P. Lund Trading ApS v. Kohler Co.</u>, 163 F.3d
27, 33 (1st Cir. 1998), or copyright infringement, <u>see</u> <u>Concrete
Mach. Co. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 611-12
(1st Cir. 1988).  It is also consistent with the parties'

---

circumstances include, but are not limited to, a material and
prejudicial change of position prior to acquiring knowledge or
reason to know of misappropriation."  The defendants do not
explain how that describes their situation; as discussed <u>infra</u>,
the materials now before the court strongly suggest that EKTouch
knew that the removable roller concept was Contour's trade
secret.  Nor do the defendants persuasively demonstrate other
"exceptional circumstances."  <u>See</u> Uniform Trade Secrets Act § 2
cmt., 14 ULA 620 (2005) (noting that "[e]xceptional circumstances
include the existence of an overriding public interest," e.g.,
that "enjoining a misappropriator from supplying the U.S. with an
aircraft weapons control system would have endangered military
personnel in Viet Nam").

understanding, expressed in the NDA, that Chance's breach of the

agreement will cause Contour "irreparable harm for which no

adequate remedy exists at law."  This provision, while not

dispositive of the issue, lends further support to a finding of

irreparable harm.[8]  See, e.g., Baker's Aid, Div. of M. Raubvogel

Co. v. Hussman Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987).

In any event, Contour has specifically demonstrated

irreparable harm.  Should EKTouch begin marketing its ERGO Roller

to American customers at the Consumer Electronics Show, it will

injure Contour's existing relationships with its customers, who

(as has already happened in one documented instance) may well

view the ERGO Roller as a superior and cheaper alternative to

Contour's existing product line.  That sort of competitive wrong

---

[8]In arguing that injunctive relief is nevertheless
inappropriate, the defendants rely on the penalty provision of
the manufacturing agreement which, as discussed supra, provides
for actual or liquidated damages in case Chance manufacturers
goods in violation of that agreement.  At this stage, however,
there are numerous problems with this argument, including that:
(1) the provision does not say that damages are the exclusive
remedy for a breach; (2) the NDA provides that injunctive relief
is the appropriate remedy, at least for a breach constituting a
misappropriation of Contour's trade secrets; (3) the
manufacturing agreement has expired (though neither its
confidentiality provision nor the NDA has); and (4) the
defendants make no attempt to show that the penalty clause,
insofar as it authorizes liquidated damages, meets the criteria
necessary to enforce such a provision under New Hampshire law,
see Orr v. Goodwin, 157 N.H. 511, 514 (2008), if in fact New
Hampshire law applies, see notes 2-3, supra.

cannot readily be righted by money damages and is appropriately remedied by injunctive relief.  <u>See</u> <u>Gen. Elec. Co. v. Sung</u>, 843 F. Supp. 776, 778 (D. Mass. 1994) (issuing injunction to prevent defendants' use of misappropriated trade secrets which "enabled them to produce [goods] for commercial sale and thereby to compete with [plaintiff] in the [relevant] industry before it would have been otherwise possible").  Indeed, that is the very premise of § 2(a) of the Uniform Trade Secrets Act, which authorizes an injunction "to eliminate commercial advantage that otherwise would be derived from the misappropration."  N.H. Rev. Stat. Ann. § 350-B:2, I.

The public interest likewise favors the issuance of an injunction against the misappropriation of trade secrets to "reinforce the public policy of commercial morality."  <u>Gen. Elec.</u>, 843 F. Supp. at 778; <u>cf.</u> <u>Borinquen Biscuit Corp. v. M.V. Trading Corp.</u>, 443 F.3d 112, 115 (1st Cir. 2006) ("as a matter of public policy, trademarks should be protected against infringing uses"); <u>Concrete Mach.</u>, 843 F.2d at 612 ("it is virtually axiomatic that the public interest can only be served by . . . preventing the misappropriation of the skills, creative energies, and resources which are invested" in copyrighted works).  The

defendants' argument that Contour has failed to show that an injunction would serve the public interest is without merit.[9]

## B.    Likelihood of success on the merits

New Hampshire's Uniform Trade Secrets Act defines "misappropriation," in relevant part, as "use of a trade secret of another without express or implied consent by a person who," at that time, "knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it."  N.H. Rev. Stat. Ann. § 350-B:1, II(b)(2).  The term "improper means" includes, also in relevant part, "breach or inducement of a breach of a duty to maintain secrecy."  Id. § 350-B:1, I.

