UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Contour Design, Inc.

     v.                             Civil No. 09-cv-451-JL

Chance Mold Steel Co., Ltd., et al.


**REPORT AND RECOMMENDATION**

     Before me is plaintiff's motion for preliminary injunction
(Doc. No. 31).  An evidentiary hearing took place on August 26,
2010.  For the reasons stated below, I recommend that the court
grant the motion and order injunctive relief as set forth below.

## I.   **Factual Background**

     Plaintiff Contour Design, Inc. ("Contour") is a Delaware
corporation having its usual place of business in Windham, New
Hampshire.  Contour designs, manufactures, and sells
ergonomically friendly "computer pointing devices," also known
as mouse products.  (Doc. No. 48, p. 1).  The products from
Contour's Roller Mouse line feature a wide roller bar
incorporated into a component placed centrally below the
keyboard, as opposed to the configuration of a traditional
computer mouse, which has a narrow trackball incorporated into a
smaller component placed to one side of the keyboard.

Defendants Chance Mold Steel Co., Ltd. ("Chance") and EKTouch Co., Ltd. ("EKTouch") are corporations organized under the laws of Taiwan.  Chance is a mold maker, designer, and manufacturer.  EKTouch sells computer mouse products under its own trade name and for a Swedish company, Ergoption AB.  EKTouch is not a signatory to the confidentiality agreement at issue in this case.  Nevertheless, the parties proposed in their Joint Statement of Agreed and Disputed Facts that Chance and EKTouch be factually treated, for purposes of the preliminary injunction proceeding, "collectively" as "Chance."  (Doc. No. 48, p. 1, ¶ 2).  It is undisputed that EKTouch is owned by Chance and that the companies have the same owners, principal place of business, and phone number.  (Doc. No. 50, p. 2, ¶¶ 2, 8).  For purposes of the preliminary injunction motion, the court refers throughout this report and recommendation to defendants Chance and EKTouch collectively as "Chance."

In early 1995, Contour entered into a manufacturing relationship with Chance whereby Chance agreed to manufacture mouse products for Contour.  (Id. at p. 2, ¶ 3).  On June 15, 1995, Contour and Chase executed a Non-Disclosure Agreement ("NDA") and a Letter of Intent to Develop the Contour Mouse ("LOI").  (Doc. No. 47, p. 1; Pl. Exs. P-12, P-13).  In 1996 Chance began manufacturing the Contour Mouse.  On December 1,

1996, Contour and Chase executed a Manufacturing and Supply

Agreement for the manufacture of the Contour Mouse

("Manufacturing Agreement").  (Pl. Ex. P-14; Doc. No. 47, p. 2;

Doc. No. 48, p. 2, ¶¶ 3-6).

The LOI expressed the parties' intentions to develop

plaintiff's Contour Mouse product.  (Pl. Ex. P-13).   It

contains a confidentiality provision related specifically and

only to the Contour Mouse.  (Id.)  Section 1 of the NDA likewise

obligates Chance to keep secret and to refrain from using

Contour's "confidential information."  (Pl. Ex. P-12).

"Confidential information" is defined as Contour's "inventions,

designs, methods, samples, market information concepts and ideas

. . . relating to computer mouse products and related

materials."  Under the NDA, "computer mouse products and related

materials" collectively comprise Contour's "Product."  (Id.)

The NDA also contains a non-compete clause, Section 3,

which prohibits Chance from duplicating, producing,

manufacturing "or otherwise commercially exploit[ing]" Contour's

products or "any other product derived from or based on"

Contour's products.  In the NDA Chance acknowledged that its

breach of the NDA will cause Contour "irreparable harm for which

no adequate remedy exists at law, and that upon any such breach

or threatened breach [Contour] shall be entitled to injunctive

relief."  The NDA further provides that Colorado law "shall
apply to [its] performance and interpretation."  Finally, the
NDA provides for a defined "period of protection," whereby
Chance's obligations under the NDA "shall expire twenty years
from the date of this agreement."  (Id.)

From 1995 to 2010, Chance was Contour's exclusive contract
manufacturer of mouse products.  Tr. at 51.[1]  The parties
verbally agreed that Chance would not disclose or use Contour's
confidential information (Id. at 46-47), and from 1995 through
2008, Chance abided by that agreement.  (Id. at 59).

From 2003-04, Contour developed its "Roller Mouse Pro"
("Contour Pro") and related firmware at a cost to Contour of
approximately $200,000.  (Id. 61-62; 93-95).  The firmware is a
computer code that is programmed into a mouse and defines how
the mouse functions.  Chance began manufacturing the Contour Pro
for Contour in January 2005.  From 2006 to 2009, Contour
developed the Roller Mouse Free ("Contour Free").  Chance began
manufacturing the Contour Free for Contour in 2009.  (Doc. No.
47, p. 2; Tr. 64, 95).  Marco Laurenzano, a Contour employee,
developed the firmware for both the Contour Pro and Contour
Free.

---

[1]"Tr." signifies the uncertified transcript of the August 26,
2010, evidentiary hearing in this case.

Contour's work on both the Contour Pro and Contour Free
entailed development of multiple prototypes.  (Tr. 82-87).  The
production tooling for both these products was developed through
a back and forth process of refinement between the parties,
based on designs and concepts supplied by Contour.  Chance was
compensated for its work on the tooling through an agreed-upon
premium Chance received for every Contour Pro and Contour Free
it manufactured.  (Id. at 69, 75-76, 90-91).

Contour's original concept for the Contour Free was to
include a removable roller.  Contour communicated that concept
to Chance.  Delays in developing a removable roller for the
Contour Free prompted Contour to produce the Contour Free
without a removable roller and to save the removable roller for
a later version of the product.  (Id. at 64-65).

