UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Contour Design, Inc.

     v.

Chance Mold Steel Co., Ltd.
and EKTouch Co., Ltd.

Civil No. 09-cv-451-JL
Opinion No. 2011 DNH 069

**MEMORANDUM ORDER**

Ergonomically friendly computer mouse products have led to a great deal of unfriendliness between the parties to this lawsuit, plaintiff Contour Design, Inc., and defendants Chance Mold Steel Co., Ltd. and EKTouch Co., Ltd.  Contour has sued Chance, which formerly manufactured products for Contour, and EKTouch, a related company, claiming that they have misappropriated Contour's trade secrets and breached confidentiality agreements with Contour by selling their own versions of ergonomic mouse products, which are known as the "Classic," the "Open," the "Professional," and the "Ergoroller."

The defendants have counterclaimed, alleging that Contour breached the parties' agreement that Chance would serve as Contour's exclusive manufacturer when it hired a different manufacturer to make certain products, chiefly plastic cases for

iPods.[1]  This court has jurisdiction over this action between Contour, a Delaware corporation with its principal place of business in Windham, New Hampshire, and the defendants, Taiwanese corporations, under 28 U.S.C. § 1332(a)(2) (diversity).

Both parties have filed partial motions for summary judgment.  See Fed. R. Civ. P. 56.  Chance has moved for summary judgment on Contour's claims for misappropriation of trade secrets and for certain breaches of the confidentiality agreements.[2]  Chance argues that Contour cannot show a genuine issue of fact as to whether (1) any of the information embodied in the design of the products at issue amounts to a protectible trade secret, largely because their designs had been publicly disclosed before Chance started making them, or (2) any "marketing information and distribution methods" for the products amount to a trade secret.

---

[1]The agreements at issue here were between Contour and Chance, so EKTouch would not seem to be a proper party to the counterclaim for breach of contract (nor to Contour's contract claims, absent some basis for disregarding the defendants' corporate separateness).  Because the parties have ignored this issue, however, the court will do the same.  Furthermore, for simplicity's sake, the court will refer to the defendants collectively as "Chance."

[2]Chance has not moved for summary judgment on Contour's claim that Chance's manufacture and sale of the Ergo amounted to a violation of the parties' confidentiality agreements.

Contour's principal response is that, even if no other aspect of the Professional, the Open, or the Ergo misappropriates its trade secrets or confidential information, a genuine issue of fact exists as to whether the firmware for those products does (firmware is the computer code programmed into the products that defines how they function).  Chance's opening brief does not address the firmware--even though its status as "confidential information" under the parties' agreements was the major focus of the preliminary injunction proceedings in this case.  Although Chance's reply brief does address the issue, that is too late and, in any event, only highlights disputed facts going to whether Chance's products have misappropriated Contour's firmware.  Thus, as fully explained below, Chance's motion for partial summary judgment must be denied, without prejudice to its ability to seek rulings at the upcoming trial as to whether other particular aspects of Contour's products constitute trade secrets or confidential information as a matter of law.

Contour's motion for summary judgment on Chance's counterclaim for breach of contract must also be denied, because the motion rests entirely on an affirmative defense--statute of limitations--that was not raised in Contour's reply to the counterclaim.  While Contour has moved to amend its reply to add the defense, that motion was not filed until some nine months

3

after the applicable deadline set forth in the scheduling order.
Contour argues that, because it did not learn of the factual
basis for its limitations defense until it took the deposition of
a Chance witness in December 2010, there is "good cause" under
Fed. R. Civ. P. 16(a)(4) to modify the order to accommodate the
late amendment.  But, as fully explained infra, the basis for the
defense was apparent from the face of Chance's counterclaim and,
moreover, known to Contour's president since the underlying
events occurred.  In any event, Contour did not move to amend its
reply until nearly three months after the deposition, an
additional delay which it has not attempted to explain.