To show a likelihood of success on its claim for misappropriation of trade secrets sufficient to enjoin EKTouch, then, Contour must show that (1) it had a trade secret, (2) EK Touch is using it, and (3) EKTouch knows or has reason to know that it has derived its knowledge of the trade secret through a

_____

[9]As the defendants suggested at the hearing, the public interest generally favors competition in the marketplace, but that principle yields when the competition in question embodies the misappropriation of trade secrets or other unfair forms.  See Concrete Mach., 843 F.2d at 612.  That is why a likelihood of success on the merits on a trade secrets claim virtually guarantees that a remedial injunction will serve the public interest.

14

person--namely Chance--who used improper means to acquire it.
See Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir.
1985).  The court finds that Contour has made an adequate showing
as to each of these elements.

### a.  Contour's trade secret

While Contour's written submissions are somewhat elliptical
on what exactly its trade secrets are, it clarified at the
hearing that the trade secret at issue is its "idea" or "concept"
for the removable roller.[10]  The Uniform Trade Secrets Act
defines "trade secret" as

> information, including a formula, pattern, compilation,
> program, device, method, technique, or process, that:
>
> (a) Derives independent economic value, actual or
> potential, from not being generally known to, and not
> being readily ascertainable by proper means by, other
> persons who can obtain economic value from its
> disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable
> under the circumstances to maintain its secrecy.

N.H. Rev. Stat. Ann. § 350-B.1, IV.  Contour's idea to
incorporate a removable roller into its ergonomic mouse series

---

[10]Contour argued that its protectable trade secrets also
included its marketing methods, sales volumes, and profit
margins.  Since there is no evidence before the court at present
that Contour ever shared this data with Chance, or that EK Touch
plans to make use of it, the court need not consider the trade
secret status of that information here.

possesses both of these characteristics, at least based on the
evidence submitted to the court so far.

First, Contour's idea has the independent economic value
required by § 350-B.1, IV(a).  That section of the Act
encompasses confidential information that has "potential"
economic value, not just "actual" economic value, and therefore
"extends protection to a plaintiff who has not yet had an
opportunity or acquired the means to put a trade secret to use."
Uniform Trade Secrets Act § 1 cmt., 14 ULA 538 (noting that the
Act eliminated the prevailing common-law requirement "that a
trade secret be continuously used in one's business") (internal
quotation marks omitted).

A number of courts have applied the Act "to confidential
disclosures of concepts, or as yet-untested, ideas for a new
product or a new process."  2 Roger M. Milgrim, Milgrim on Trade
Secrets § 9.05[4], at 9-487--9-488.2 & n.36 (Eric E. Bensen, ed.,
2003 rev. ed. & 2009 supp.) (discussing cases).  These include
the Seventh Circuit's decision in Learning Curve Toys, Inc. v.
Playwood Toys, Inc., 342 F.3d 714 (7th Cir. 2003), which
overruled a directed verdict against a trade secret claim based
in part on the district court's conclusion that the plaintiff's
concept for a new product "had no economic value" because its
"prototype did not work perfectly" and therefore "lacked value

16

until it was refined, developed and manufactured by" the defendant.  Id. at 726.

The court of appeals relied on evidence at trial that the concept had value in the industry nonetheless, including the fact that, once the concept was perfected by the defendant, its sales "skyrocketed" despite the defendant's prior difficulties in differentiating its products from those of its entrenched competitor.  Id.  In light of such evidence, that the plaintiff "did not actually use the concept in its business" was "irrelevant," because a jury could have found that "the concept was 'of value' to" the plaintiff, which was sufficient to convey the "economic value" the Act demands.  Id. at 727.

This court considers Learning Curve both persuasive and instructive here.  It is true, as the defendants emphasize, that Contour's concept for an ergonomic mouse with a removable roller proved difficult to execute, to the point that Contour decided to release the new version of its Roller Mouse product without that feature.  As in Learning Curve, however, there is evidence that the removable roller concept had "potential economic value" nonetheless:  despite the fact that neither Chance nor EKTouch had ever sold its own products, they experienced early success in marketing the ERGO Roller, as reflected in the interest of one of Contour's customers as well as EKTouch's plan to showcase the

17

product at the Consumer Electronics Show--where Contour had previously been the only seller of similar products.