From the beginning of its relationship with Contour until
the end of 2008, Chance did not manufacture any computer mouse
or competing mouse products for any company other than Contour.
In 2009, however, Chance began marketing its Ergo Roller
("Ergo") under the EKTouch trade name.  (Doc. No. 47, p. 2).
The Ergo is a computer mouse product with a removable roller
bar.

In late 2009, Contour filed the present suit for trade
secret misappropriation and breach of contract against Chance

for their production and marketing of the Ergo.  In January 2010, the court (LaPlante, J.) granted Contour's motion for a temporary restraining order enjoining Chance's production and marketing of that product.  Contour Design, Inc. v. Chance Mold Steel Co., No. 09-cv-451-JL, 2010 WL 174315 (D.N.H. Jan. 14, 2010) ("TRO Decision").  In April 2010, Chance refused to manufacture any products for Contour and has refused Contour's request for the return of its production tooling.  (Doc. No. 47, p. 2).

Sometime in 2010, Chance began selling its "Professional" and "Open" roller mouse products to the Swedish company Ergoption AB, which is owned and operated by Mr. Gunnar Drougge. Ergoption sells the Chance Professional and Open products in Europe.  (Id. at 2-3).  In settlement of a lawsuit brought by Contour against Ergoption, the latter enjoys a broad license from Contour to "make [or] have made" computer mouse products covered by certain Contour patents.  (Pl. Ex. P-18).

The parties have stipulated that Chance is using the Contour Pro and Contour Free production tooling to produce the Chance Professional and Chance Open and that Chance has not returned the tooling to Contour.  (Doc. No. 48, p. 3, ¶¶ 16-18). Contour did not give permission to Chance (or EKTouch) to manufacture the Chance Professional or the Chance Open.  (Id. at

2, ¶ 14).  Contour amended its complaint in June 2010 to include
trade secret misappropriation and breach of contract claims
relating to the Chance Professional and Chance Open products.
(Doc. No. 30).

Chance suggests that Contour does not own the production
tooling for the Contour Pro and Contour Free, that Chance
independently developed the firmware for the Chance Professional
and Chance Open, and that it owes Contour no confidentiality or
non-compete obligations with respect to those products.  As
explained below, the evidence fails to support these
contentions.

II.  **Procedural Background**

Contour brought its four-count amended complaint (Doc. No.
30) against Chance alleging violation of New Hampshire's Uniform
Trade Secrets Act (N.H. Rev. Stat. Ann. § 350-B:1) ("UTSA") and
breach of the parties' NDA.

In the TRO Decision, the court granted Contour's motion for
a temporary restraining order enjoining Chance (and EKTouch)
from selling and marketing Chance's product known as the Ergo
Roller, or any similar product.  2010 WL 174315, at *8.  The
court found, on the abbreviated record then before it, that
Contour is likely to prevail on its claim that Chance

misappropriated plaintiff's trade secret in violation of New Hampshire's UTSA.  Id.

Plaintiff thereafter filed the instant motion for preliminary injunction.  (Doc. No. 31).  Plaintiff's motion seeks to enjoin Chance (and EKTouch) from selling, distributing, and marketing "any product that is the same or similar to those manufactured" by Chance, including the Chance Open and Chance Professional computer mouse products.  Two preliminary issues regarding plaintiff's motion need to be addressed: (A) the scope of the relief sought; and (B) the claims on which the motion is based.

### A. Scope of Relief

With respect to the scope of relief, on August 24 (two days before the hearing), plaintiff filed its "Proposed Order" (Doc. No. 52-1), as required by this court's July 30, 2010, order. (Doc. No. 40).  In its Proposed Order, plaintiff seeks relief that is broader in scope than the relief requested in its underlying motion for preliminary injunction.  Specifically, plaintiff's Proposed Order includes a provision for the return of its production tooling and, further, adds Chance's Ergo mouse product to the list of products it seeks to enjoin Chance from producing.  Chance objects to plaintiff's last minute request to include the Ergo in the injunction, and correctly notes that

Ergo "was scarcely discussed during the hearing."  (Doc. No. 64, p. 13).

The proper route for plaintiff to expand its request for relief would have been the filing of a motion to amend the motion for preliminary injunction.  Though the motion for preliminary injunction contains a catch-all "including but not limited to" phrase that could conceivably encompass the Ergo, that is not sufficient notice to the defendant or the court. Plaintiff knew for three weeks the date on which the hearing would be held, but chose to "request" additional relief only two days before the hearing by embedding the request in a Proposed Order.  Plaintiff should have placed the issue of the scope of the injunction squarely before the court through a proper motion.  A decision by this court to disregard the request for relief related to the Ergo is supported by the fact that plaintiff did not argue in its post-hearing brief anything about the Ergo.  For these reasons, the court does not consider the Ergo in its analysis.

Even if the court were to include the Ergo in its analysis, however, there are serious doubts about whether the concept for a removable roller was "confidential information" when Contour's president, Steven Wang, communicated the idea to Chance.  After entry of the TRO, Chance filed its Answer to the Amended

Complaint (Doc. No. 35), to which Chance attached two patents, one dated 1992 and the other dated 2002.  (Doc. Nos. 35-2, 35-3).  In opposition to the motion for preliminary injunction, Chance relies on these patents to argue that the removable roller concept was in the public domain prior to Steven Wang's communication of the idea to Chance.  (Doc. No. 64, pp. 13-14).  The court agrees that the patents raise serious doubts about whether the removable roller concept had the character of "confidential" information.  See NDA, Pl. Ex. P-12 (excluding public domain information from definition of "confidential information").