## I.    **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c)(2).  Under this rule, "[o]nce the moving
party avers an absence of evidence to support the non-moving
party's case, the non-moving party must offer 'definite,
competent evidence to rebut the motion.'" Meuser v. Fed. Express
Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Mesnick v. Gen.
Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

In ruling on a motion for summary judgment, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The following facts are therefore set forth in the light most favorable to Contour, which is the non-moving party (because, as just discussed, the court does not reach the merits of Contour's own motion for summary judgment), though the defendants' version of the facts is noted where appropriate.

## II.  Background

### A.   Factual history

Contour designs, manufactures, and sells ergonomically friendly "computer pointing devices," including the "Roller Mouse" series.  The products from this line feature a wide roller bar incorporated into a component placed centrally below the keyboard, as opposed to the configuration of a traditional computer mouse, which has a narrow trackball incorporated into a smaller component placed to one side of the keyboard.

In 1995, Contour engaged defendant Chance as a manufacturer of mouse products.  The parties executed a "Non-Disclosure Agreement" (the "NDA"), dated June 15, 1995 and set to expire on June 15, 2015.  The NDA recited that Contour "has certain

inventions, designs, methods, samples, market information[,] concepts and ideas," defined as the "Confidential Information," that relates "to consumer mouse products," defined as "the Product."  Chance agreed in the NDA to preserve the confidentiality of the Confidential Information and to make no use or disclosure of it without Contour's prior written consent. Chance further agreed not to "duplicate, produce, manufacture, or otherwise commercially exploit the Product, or develop any other product derived from or based on the Product," without Contour's prior written consent.  Steven Wang, Contour's president, also received oral assurances from Chance that "confidentiality is not a problem . . . they can keep everything they develop secret." Chance proceeded to serve as the exclusive contract manufacturer of Contour's computer pointing devices for the next 14 years.

### 1.    The "Professional" and the "Open"

The products that Chance manufactured for Contour included, in chronological order, the "Roller Mouse Classic," the "Roller Mouse Pro," and the "Roller Mouse Free."  To make these products, Chance used tooling (metal molds for the insertion of melted plastic) that it had built from designs provided by Contour. Contour's president recalls that he "would be in Taiwan weeks at

6

a time guiding [Chance] through the final adjustment of the tool to produce the plastic shape precisely the way I want it."

The Classic ran on firmware developed for Contour by an independent engineering firm, LCS Engineering, which took several months to write the code for the firmware and never disclosed it to anybody other than Contour.  The Pro and the Free ran on firmware that Contour developed from the firmware for the Classic, and included a number of improvements over its predecessor version.  These improvements were conceived and designed by Contour over the course of five months' work.[3]  When Contour developed these improvements, it was not aware of any other mouse in existence which offered them, and there is no evidence in the record that any such product existed.  Contour did not share the source code for the firmware with anyone, and shared the machine code for the firmware with no one but Chance.

In 2010, Chance began manufacturing and selling its own computer pointing devices, including the "Classic," the "Professional," and the "Open."  In its responses to Contour's requests for admissions here, Chance has admitted that it made the Professional and the Open using the same tooling it used to

---

[3]These improvements included "anti-bounce," "auto-centering," and "vertical inhibit," each of which essentially operates to reduce or eliminate undesired cursor movements.

make the Pro and the Free, respectively, and that, as a result, the dimensions, shape, buttons, and wrist rests of the Professional and the Open are the same as the dimensions, shape, buttons, and wrist rests of the Pro and the Free, respectively. Chance has also admitted that "some" of the Professional and Open products it "initially produced" used the same electronics, including the circuit board, as those of the Pro and the Free, respectively, though it says that is not "currently" the case.