Also as in Learning Curve, this chronology supports a finding that the removable roller concept derived its value from its secrecy, i.e., "not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."[11]  The fact that Chance, despite its decade of experience in manufacturing ergonomic mouse products, had not incorporated a removable roller into any of those products until after Contour had divulged that concept to Chance tends to indicate that the concept was not "readily ascertainable."  And, so far as the record shows, nobody else had marketed an ergonomic mouse with a removable roller before that time, suggesting that the concept was not "generally known."  In short, if the concept "really was obvious" in the

---

[11]In attempting to dispute this point, the defendants rely solely on the patent Wang holds on an ergonomic mouse device. See note 6, supra.  That patent, though, does not appear to disclose the removable roller.  Without more, the patent in no way undermines Contour's likely success on its claim that the removable roller concept was a trade secret.  See 2 Rudolf Callman, The Law of Unfair Competition, Trademarks and Monopolies § 14:29, at 14-251--14-252 (Louis Altman, ed., 4th ed. 1982 & 2005 rev.) ("trade secret protection may coexist with patent protection on the same product if the published patent does not destroy the trade secret.  The mere fact that a trade secret further implements a patented invention does not affect its status as a protectable trade secret.") (footnotes omitted).

18

sense that it was readily ascertainable or generally known, then Chance--or someone else in the industry--"would have thought of it earlier." Id. at 729.

Second, Contour's removable roller concept was the subject of reasonable efforts to maintain its secrecy, as also required of a protectable trade secret. There is no indication that Contour divulged the concept to anybody besides Chance, who had agreed in the NDA to preserve the secrecy of Contour's "Confidential Information," defined to include "concepts and ideas . . . relating to consumer mouse products." That would seem to encompass Contour's concept for the removable roller.[12]

Even if it did not, however, Contour attests that it had received assurances from Chance that "all of Contour's ideas,

---

[12]At the hearing, the defendants maintained that, in light of the relationship between the NDA and the manufacturing agreement, the former provided for confidentiality over only information disclosed during the life of the latter; under this view, the NDA's 20-year term dictated the length of Chance's obligation to preserve the secrecy of whatever it learned from Contour during the term of the manufacturing agreement, rather than whatever Chance learned from Contour during the term of the NDA. This argument has some plausibility, but it is not without its weaknesses: for example, the manufacturing agreement has its own confidentiality provision which specifically states that it is "[i]n addition to" the one in the NDA, suggesting that the duration of one is not necessarily tied to the duration of the other. Given the breadth of the NDA's definition of "Confidential Information," the court takes the view, for the moment at least, that it includes Contour's removable roller concept, even though it was not disclosed to Chance until after the manufacturing agreement had expired.

trade secrets, products, specifications and know-how would remain
secret from others" (emphasis added), and Chance has not
meaningfully disputed that the parties labored under this broad
understanding of confidentiality throughout their relationship.[13]
The fact that these assurances were verbal, moreover, is not
fatal to Contour's claim, because the Trade Secrets Act does not
require written confidential agreements, only "efforts that are
reasonable under the circumstances." <u>See</u>, <u>e.g.</u>, <u>Learning Curve</u>,
342 F.3d at 725-26; <u>Editions Play Bac, S.A. v. W. Publ'g Co.</u>,
1993 WL 541219, at *8 (S.D.N.Y. Dec. 28, 1993); 2 Callman, <u>supra</u>,
§ 14:26, at 14-204.

Indeed, over the course of Chance's ten-year relationship
with Contour prior to their discussion of the removable roller
concept, Chance had never, so far as Contour knows, disclosed any
of its confidential information to any third parties.  Based on
this history, Contour could have reasonably believed that no

---

[13]Yuan's declaration states that "[o]n March 27, 2007,
Contour authorized Chance to develop and design certain new
products, but did not require confidentiality."  This statement
appears to refer to another of the defendants' submissions, an
"Authorization" document purporting to bear Wang's signature.
Putting aside the fact that the "Authorization" is largely
unintelligible, neither it nor Yuan's declaration indicates what
"products" it covers.  So the defendants have provided no support
for the notion that--contrary to Wang's account of how the
parties had done business in the past--Contour permitted Chance
to produce any version of the Roller Mouse Free without
preserving Contour's confidential information.

further precautions, such as additional written confidential
agreements, were necessary.  As the court of appeals has
observed, "a confidential relationship typically will be implied
where disclosures have been made in business relationships,"
including between "purchasers and suppliers."  Burten, 763 F.2d
at 463.  Accordingly, based on the materials before the court at
this stage, Contour has shown that its removable roller concept
was "the subject of efforts that [were] reasonable under the
circumstances to maintain its secrecy."  Cf. Mortgage
Specialists, Inc. v. Davey, 153 N.H. 764, 771-72 (2006) (finding
no such efforts as a matter of law where the documents containing
the information "were never marked confidential or trade secret"
and the employees handling them "were not consistently and
uniformly given instructions as to the proper treatment of the
information as confidential").