**B. Claims for Relief**

The second threshold issue before the court concerns exactly what claims plaintiff is relying on to justify the injunction it seeks.  From the multiple submissions in support of its motion, it is clear that plaintiff is relying on its likelihood of success in proving Chance's breach of the NDA.  The record is muddled, however, as to whether plaintiff is also relying on its likelihood of success in proving its UTSA trade secret misappropriation claim against Chance.  Specifically: (1) the motion does not specify the claim or claims for which plaintiff seeks injunctive relief (Doc. No. 31); (2) plaintiff's pre-hearing memorandum in support of its motion discusses

10

likelihood of success on the merits only with respect to its claim for breach of the parties' NDA (Doc. No. 32, pp. 6, 12); (3) in its pre-hearing reply brief, plaintiff refers to its likelihood of success in proving its trade secrets misappropriation claim (Doc. No. 49); (4) in its proposed conclusions of law, plaintiff lists, in addition to a conclusion that Chance breached the NDA, a conclusion that "Chance violated the New Hampshire Uniform Trade Secrets Act."  (Doc. No. 52, pp. 4-5); and (5) plaintiff's post-hearing memorandum does not discuss the New Hampshire UTSA.  (Doc. No. 63).

Because plaintiff is responsible for clearly delineating the bases for the injunction it seeks, the court limits its analysis to that claim plaintiff clearly delineated: Chance's breach of the NDA.[2]

III. **Preliminary Injunction Analysis**

In deciding whether to issue a temporary restraining order, the court examines (1) the plaintiff's likelihood of success on the merits of its claim, (2) the risk of irreparable harm to the

---

[2]Moreover, the court notes that plaintiff has not, as required under UTSA, identified with reasonable specificity the trade secrets that Chance allegedly misappropriated.  Where, as here, computer programming is alleged to be a trade secret, plaintiff cannot simply claim that the entire software or firmware is a trade secret.  See Sutra, Inc. v. Iceland Exp., No. 04-11360-DPW, 2008 WL 2705580, **3-5 (D.Mass. July 10, 2008) (comparing cases).

plaintiff absent the injunction, (3) how that threatened harm
balances against the harm that granting the motion threatens to
cause the defendant, and (4) any effect the ruling would have on
the public interest. See, e.g., Naser Jewelers, Inc. v. City of
Concord, 513 F.3d 27, 32 (1st Cir. 2008).  While all four
factors must be considered, "[t]he sine qua non of this four-
part inquiry is likelihood of success on the merits." New Comm
Wireless Servs. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir.
2002).

### A.  Likelihood of Success on the Merits

Contour alleges that Chance breached both Sections 1 and 3
of the parties' NDA.  As noted, Section 1 is a non-disclosure
provision and Section 3 is a non-compete clause that prohibits
Chance from duplicating, producing, or otherwise exploiting
Contour's products.  For the following reasons, the court finds
that Contour is likely to succeed on its claim that Chance has,
and continues, to breach both sections of the NDA.

### 1. Chance is Bound by the NDA

Offering two rationales, Chance argues that it is not bound
by the terms of the NDA.  The court rejects both arguments.

Chance's first argument against application of the NDA is
that the NDA only obligates Chance to the duties relating to the
Contour Mouse in existence in 1995.  Chance raised this argument

in the TRO proceeding, pointing out that the parties'
Manufacturing Agreement was limited to the Contour Mouse.   In
the TRO Decision, the court rejected that argument.   2010 WL
174315, at *6, n.12.   Relying on the fact that the NDA has its
own, more broadly worded, confidentiality provision, the court
found that the NDA did not "provide[] for confidentiality over
only information disclosed during the life" of the Manufacturing
Agreement.   Id.

       In this preliminary injunction proceeding, Chance
reiterates the argument it made previously, but adds a new piece
of evidence to support its position.   Specifically, Chance
points to the LOI, which was executed the same day as the NDA.
(Pl. Ex. P-13).

       While the LOI is limited, by its terms, to the Contour
Mouse, the court finds that the LOI's narrow scope does not
affect the scope of the separate and broad confidentiality
provision of the NDA.   Like the Manufacturing Agreement, the LOI
contains its own confidentiality provision.   That provision is
limited to information about the "Contour mouse" and states
explicitly that the obligation of confidentiality is "in
addition to" Chance's obligations under the NDA.   (Pl. Ex. P-13,
¶ 3).

In addition, and more importantly, after the parties signed the LOI, the NDA, and the Manufacturing Agreement, they engaged in a course of conduct consistent with a broad interpretation of Chance's confidentiality and non-compete obligations under the NDA.  For fourteen years Contour shared confidential information with Chance, and Chance kept the information confidential.

Furthermore, Steven Wang testified that the parties understood the NDA to be broader in scope than either the LOI or the Manufacturing Agreement.  (Tr. 54, 59).  The declaration of Mei-Ling Wang, president of Chance (Doc. No. 37-5), does not outweigh Steven Wang's testimony.  Though Mei-Ling Wang declares that the parties intended the NDA to cover only mouse products extant in 1995, she provides no details and her declaration is unsworn.[3]

Chance's second argument against application of the NDA is that Contour breached the parties' agreement, thus relieving

---

[3] Chance also relies on a July 2001 Contour press release announcing that the "Roller mouse" is "not a mouse" but a "revolutionary alternative."  Contour's press release announcing its RollerMouse product is weak evidence that Contour's later-developed products are not "mouse products."  Despite announcing that the RollerMouse was not a "mouse" but a "revolutionary alternative," Contour used the word "mouse" in the name of the product.  In addition, the claims about the RollerMouse appear to be little more than standard marketing hyperbole.  Chance's reliance upon this press release to narrow the scope of its confidential duties is unpersuasive.