Chance disputes, however, that its Professional and Open products use the same firmware as Contour's Pro and Free products. One of Chance's employees says that it hired an outside engineer who independently designed the firmware for the Professional and the Open. But Contour has come forward with testimony from a computer programming expert, Howard Eglowstein of LCS Engineering, that the firmware in each of the Professional and the Open is identical to that in the Pro and the Free, respectively, aside from "poorly executed cosmetic changes." Eglowstein says, among other things, that Contour's versions of the firmware for the Pro and the Free contain bugs that have been replicated identically in the firmware in the Professional and the Open. Moreover, Chance has admitted that "some" of its

"initially produced" Professional and Open products "incorporated machine code from the firmware used" in Contour's Pro and Free.[4]

### 2.   The "Ergoroller"

Before the introduction of the Free, one of Contour's customers had asked it for an ergonomic mouse with a roller bar that could be removed to allow for cleaning.  So Contour initially designed the Free with a bar that could be removed by flipping open a trapdoor that locked it in.  Contour communicated this idea to Chance during the design work on the Free product, but the parties' engineers "had a lot of trouble making the bar click very smooth[ly] from left to right" because the trapdoor failed to stabilize it.  Due to these engineering difficulties, as well as the departure of Chance's chief designer, Contour decided to release the Free without the removable roller.

---

[4]In its reply brief, Chance points to other testimony by Eglowstein to the effect that "newer versions of the Chance Open and Professional products use a different microprocessor than Contour's products, and that Contour's firmware, in the binary [i.e., machine code] form that was provided to Chance, will not work on Chance's different microprocessor."  But even if it necessarily follows that Contour's firmware for the Free and the Pro was not used to create the firmware for the "newer versions" of the Open and the Professional (which the court cannot tell from the record at present), this testimony still does not contradict Eglowstein's opinion that the firmware in the earlier versions of the Open and the Professional was copied from the firmware in the Free and the Pro.

Contour subsequently learned that Chance was marketing an ergonomic mouse called the "Ergoroller," or the "Ergo," which was similar to Chance's Open product--but with the elusive removable roller.  The design of the Ergo does not incorporate the trapdoor conceived by Contour, but places the roller in a plastic trough with two Teflon rails along it.  Chance states that it "independently developed" this design, which "does not utilize the basic frame structure" of the Free.[5]  But Contour's president testified that the roller bar in the Ergo actually "sits on a carriage very similar to" that of the Free, and that during the design of the Free the parties had discussed placing the roller bar atop two separate rods--a configuration that "serves the same purpose and idea" as the trough and the rails in the Ergo.

The facts are also in dispute as to whether the Ergo incorporates not only the Free's physical design, but its firmware as well.  Chance maintains that, as in the case of the firmware for the Professional and the Open, it hired an outside engineer to write the firmware for the Ergo.  But Contour emphasizes that Chance did not hire that engineer until after it had already started selling the Ergoroller.  Contour also points

---

[5]In support of this statement, in its reply brief, Chance relies on deposition excerpts and other materials that were not filed with the brief, and do not appear to have been previously submitted to the court.

to testimony by Chance's general manager that the Ergo uses the same firmware as the Open--and, as just discussed, there is evidence that Chance copied at least the initial version of its firmware for the Open from Contour's firmware for the Free.

The parties have also submitted conflicting excerpts from the deposition of Chance's computer programming expert, Mark Blackburn, as to whether the firmware for the Ergo is any different from the firmware for Contour's products.[6]  Chance further relies on testimony from one of its engineers that he designed a "microcontroller circuit" for the Ergo which differs from the microcontroller used in the Free, meaning that the Ergo could not run the machine code version of the Free's firmware (according to both Blackburn and Contour's programming expert, Eglowstein, though Blackburn has acknowledged that the source code could have been the same).

---

[6]Specifically, Contour points to Blackburn's testimony that he cannot say "that the firmware in the version of the Ergoroller that's actually been sold is any different than [*sic*] the firmware of Contour's products," and that tests he has conducted do not rule out that "99.9 percent" of the source code for Chance's products is the same as the source code for Contour's products.  Chance responds with Blackburn's testimony that the Ergo is "different from the Contour products in terms of the way it operates."