> **b.   EKTouch's use of the trade secret**

As just discussed, there is no question at the moment that
Chance--and EKTouch, by virtue of its close relationship with
Chance--came by their knowledge of the removable roller concept
as a result of Chance's dealings with Contour.  There is also no
question that, as Contour alleges, EKTouch's ERGO Roller is
substantially similar to Contour's Roller Mouse Free, except that

EK Touch's product boasts the removable roller that Contour decided to omit from its latest ergonomic mouse.

"These showings--access and similarity--may support a trade secret misappropriation claim" because they suggest that the defendant derived its product from the plaintiff's trade secret, rather than from an independent source. Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1361 (Fed. Cir. 2002). While the defendants dispute that the removable roller concept was a protectable trade secret, they do not dispute (at least for present purposes) that the ERGO Roller incorporates that concept. Due to the similarity between that product and Contour's original concept of the Roller Mouse Pro, and the defendants' access to that concept--as well as the fact that the ERGO Roller appeared just months after Contour had informed Chance that the Roller Mouse Pro would not include the removable roller--the court finds (for present purposes) that EKTouch used Contour's removable roller concept in developing the ERGO Roller.

### c.  EKTouch's knowledge that the trade secret was derived through improper means

Finally, there is also no serious dispute, based on what is now before the court, that EKTouch "knew or had reason to know that [its] knowledge of the trade secret was derived from or

through a person who had utilized improper means to acquire it,"
N.H. Rev. Stat. Ann. § 350-B:1, II(b)(2), i.e., "breach or
inducement of a breach of a duty to maintain secrecy," id.
§ 350-B:1, I.  As already noted in several places, Chance and
EKTouch share the same president, which is reason enough to find
that Chance as a corporate personage "knows" what EKTouch "knows"
as a corporate personage.  See, e.g., United States v. Bank of
New Eng., N.A., 821 F.2d 844, 856 (1st Cir. 1987); New Hampshire
v. Zeta Chi Fraternity, 142 N.H. 16, 22 (1997).

EKTouch knew, then, that Chance had "a duty to maintain
secrecy" over Contour's confidential information, including the
removable roller concept, by virtue of either the written
confidentiality provision of the NDA or Chance's verbal
assurances to the same effect, as already discussed.  See Part
III.B.a, supra.  Whatever its source, that duty prevented Chance
from disclosing any of Contour's confidential information to
anyone else without Contour's consent (which, so far as the
record reflects, it never gave).  As also already discussed, see
id., the removable roller concept was neither generally known nor
readily ascertainable, so the record as it stands fairly compels
the conclusion that EKTouch gained its knowledge of the concept
from Chance--in what both parties knew was a breach of Chance's
duty.  Based on the materials presently before the court, Contour

has shown that EKTouch knowingly derived its appreciation of the removable roller through Chance's breach of its duty of secrecy, making EKTouch's use of that concept a misappropriation under the Act.  N.H. Rev. Stat. Ann. § 350-B.1, II(b)(2).

## IV.  __Conclusion__

Contour has demonstrated a likelihood of success on the merits of its claim that EKTouch's ERGO Roller product amounts to a misappropriation of one of Contour's trade secrets.  Contour has also satisfied the other criteria for issuance of a temporary restraining order issued with prior notice to the defendant. The court therefore GRANTS Contour's motion for a temporary restraining order,[14] which has been entered on the docket as a separate document.[15]

As that document indicates, the issuance of the order was contingent upon Contour's giving "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Based on Contour's submission, and in the absence of any countervailing evidence or argument from the defendants, the

---

[14]document no. 2.

[15]document no. 11.

court finds the sum of $50,000 sufficient for that purpose, and notes that Contour has posted such security according to the court's instructions.[16]

The temporary restraining order also indicates that it shall expire fourteen days from the date it issued.  See Fed. R. Civ. P. 65(b)(2).  As discussed at the hearing, however, the court anticipates conducting proceedings to dissolve the temporary restraining order or convert it into a preliminary injunction at the parties' earliest convenience.  See Fed. R. Civ. P. 65(b)(3).

**SO ORDERED.**

/s/Joseph N. Laplante
Joseph N. Laplante
United States District Judge

January 14, 2010

cc:  Lawrence L. Blacker, Esq.
     Peter G. Callaghan, Esq.

---

[16]document no. 12.