Chance of any contractual duties.  (Doc. No. 64, pp. 10-13).
Specifically, Chance argues that the parties had an arrangement
whereby Chance developed tooling for numerous Contour products,
including mouse products and iPod cases, without taking payment
up front.  Chance was to receive compensation through the
revenues generated by its manufacturing of the products.
Chance's compensation for the tooling depended, therefore, on
the success of the products in the marketplace and Contour's
continued use of Chance to manufacture the products.

Chance claims that Contour breached that agreement prior to
any of the alleged breaches by Chance.  According to the unsworn
declaration of Mei-Ling Wang, "Contour breached this agreement
in 2006 by beginning to move the manufacturing of some of these
products away from Chance, to a manufacturer in China."  (Doc.
No. 37-1, ¶ 13).  Steven Wang testified to the contrary.
According to Steven Wang, the only products Contour considered
moving to China were iPod cases, not mouse products.  (Tr. 78-
79, 83).  Steven Wang further testified that he discussed with
Chance the possibility of moving to China the manufacturing of
the iPod cases, and the companies made a mutual decision how to
proceed.  He also testified that he assured Chance that the
mouse products would not go to China but would remain with

15

Chance, and that Contour, in fact, continued to have Chance
manufacture the mouse products until 2009.  (Id. at 82).

On this disputed question, the court finds Steven Wang's
sworn, in-court testimony more credible than Mei-Ling Wang's
unsworn declaration.  The court finds that Chance has not shown
a breach by plaintiff that would absolve Chance of its non-
disclosure and non-compete obligations under the NDA.

Accordingly, the court finds that plaintiff is likely to
succeed in establishing that, at all times relevant to this
suit, Chance was obligated to refrain from disclosing and using
Contour's confidential information relating to its mouse
products and from duplicating, marketing, and otherwise
exploiting Contour's mouse products, including the Contour Pro
and Contour Free.

### 2.  Contour's Tooling and Firmware are Confidential Information

Though its briefs lack perfect clarity on the point,
Contour appears to be claiming two categories of confidential
information were improperly disclosed and used by Chance: (1)
Contour's production tooling and the design and implementation
information that went into developing the tooling, and (2) the
firmware for its Contour Pro and Contour Free products.  While
it is unclear whether plaintiff is also claiming confidential

information status for the products' appearance and components,
(such as the buttons, wrist rest, and packaging) (Doc. No. 63,
p. 2), the court will assume as much, and will address that set
of purported confidential information as a separate group
(hereinafter referred to as "appearance and components").[4]

The NDA defines "confidential information" as "inventions,
designs [and] methods . . . relating to [Contour's] computer
mouse products." (Pl. Ex. P-12).  By the express terms of the
NDA, information is not protectable as "confidential" if such
information finds its way into the public domain "other than as
a result of a breach" by Chance.  Id.  In addition, information
subject to the NDA need not meet the strict definition of a
"trade secret" because the NDA broadly defines "confidential
information."  See generally ACAS Acquisitions (Precitech) Inc.
v. Hobert, 155 N.H. 381, 389, 396 (2007) ("Legitimate interests"
that may be protected by contract include "confidential
information other than trade secrets."). [5]  Cf. Modern Controls,

---

[4] Plaintiff also uses the general term "confidential product
design information."  The court finds this phrase to be
ambiguous, and construes it to refer to the specific categories
of information set forth above for which Contour has submitted
evidence.

[5] The NDA provides that Colorado law is to govern the parties'
performance under that contract, and Chance relies on Colorado
law in its submissions (Doc. No. 37-1, pp. 6-7).  However, as

<u>Inc. v. Andreadakis</u>, 578 F.2d 1264, 1268 (8th Cir. 1978)
(holding that confidential information regarding a company's
computer hardware development, while not rising to the level of
a trade secret, was protectable under a covenant not to
compete).

### a. Tooling

The court finds that Contour is likely to establish that
its production tooling, and the design specifications and
information it disclosed to Chance during the development of the
tooling, constitute Contour's confidential information.  The
testimony of Steven Wang shows that the tooling was unique to
Contour's products and was based on Contour's product design and
implementation information.  (Tr. 75-76).  Steven Wang testified
that he spent significant time and effort working with and
directing Chance in the development of the tooling to achieve
such things as "precise fit . . . [and] right feel."  (<u>Id.</u> at
75).  Steven Wang would not "just hand . . . a drawing" of the

_____

the TRO Decision explains, a particular state's law controls
only where there is some significant relationship between the
contract and the jurisdiction.  2010 WL 174315, at *1, n.2.  On
this record, there is no relationship between the NDA and
Colorado.  Moreover, the parties have not pointed to any
practical difference between Colorado and New Hampshire law on
the material questions in this lawsuit.  The court, therefore,
applies New Hampshire law in this preliminary proceeding.

product to Chance, but would also provide substantial feedback during "four or five major iterations" of each tooling product and "guid[e] [Chance] through the final adjustment of the tool to produce the plastic shape precisely the way I want it." (Id.).

Chance suggests that the tooling is not proprietary to Contour. At this preliminary stage, the evidence weighs in favor of Contour on this issue. Steven Wang testified that Contour developed the tooling by supplying product designs and implementation expertise in a back and forth exchange with Chance (id. at 75-76), and that Chance was compensated for its work on the tooling through receipt of a premium from Contour for each piece produced. (Id. at 69). The court credits Steven Wang's testimony.[6] Finally, Chance offered no evidence or argument that the tooling (or the confidential information used to build the tooling) were placed in the public domain or otherwise lost their "confidential" character.