**B.    Procedural history**

Contour filed its initial complaint in this action in late 2009, together with a motion for a temporary restraining order to prevent Chance from marketing the Ergo at the January 2010 Consumer Electronics Show in Las Vegas, or anywhere else in the United States, for a two-week period.  Following the appearance of counsel on behalf of Chance, this court held a hearing on the motion, granted it, and issued a written order explaining the court's reasoning. Contour Design, Inc. v. Chance Mold Steel Co., 2010 DNH 011.  The court ruled that, based on the limited facts the parties had provided at that point, Contour had shown a likelihood of success on the merits of its claim that the Ergo represented a misappropriation of one of its trade secrets, id. at 24, namely, Contour's "idea to incorporate a removable roller into its ergonomic mouse series," id. at 15-16.  By its terms, the temporary restraining order expired 14 days after its issuance, see id. at 25, on January 20, 2010.

Following the preliminary pretrial conference, the court approved the parties' joint discovery plan, which set a deadline of June 1, 2010, for Contour's amendment of its pleadings.  With Chance's assent, Contour later filed an amended complaint in six separately numbered counts:

12

• Count 1 alleges that the Ergo misappropriates Contour's trade secrets in the "concept, design and specifications" of the Free, in violation of New Hampshire's version of the Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B;

• Count 2 alleges that the Chance has breached the NDA by marketing the Ergo;

• Count 3 alleges that Chance has used Contour's trade secrets, "including but not limited to design concepts, sketches, drawings, marketing information and distribution methods" for its ergonomic pointing devices, "for its own advantage in the manufacturing or marketing of products that are the same or similar in nature," also in violation of the Trade Secrets Act;

• Count 4 alleges that Chance has manufactured "products derived from or based on" Contour's consumer mouse products, in breach of the parties' NDA;[7]

• Count 5 seeks a declaratory judgment that the NDA is valid and remains in effect; and

• Count 6 alleges that Chance has manufactured "products derived from or based on" the products it manufactured for Contour, in breach of the parties' oral agreement.

Chance responded by filing an answer, together with a

counterclaim in two counts:  (1) a count for a declaratory

judgment that Chance had not misappropriated any of Contour's

trade secrets, and (2) a count for breach of contract, alleging

that "[i]n 2006, despite the assurance to [Chance] of an

---

[7]As pled in the amended complaint, counts 3 and 4 could cover misappropriation of Contour's trade secrets and violation of the NDA through any Chance product, including the Ergo. Because counts 1 and 2 specifically allege misappropriation of trade secrets and violation of the NDA through the Ergo, however, this court has construed counts 3 and 4 to refer to products besides the Ergo, i.e., the Classic, Professional, and Open.

exclusive manufacturing arrangement," Contour "breached this agreement by seeking other manufacturers for these products, purchasing fewer and fewer, and ultimately none, of the these products" from Chance.  As Chance subsequently explained, its contract claim arises out of Contour's hiring a different manufacturer to make certain products for it, chiefly plastic cases for iPods.  Contour filed a reply to the counterclaim, raising only one affirmative defense--that the contract claim was barred by the statute of frauds.  The reply did not raise any statute of limitations defense.

Shortly after filing its amended complaint, Contour also filed a motion for a preliminary injunction, seeking to prevent Chance from marketing "any product that is the same or similar" or "derived from or based on" any product manufactured for Contour by Chance.  The court referred the motion to Magistrate Judge McCafferty, who conducted a one-day evidentiary hearing and received a number of written submissions from the parties.  She then issued a report and recommendation that Contour's motion for a preliminary injunction be granted "with modifications to the relief requested."  Contour Design, Inc. v. Chance Mold Steel Co., No. 09-451, 2010 WL 4774283, at *13 (D.N.H. Oct. 22, 2010).