---

[6]Supporting Steven Wang's testimony is the fact that Contour treated the tooling for the Contour Pro as its own proprietary tooling when it placed a memorial inscription on the tooling in honor of a deceased Contour employee. See infra at p. 24.

**b. Firmware**

In addition to its tooling, Contour is likely to succeed in establishing that its firmware for the Contour Pro and Contour Free is Contour's confidential information.

Steven Wang and Laurenzano testified that Laurenzano developed the firmware specifically for Contour's Pro and Contour Free products. (Id. at 94, 146, 153-81). Laurenzano detailed the extensive effort, time, and expertise that went into development of the firmware. (Id. at 153-81). He testified that several features he incorporated into the firmware for the Contour Pro and Contour Free were improvements on Contour's firmware for its original "Classic" mouse. (Id. at 158). He also testified that Contour shared the source code for this firmware with no one outside of Contour. (Id. at 176). Only Chance was given the machine code versions of the firmware.[7] (Id. at 175). Laurenzano further testified that firmware is not easily subject to duplication by simple observation, and that

---

[7]Source code is a text file that a program developer uses to write the firmware. Source code is readable by the developer. Machine code is an encoded form of the source code, consisting of a long string of numbers. Machine code is designed to be understood, or readable, by the central processing unit. (Tr. 151).

duplication by observation alone of the features of Contour Pro and Contour Free firmware was "unlikely."  (Id. at 201-02).

The only evidence Chance submitted purporting to contradict this testimony was the unsworn declarations of Mei-Ling Wang (Doc. No. 59-3) and Hsiu-Yuan Nien, a corporate officer at Chance.  (Doc. No. 59-4).  Both Mei-Ling Wang and Nien state that "the firmware in the Professional and Open roller mouse products sold to Ergoption . . . was designed for us, for these products, by another company."  Both identify an engineer by the name of Jui-Fa Cheng, whom they state worked on the firmware "with one of our engineers."  The declarations lack detail as to the exact work performed by Chance's outside and in-house engineers.  In contrast, the testimony of plaintiff's witnesses, Steven Wang and Laurenzano, provides credible details regarding the tasks, costs, and time that went into Contour's development of the firmware.

For all of these reasons, the court credits the sworn and detailed testimony of Wang and Laurenzano that the firmware for the Contour Pro and Contour Free constitute confidential information, protected by the NDA.  The court's conclusions in this regard are bolstered by the testimony of Howard Eglowstein, a design engineer at a Massachusetts-based company, with an expertise in developing computer firmware.   For the reasons

21

outlined below, Eglowstein's testimony persuaded the court that the firmware Chance used in its Professional and Open was identical to Contour's firmware and was not the product of independent design by Chance.

### c. Appearance and Components

As noted, it is not clear whether Contour is claiming that the appearance and components (Doc. No. 63, p. 4) of its mouse products constitute confidential information.  Contour does admit in its pre-hearing brief, however, that in contrast to the firmware, "the physical hardware components of the Free and Pro can be duplicated from observation."  (Doc. No. 32, pp. 4-5). It is undisputed that Contour placed the Contour Pro and Free into the market prior to Chance's alleged disclosures and misappropriations.  The physical "appearance" of those products and their obvious components, therefore, seem no longer to be confidential in nature.  Nor has plaintiff presented any evidence that the appearance and components have a confidential nature.  Accordingly, the court cannot say on the record before it that those features are confidential information as contemplated by the NDA.

In sum, the court finds that plaintiff is likely to establish that Contour's tooling and firmware for the Contour Pro and Contour Free meet the definition of "confidential

information" under the NDA.  The question next before the court
is whether plaintiff has shown a likelihood of success on its
claim that Chance used or disclosed that confidential
information in a way that violated the NDA.  For the reasons
that follow, the court answers that question in the affirmative.

### 3. Chance Breached the Non-disclosure Provision, Section 1, of the NDA

The evidence that Chance is using Contour's production
tooling and firmware to produce the Chance Open and Professional
is strong.

### a. Tooling

Certain critical facts before the court are undisputed.
First, it is undisputed that Chance has been using the Contour
Free and Contour Pro tooling to produce the Chance Open and
Chance Professional.  (Doc. No. 48, p. 3, ¶¶ 17, 18).  It is
also undisputed that Chance has retained possession of Contour's
tooling and has refused Contour's request for its return.  (Id.
at ¶ 16).

Moreover, the Chance Open and Chance Professional appear
nearly identical to the Contour Free and Contour Pro. Contour
submitted its own and Chance's mouse products as exhibits.  It
would be apparent to anyone looking at the mouse products that
they are similar in appearance.  In addition, Steven Wang

testified regarding the ways in which Chance's products are identical to Contour's products, including the dimensions, shapes, buttons, etc.  (Tr. 103).

The most conclusive evidence that Chance has replicated Contour's tooling came in the form of a story that Steven Wang told about a tribute to a now-deceased Contour employee, "Charlie."  Following Charlie's death from cancer, Steven Wang decided to place a permanent remembrance to him in the tooling for the Contour Pro, a product which Charlie played a large role in developing.  Steven Wang added to the tooling the following phrase: "In memory of Charlie."  Mr. Wang thereby ensured that every future Contour Pro would contain this tribute inside its plastic casing.  (Id. at 107-08).

Mr. Wang did not intend this tribute to be a marker for misappropriation of his tooling.  However, when the plastic casing was removed from Chance's Professional at the hearing, the tribute was visible.  Chance did not offer any explanation for this remarkable coincidence.

For all of these reasons, plaintiff is likely to succeed in proving that Chance is using Contour's tooling in its production of the Chance Open and Chance Professional.