Judge McCafferty found that Contour had established a likelihood of success on its claim that the tooling and firmware

14

for the Pro and the Free amounted to "confidential information" under the NDA, and that Chance had used that tooling and firmware to produce the Open and the Professional, despite agreeing in the NDA not to do so.[8]  *Id.* at *7-*10.  She also found that, even if the tooling and the firmware for the Pro and the Free were not "confidential information," Chance's manufacture of the Professional and the Open still violated the NDA, which independently prohibited it from making products "based on" Contour's products.  *Id.* at *10-*11.

Judge McCafferty did not reach, however, Contour's arguments that (1) Chance's manufacture of the Ergo amounted to a breach of the NDA or (2) Chance had misappropriated its trade secrets, because Contour had not properly articulated those claims in its pre-hearing filings.[9]  *Id.* at *3-*5.  This court approved Judge

---

[8] Judge McCafferty also noted that Contour had not "presented any evidence that the appearance and components" of the physical hardware of the Pro and the Free "have a confidential nature," and that those products had been publicly sold prior to Chance's alleged breaches or misappropriations.  2010 WL 4774283, at *8. She therefore declined "to say on the record before [her] that those features are confidential information as contemplated by the NDA."  *Id.*

[9] Judge McCafferty did, however, express some skepticism as to both arguments.  First, she noted that patents filed before the development of the Free "raise[d] serious doubts about whether the removable roller concept had the character of confidential information."  2010 WL 4774283, at *4.  Second, she noted that Contour had yet to "identif[y] with reasonable specificity the trade secrets" at issue.  *Id.* at *4 n.2.

15

McCafferty's report and recommendation over Chance's objection. Contour Design, Inc. v. Chance Mold Steel Co., No. 09-451, 2010 WL 4736428 (D.N.H. Nov. 12, 2010). Chance then appealed the preliminary injunction to the court of appeals, Contour Design, Inc. v. Chance Mold Steel Co., No. 10-2415 (1st Cir. Dec. 9, 2010), which will hear oral argument on May 3, 2011.

III. **Analysis**

A. **Chance's partial motion for summary judgment**

Chance has moved for summary judgment on counts 1, 3, 4, and 6 of the amended complaint. As noted at the outset, Chance argues that Contour cannot show that (1) the Ergo incorporates any of Contour's trade secrets, because the idea for an ergonomic mouse with a removable roller had been publicly disclosed before Contour shared it with Chance, (2) the Professional and the Open incorporate any of Contour's trade secrets or confidential information in the Pro or the Free, because those products had been sold to the public before Chance started making its competing products, or (3) any "marketing information and distribution methods" for Contour's products amount to a trade secret. As also noted at the outset, Contour's principal response is that, even if no other aspect of the Professional, the Open, or the Ergo misappropriates its trade secrets or

16

confidential information, a genuine issue of fact exists as to whether the firmware for those products does.

Chance's opening memorandum in support of its summary judgment motion does not address, or even mention, whether its products misappropriate Contour's firmware.  Instead, Chance addresses this issue for the first time in its reply brief, arguing that the firmware in the Professional, the Open, and the Ergo was not copied from Contour's firmware, but independently designed for Chance by an outside engineer.  This court ordinarily does not consider arguments raised for the first time in a reply memorandum, see, e.g., Doe v. Friendfinder Network, Inc., 540 F. Supp.2d 303 n.16 (D.N.H. 2008), and sees no reason to do so here.[10]  For this reason alone, Chance's summary judgment motion could be denied as to count 1 (which alleges

---

[10]Chance suggests in its opening memorandum that Contour failed to adequately identify its claimed trade secrets and confidential information in its answers to interrogatories asking it to do so.  Each of those answers, though, specifically mentions "firmware" among a number of other categories of information.  Chance's opening memorandum also suggests that these answers were not specific enough, but, as Contour points out, Chance never sought this court's intervention to compel Contour to provide a more specific response.  In any event, Contour's theory that Chance had misappropriated its firmware was discussed in great detail at the preliminary injunction hearing (where Eglowstein testified to his opinion that the Professional and the Open represented just such a misappropriation) and, indeed, was one of the bases for the issuance of the injunction. So Chance was acutely aware of this theory well before discovery closed and it filed its summary judgment motion.

misappropriation of trade secrets through the Ergo) and counts 3 and 4 (which allege misappropriation of trade secrets and confidential information through other Chance products).