### b. Firmware

With respect to the firmware for the Contour Pro and Contour Free, Chance had access to the machine code version for both products.  In addition, Chance's firmware is not only similar to Contour's, but nearly identical.  Cf. Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1361 (Fed. Cir. 2002) (showing of "access and similarity . . . may support a trade secret misappropriation claim").

The evidence is overwhelming that Chance disclosed, copied, and is using Contour's firmware.  A summary of this evidence follows.

- Software features.  Chance's Professional and Open products have a number of subtle features in their firmware that are identical to features included in the Contour Pro and Contour Free firmware. Specifically, Chance's products incorporate anti-bounce, auto-centering, vertical-inhibit, and raw mode features.  During the hearing, Contour illustrated all of these features through the testimony of Laurenzano, who illustrated how the software worked by projecting the software features onto the court's computer screen as he was testifying.  (Tr. 156-86).  The features of

the Chance software appear identical to those of the
Contour software.

- Bugs.  The testimony of Laurenzano revealed that there
  was a "bug"[8] in the firmware he had developed for the
  Contour Pro and Contour Free.  (Id. 186-93).
  Laurenzano was aware that he needed to remove this bug
  from future iterations of the firmware.  Testimony
  from a different witness revealed the existence of two
  other bugs in the Contour firmware that were not yet
  known by Laurenzano.  Specifically, Eglowstein
  testified that the Contour Free occasionally pastes
  multiple copies of the data that was "cut" by the
  user.  Id. at 233-35.  Mr. Eglowstein further
  testified that Contour's firmware contains an error in
  the configuration descriptor field that causes the
  field to generate a string of meaningless, garbled
  characters.  (Id. at 223-30).  Each of these bugs is a
  unique identifier of the Contour firmware.  The
  firmware in the Chance Professional and Chance Open
  contained exact replicas all three of these bugs.

---

[8] A "bug" is a term used by software developers to describe a
feature of the software that does not function properly.

- <u>Report descriptors</u>.  Computer mouse firmware includes
  report descriptors that provide basic information
  about the mouse, including the product name and the
  manufacturer.  In the report descriptor for the
  "manufacturer string" of Contour's firmware, the field
  is assigned the fourteen characters necessary to spell
  "Contour Design."  In the same report descriptor of
  Chance's firmware, the field is likewise assigned
  fourteen characters even though the name appearing in
  the field, "Taiwan," contains only six characters.
  The remaining eight spaces are left empty.  (<u>Id.</u> at
  219, 223-25).  Eglowstein testified that these
  "cosmetic" changes signify that the strings were made
  "without changing the source code," thus suggesting
  direct copying of the firmware.  (<u>Id.</u> at 221).  He
  testified that a person starting from scratch in
  developing source code for firmware would not leave
  blank spaces as found in Chance's descriptors, because
  space "is a very precious commodity."  (<u>Id.</u> at 221).

For all of these reasons, the court finds that plaintiffs
will likely prevail in proving that Chance violated Section 1 of
the NDA by using Contour's tooling (and tooling-related design

27

and implementation information) and Contour's firmware in its
production of the Chance Professional and Chance Open.

### 4. Chance Breached the Non-compete Provision, Section 3, of the NDA

In addition to Section 1 of the NDA, Contour relies upon
Section 3 to argue likelihood of success on the merits of its
breach of contract claim.  While Section 1 concerns the
protection of Contour's "confidential information," Section 3 is
more broad.  Specifically, Section 3 prohibits Chance from
duplicating, producing, manufacturing "or otherwise commercially
exploit[ing]" Contour's products or "any other product derived
from or based on" Contour's products.  (Doc. No. 31-1, p. 2, ¶
3).  The NDA defines Contour's products as "computer mouse
products and related materials."  (Id. at p. 1).  The "products
and related materials" Chance promised under Section 3 of the
NDA not to duplicate or exploit include items that go beyond the
"confidential information" described in Section 1.  The court
agrees with Contour that regardless of what constitutes
"confidential information" under Section 1 of the NDA, Section 3
precludes Chance from misappropriating Contour's products.
(Doc. 63, ¶ 12).

Having carefully considered the evidence, the court finds
that the Contour Pro and Contour Free are "Contour's products,"

developed by Wang and his company through years of effort and at significant cost.  The court has already found that the tooling is proprietary to Contour.  In addition, the tooling itself is "related material," for which Contour devoted time, expertise, and money.  Likewise, the firmware for the Contour Pro and Free are also "Contour products," developed by Laurenzano for Contour and at considerable cost to Contour.  See supra Part III.A.2.

Though plaintiff has not shown on this record that the "appearance and components" of the Contour Free and Contour Pro, such as the buttons and wrist rest, are confidential information, they clearly are "Contour's products."  As such, they, too, are subject to protection from Chance's duplication and/or exploitation under Section 3.

Relying on an unsworn, out-of-court declaration, Chance claims that Drougge, president of Ergoption, designed the Contour Pro and Contour Free.  (Doc. No. 59-2).  Drougge's declaration, however, does not provide details of his purported design work, such as how he came up with the design, in contrast to the detailed testimony and exhibits presented by Contour at the hearing.  In sum, because (1) Chance's products are virtually identical copies of Contour's products in all aspects, and (2) the evidence reveals that Chance replicated Contour's

products, the court finds that Contour is likely to prevail on its claim that Chance violated Section 3 of the NDA.

**B.  Irreparable Harm, Balance of Harms, and the Public Interest**

Absent an injunction against Chance's continued disclosure and use of Contour's confidential information and continued violation of the NDA's non-compete provision, Contour is suffering, and will continue to suffer, irreparable harm.