In any event, Chance's reply memorandum does not demonstrate the absence of a factual issue as to whether the Professional, the Open, and the Ergo misappropriate Contour's firmware.  The reply merely presents Chance's own evidence on that issue, which conflicts with Contour's, and therefore presents a genuine issue for trial.  As discussed in Part II.A.1, supra, while one of Chance's engineers says that it independently designed the firmware for the Professional and the Open, Contour's programming expert says that this firmware is identical to that in the Pro and the Free, respectively.  Indeed, Chance has admitted that it produced at least some Professional and Open products with firmware that incorporated code from the Pro and the Free.[11]

---

[11]Based on this admission and Chance's position that the current versions of the Professional and the Open use a microprocessor that is incompatible with Contour's firmware, see note 4, supra, Chance appears to be saying that, even if the Professional and the Open were misappropriating Contour's firmware at some point, they no longer are.  Even if this is true, though, it would not relieve Chance of liability on counts 3 or 4, but at most would affect the measure of Contour's damages on those claims (assuming that Contour can prove that the firmware for the Professional and the Open amounted to trade secret or confidential information in the first place, which is an issue not raised in any of Chance's summary judgment briefing and therefore not addressed in this order).

Thus, even if the court were to consider Chance's argument that the Professional and the Open do not misappropriate Contour's trade secrets or confidential information, Chance would still not be entitled to summary judgment on counts 3 or 4.

Moreover, as Contour points out, even if the Professional and the Open do not misappropriate its confidential information, they still amount to a violation of the NDA so long as they are "derived from or based on" any of Contour's "consumer mouse products"--as Judge McCafferty observed, 2010 WL 4774283, at *10-*11.  Neither Chance's opening brief nor its reply brief address this point, which is fatal to its summary judgment motion on count 4 regardless of disputes over whether the Professional and the Open misappropriate Contour's firmware.  For the same reason, Chance is also not entitled to summary judgment on count 6, which alleges a breach of its oral agreement not to "manufacture for itself or others products that were the same or similar to those manufactured for Contour."

There are likewise factual disputes going to whether the Ergo misappropriates the firmware from the Free.  As discussed in Part II.A.2, supra, Chance itself has provided conflicting evidence on this point, in the form of the testimony of one of its engineers (who says the firmware for the Ergo was independently designed), its general manager (who says the Ergo

19

uses the same firmware as the Open, which there is evidence to show was copied from the firmware for the Free), and its programming expert (who, in the snippets of his testimony provided, seems to say that firmware for the Ergo could be both the same as and different from that for the Free).  So, again, even if the court were to consider Chance's argument in its reply brief about the Ergo's firmware, it would not be entitled to summary judgment on count 1 either.

The court therefore need not reach--for now, at least--the arguments that Chance actually <u>does</u> make in its initial summary judgment memorandum, i.e., that Contour cannot claim any protectible trade secrets or confidential information in the physical design of the Pro and the Free, the removable roller concept for the Ergo, or Contour's "marketing information and distribution methods" for any of its products.  The court also need not reach Chance's argument in its reply memorandum that it, not Contour, conceived and executed the physical design for the Ergo.  Based on the materials presently before it, however, the court notes that these arguments appear to have some merit (as did Judge McCafferty with regard to many of them, <u>see</u> notes 8-9, <u>supra</u>).  The court's denial of Chance's summary judgment motion, then, is without prejudice to its ability to raise these arguments in connection with the upcoming trial.