First, the parties expressed their understanding in the NDA that Chance's breach of the agreement would cause Contour "irreparable harm for which no adequate remedy exists at law." While this provision is not dispositive, it does lend "further support to a finding of irreparable harm."  2010 WL 174315 at *4 (citing Baker's Aid, Div. of M. Raubvogel Co. v. Hussman Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987)).

In addition to the parties' agreement that a breach would lead to irreparable harm, Contour has submitted evidence demonstrating such harm.  Chance's copying and selling of Contour's products, its use of Contour's production tooling, and its refusal to return the tooling to Contour for Contour's continued production of its mouse products, has caused harm not readily fixed by an award of money damages, as follows: (1) a two-year delay in Contour's release of new products as it

attempts to find a new manufacturing partner and to develop new tooling; (2) loss of customers who see Chance's copied products as replacements for Contour's products; (3) damage to Contour's product distribution channels as Chance solicits Contour's distributors to distribute its copied products; and (4) loss of customer goodwill as a result of Contour running out of product due to loss of tooling.  (Tr. 120-22).

These irreparable harms outweigh any harm Chance will suffer from an order enjoining its manufacture and sale of copied products.  Any harm to Chance is the direct result of Chance's breaches of its contractual obligations to Contour. See Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 486 (1st Cir. 2009) (holding balance of hardships weighs in favor of injunction where defendants' harm "is of their own doing").[9]

Finally, the public interest also favors the issuance of an injunction in this case.  As explained in the TRO Decision, injunctions against violations of intellectual property rights

_____

[9] Chance also claims that the injunction should not prohibit its use of Contour's firmware since Chance is no longer using it. As a general matter, this mootness argument is of no avail in light of the possibility that Chance could resume use of the firmware.  See Allee v. Medrano, 416 U.S. 802, 810-811 (1974). As part of the balancing of harms calculus, moreover, Chance's apparent abandonment of the firmware also lessens whatever harm the injunction will have upon Chance.

promote commercial morality.  2010 WL 174315, at *4 (<u>citing</u> <u>Gen.</u>
<u>Elec. Co. v. Sung</u>, 843 F. Supp. 776, 778 (D. Mass. 1994);
<u>Borinquen Biscuit Corp. v. M. V. Trading Corp.</u>, 443 F.3d 112,
115 (1st Cir. 2006) (trademark infringement); <u>Concrete Mach.</u>
<u>Co., Inc. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 612
(1st Cir. 1988) (misappropriation of "skills, creative energies,
and resources which are invested" in copyrighted works)).
Though the present injunction is based on Chance's breach of the
NDA and not on violation of an intellectual property right in
the strictest sense, commercial morality will, nonetheless, be
promoted by an injunction against Chance's disclosure and use of
Contour's confidential information and duplication and/or
exploitation of Chance's proprietary products.

　　　For all of the above reasons, the court finds that all four
prongs of the preliminary injunction standard favor Contour in
this case.

## IV.　<u>Jurisdiction and Reformation Issues</u>

　　　Chance asserts two additional arguments against a ruling in
Contour's favor.  Chance first argues that the court lacks
subject matter jurisdiction over Contour's claims.  Chance next
argues that an injunction in this case would operate as a de
facto reformation of a settlement agreement between Contour and

Ergoption, which is not permitted by law.  Both arguments are without merit.

### A. Subject Matter Jurisdiction

Relying on the First Circuit's decision in Cecil McBee v. Delica Co., Ltd., 417 F.3d 107 (1st Cir. 2005), Chance argues that this court does not have subject matter jurisdiction to enjoin the foreign activities of the foreign defendants unless plaintiff can show that Chance's contractual breaches have had a "substantial effect" on commerce in the United States.  (Doc. 64, pp. 1-4).

As a preliminary matter, the court notes that it has personal jurisdiction over the defendants and that the parties agreed, by the terms of the NDA, to have their performance under that contract governed by the laws of an American state.

Under these circumstances, and because the present case does not involve a federal statute, the court finds McBee to be inapposite.  In McBee, the First Circuit set forth its test for extraterritorial application of the Lanham Act, 15 U.S.C. § 1051 et seq.  417 F.3d at 119.  The First Circuit held that a United States federal court has jurisdiction to apply the Lanham Act to enjoin the foreign activities of a foreign defendant where the defendant's conduct has a "substantial effect on United States commerce."  Id. at 122.  However, the precise issue facing the

33

McBee court is not relevant to the present case.  In McBee, the court's federal question subject matter jurisdiction was dependent on the Lanham Act's territorial reach.  The "substantial effects" test arose solely from the inquiry into how best to ensure the interest of the United States in the litigation, as measured by "the core purposes of the Lanham Act."  Id. at 121.  Here, the court's subject matter jurisdiction does not rest on the Lanham Act or on any federal statute, but on diversity jurisdiction.  Chance's contention, therefore, that this court is without subject matter jurisdiction absent satisfaction of McBee's "substantial effects" test is misplaced.

Because McBee places no restriction on this court's power to enjoin Chance, plaintiff need not demonstrate that it has satisfied McBee's "substantial effects test."  Nevertheless, were McBee's test applicable, plaintiff would satisfy the test. Specifically, Contour is headquartered in New Hampshire and the effects of Chance's breach of contract are felt in New Hampshire and nationally.  Steven Wang testified that Chance's violations of the NDA have cost it, to date, approximately $100,000 in lost sales in New Hampshire, in addition to lost sales in Europe. (Tr. 120).  Steven Wang also testified that because of Chance's copying of Contour's products and its cutting off of Contour's

product supply by retention of Contour's tooling, Chance has damaged Contour's reputation domestically and around the world and has prevented Contour from supplying products nationally and internationally.  (Id.).