**B.   Contour's motion for partial summary judgment and corresponding motion to amend its reply**

Contour has moved for summary judgment on one of Chance's counterclaims, for breach of contract, arguing that it is barred by the statute of limitations.  As discussed in Part II.B, <u>supra</u>, however, Contour did not assert the statute of limitations in its reply to the counterclaim.  The statute of limitations is an affirmative defense, <u>see</u> Fed. R. Civ. P. 8 (c), such that a party's failure to raise it in its responsive pleading "generally results in waiver of the defense and its exclusion from the case," Wolf v. Reliance Std. Life Ins. Co., 71 F.3d 444, 449 (1st Cir. 1995).  Accordingly, Contour has moved to amend its reply to add a limitations defense, which it can then use as the basis for its summary judgment motion.

The default rule governing a motion to amend a responsive pleading (at least if more than 21 days have passed since the pleading was filed) is Fed. R. Civ. P. 15(a)(2), which instructs the court to "freely give leave when justice so requires."  But, if a scheduling order sets a deadline for such amendments, and that deadline has passed--which, in this case, occurred on June 1, 2010--"the liberal default rule is replaced by the more demanding 'good cause' standard of Fed. R. Civ. P. 16(b)," because allowing the amendment would amount to a de facto

modification of the order.  Steir v. Girl Scouts of the USA, 383
F.3d 7, 12 (1st Cir. 1994).  "This standard focuses on the
diligence (or lack thereof) of the moving party more than it does
on the prejudice to the party-opponent." Id. (footnote omitted).

While Contour acknowledges--in its reply brief--that this
standard (rather than Rule 15(a)(2)), applies, even there it
fails to demonstrate its "diligence" in asserting its limitations
defense.  Contour argues that it did not have a basis for raising
the defense until Chance's general manager stated, at her
deposition on December 13, 2010, that she learned the facts
underlying Contour's alleged breach of contract in 2006 (which
would have necessarily been more than three years before Chance
filed its counterclaim here, in 2010, at least if the possible
availability of the relation back doctrine is ignored).  Even if
this argument is taken at face value, however, Contour did not
file its motion to amend its reply to assert the defense until
more than two and a half months later, on March 1, 2011.

Contour has not attempted to show how this amounts to
diligence, and that proposition is not apparent to the court.  If
anything, the record supports the contrary inference:  that
Contour, while possessed of all the information it says it needed
to seek leave to raise its limitations defense, waited until the
last possible day--the summary judgment deadline--when it could

22

do so and still file a timely motion for summary judgment based on the defense.  This has the appearance of a litigation tactic, not diligence or the "good cause" necessary to allow an amendment for which leave was not sought until eight months after the deadline set forth in the scheduling order.[12]

In any event, the court cannot accept Contour's claim that it lacked a basis for raising the defense until it took the deposition of Chance's general manager.  As Chance points out, the counterclaim itself alleges that Contour breached the parties' exclusive manufacturing agreement in 2006, which is evidently more than three years before the counterclaim was filed in 2010.  Contour argues that, nevertheless, it "could not assert a statute of limitations defense until there was evidence that Chance knew in 2006 of the actions it claims constitute a breach of contract" (emphasis omitted).

This is so, Contour explains, because of New Hampshire's discovery rule.  Under that rule, the limitations period begins

---

[12]Since the deposition at which Contour claims to have first learned the basis for its limitations defense, the court has held three separate telephone conferences and one in-person hearing with counsel at which scheduling matters were discussed to some degree, but Contour did not hint at any intention to try to add a limitations defense during any of those proceedings.  Indeed, at the hearing, Contour asked for (and received) a brief extension of the summary judgment deadline, explaining that it intended to move for summary judgment "on liability"--and still did not reveal any plan to assert a limitations defense.

running upon "the act or omission complained of, except . . .
when the injury . . . could not reasonably have been discovered"
at that point, in which case the period starts running when "the
plaintiff discovers, or in the exercise of reasonable diligence
should have discovered, the injury."  N.H. Rev. Stat. Ann.
§ 508:4, I.  The burden of showing that the discovery rule
applies, however, falls on the party bringing the claim that
would otherwise be time-barred, not on the party defending
against that claim.  See, e.g., Perez v. Pike Indus., Inc., 153
N.H. 158, 160 (2005).