In short, Chance's argument that this Court lacks subject matter jurisdiction to issue this preliminary injunction is without merit.

### B. Reformation of Third-Party Licensing Agreement

Chance's final argument appears to be based on contract law.  Chance argues that a preliminary injunction enjoining Chance from manufacturing the Chance Open and Chance Professional would amount to a de facto reformation of a licensing agreement that Contour has with Ergoption.  Ergoption is a Swedish company that hired Chance (as EKTouch) to produce the Chance Professional and Chance Open.  It is undisputed that Contour gave Ergoption a broad license to produce, market, and sell products based on certain Contour patents.  (Pl. Ex. P-18). Chance claims that Ergoption's right under the licensing agreement would be undermined by an injunction disallowing Chance from producing such products for Ergoption.  As a result, Chance asserts that the court cannot issue such an injunction. The argument is without merit.

Contour's agreement with Ergoptian does not absolve Chance from its own independent contractual obligation to Contour to refrain from using and disclosing the confidential tooling and related implementation information.  Importantly, too, that agreement does not release Chance from its obligation under Section 3 of the NDA not to compete with Contour by the "duplicating, producing, manufacturing" of Contour's products or "any other product derived from or based on" Contour's products. (Doc. No. 31-1, pg. 2, par. 3). [10]

**V. <u>Conclusion</u>**

For the foregoing reasons, I recommend that the court grant plaintiff's Motion for Preliminary Injunction (Doc. No. 31), with modifications to the relief requested to ensure that the injunction is "narrowly tailored to give only the relief to which the plaintiff is entitled."  <u>Brown v. Tr. of Boston Univ.</u>, 891 F.2d 337, 361 (1st Cir. 1989).  The recommended injunction against Chance is narrowly tailored to plaintiff's probable success in proving that the Chance Open and Chance Professional

---

[10] Chance also argues that Contour has come to the court with unclean hands for its "failure" to bring the licensing agreement to the court's attention at the TRO hearing and in this preliminary injunction proceeding.  Because the court finds that Chance's obligations under the NDA are not affected by Contour's licensing agreement with Ergoption, the court finds that Contour had no obligation to bring the agreement to the court's attention.

(1) are derived from Chance's disclosure and use of Contour's
"confidential information"; and (2) are in all aspects,
including appearance, components, and firmware, derived from,
duplicates of, and commercial exploitations of the Contour Pro
and Contour Free, and derived from Chance's use and exploitation
of Contour's tooling, all in violation of Section 3 of the NDA.

Accordingly, I recommend entry of the following injunctive
order:

1. That the defendants, Chance Mold Steel, Co., Ltd.
a/k/a Chance Mold Co., Ltd ("Chance") and EKTouch Co.,
Ltd. ("EKTouch") their affiliates, agents, servants,
employees, attorneys or successors or anyone in active
concert or participation with them who shall receive
actual notice, are hereby enjoined from showing,
offering for sale, selling, marketing, manufacturing,
distributing, or displaying the Chance "Open" and
"Professional" computer mouse products, any product
under a different trade name that is the same as,
similar to, or derived from the "Open" and
"Professional," and any product that is the same as,
similar to, or derived from the computer mouse
products manufactured by the Defendant Chance for
Contour Design, Inc. ("Contour"), including but not
limited to, the Roller Mouse Pro and Roller Mouse
Free.

2. That Chance and EKTouch are hereby ordered to
recall any orders in transit for the Chance "Open" and
"Professional" computer mouse products, any product
under a different trade name that is the same as,
similar to, or derived from the "Open" and
"Professional," and any product that is the same as,
similar to, or derived from the computer mouse
products manufactured by the Defendant Chance for
Contour, including but not limited to, the Roller
Mouse Pro and Roller Mouse Free.

3. That Chance and EKTouch are hereby ordered to
recall from any distributors and retailers all
inventory of the "Open" and "Professional" computer
mouse products, any product under a different trade
name that is the same as, similar to, or derived from
the "Open" and "Professional," and any product that is
the same as, similar to, or derived from the computer
mouse products manufactured by the defendant Chance
for Contour, including but not limited to, the Roller
Mouse Pro and Roller Mouse Free.

4. That Chance and EKTouch are hereby ordered to
immediately return to Contour all Contour product
information, including but not limited to design
information, specifications and firmware, and the
product tooling used to manufacture Contour products.

5. That Chance and EKTouch are hereby ordered to file
with the Court and to serve upon the Plaintiff within
thirty days after entry of the preliminary injunction
a report in writing under oath setting forth in detail
the manner and form in which the Defendants have
complied with the preliminary injunction.

6. The cash bond in the amount of $50,000 previously
filed with this court in its granting of a temporary
restraining order shall constitute the bond required
for the granting of this order.

This order shall remain in effect until further order
of the Court.

Any objections to this report and recommendation must be

filed within fourteen (14) days of receipt of this notice.  Fed.

R. Civ. P. 72(b)(2).  Failure to file objections within the

specified time waives the right to appeal the district court's

order.  See <u>Unauthorized Pract. Of Law Comm. V. Gordon</u>, 979 F.2d

11, 13-14 (1st Cir. 1992).

_____
                            Landya B. McCafferty
                            United States Magistrate Judge

Dated:  October 22, 2010

cc:  Lawrence L. Blacker, Esq.
     Peter G. Callaghan, Esq.
     Felix J. D'Ambrosio, Esq.
     Robert J. Gunther, Esq.
     Jordan L. Hirsch, Esq.
     Anne M. McLaughlin, Esq.
     Thomas J. Moore, Esq.
     John R. Schaerfer, Esq.
     Laura A. Sheridan, Esq.
     Michael J. Summersgill, Esq.