In light of this allocation, it makes no sense to say that
the defending party cannot raise the statute of limitations until
it has evidence that the discovery rule does not apply.[13]  As
Chance points out, "[c]ertainty of proof is not a precondition to
the necessity to plead an affirmative defense."  Jakobsen v.
Mass. Port Auth., 520 F.2d 810, 816 (1st Cir. 1975).

---

[13]Indeed, in addition to the discovery rule, there are a
number of other recognized bases for tolling a limitations period
under New Hampshire law.  See, e.g., Kierstead v. State Farm Fire
& Cas. Co., 160 N.H. 681, 689 (2010) (discussing equitable
estoppel); Furbush v. McKittrick, 149 N.H. 426, 431-32 (2003)
(discussing fraudulent concealment and continuing
representation); Turetsky v. Town of Gilsum, 118 N.H. 23, 25
(1978) (discussing insanity).  It certainly cannot be the case
that a defendant cannot assert a limitations defense until it has
evidence that each of these tolling doctrines is inapplicable.

Moreover, long before the deposition of Chance's general manager, Contour did have evidence that Chance knew of the breach when it occurred.  This evidence was in the form of the recollection of its own president, who has testified that, in essence, he told Chance that Contour was moving the manufacture of its iPod cases to mainland China to reduce costs, and that this occurred in 2006.[14]  So Contour has known all along that Chance was aware of Contour's alleged breach of contract in 2006. That alone makes its motion to add a limitations defense inexcusably late.  See Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1517-18 (1st Cir. 1989) (upholding exclusion of late counterclaim because the underlying facts "were known to defendant all along"); Fed. Ins. Co. v. Gates Learjet Corp., 823 F.2d 383, 387 (10th Cir. 1987) (upholding exclusion of late limitations defense where defendant always "possessed documents from which it could have discovered and asserted" it).

Finally, Contour argues that adding the defense at this stage will not prejudice Chance.  Again, though, the "good cause"

---

[14]Among other things, Contour's president testified to a "heated exchange" with Chance's general manager where, in response to his asking if Chance wanted to stop making the products at issue for Contour, she said, "that's fine with me . . . and we left it at that."  He also testified that he did not "try to hide from Chance the fact that [Contour] desired to have the [relevant] products manufactured in [mainland] China."

standard is much less concerned with prejudice to the opposing party than it is with diligence by the moving party--and Contour has not been diligent, as already discussed.  This sort of "[i]ndifference by the moving party seals off [the Rule 16(b)(4)] avenue of relief irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause."[15]  O'Connell v. Hyatt Hotels of P.R., 357 F.3d 152, 155 (1st Cir. 2004) (quotation marks and bracketing by the court omitted).  Contour's motion for leave to amend its reply to assert a limitations defense is denied, as its motion for summary judgment, which is premised entirely on that defense.

## IV.  **Conclusion**

For the foregoing reasons, Contour's motion for leave to amend its reply[16] is DENIED, Contour's motion for summary judgment[17] is DENIED, and Chance's motion for summary judgment[18] is DENIED without prejudice as discussed supra.

---

[15]While, at oral argument, counsel for Contour offered a candid account of its failure to raise the limitations defense earlier, that account also did not demonstrate good cause.

[16]Document no. 122.

[17]Document no. 123.

[18]Document no. 124.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  April 25, 2011

cc:  Anne M. McLauglin, Esq.
     Jonathan W. Woodward, Esq.
     Jordan L. Hirsch, Esq.
     Laura A. Sheridan, Esq.
     Lawrence L. Blacker, Esq.
     Michael J. Summersgill, Esq.
     Robert J. Gunther, Esq.
     Peter G. Callaghan, Esq.
     Felix J. D'Ambrosio, Esq.
     John R. Schaefer, Esq.
     Thomas J. Moore, Esq.