UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Contour Design, Inc.</u>

    v.                          Civil No. 09-cv-451-JL
                                  Opinion No. 2011 DNH 078
<u>Chance Mold Steel Co., Ltd.</u>
<u>and EKTouch Co., Ltd.</u>

**<u>MEMORANDUM ORDER</u>**

Before the court are several motions for rulings on the
admissibility of certain evidence at trial.  Plaintiff Contour
Design, Inc. has sued defendants Chance Mold Steel Co., Ltd. and
EKTouch Co., Ltd.  Chance formerly manufactured products,
including ergonomically friendly computer pointing devices, for
Contour, but is now making those products for itself and EKTouch,
a related company.[1]  Contour claims that certain of Chance's
products amount to a misappropriation of Contour's trade secrets
and a breach of the confidentiality and non-competition
provisions of the parties' agreements.

This court has jurisdiction over this action between
Contour, a Delaware corporation with its principal place of
business in Windham, New Hampshire, and the defendants, Taiwanese
corporations, under 28 U.S.C. § 1332(a)(2) (diversity).  After

_____

[1]For simplicity's sake, the court will refer to the
defendants collectively as "Chance."

oral argument, Contour's motions are granted and Chance's motions are denied, as fully set forth below.

I.    **Background**

The underlying facts are set forth here in an abbreviated fashion, since they are laid out in detail in this court's prior orders, particularly the recent memorandum order denying the parties' motions for summary judgment.  Contour Design, Inc. v. Chance Mold Steel Co., 2011 DNH 069.  Contour designs and sells ergonomically friendly computer pointing devices, including the "Roller Mouse" series.  The products from this line have a wide roller bar incorporated into a component placed centrally below the keyboard, as opposed to the configuration of a traditional computer mouse, which has a narrow trackball incorporated into a smaller component placed to one side of the keyboard.

In 1995, Contour engaged Chance as a manufacturer of mouse products.  The parties executed a "Non-Disclosure Agreement" (the "NDA") reciting that Contour "has certain inventions, designs, methods, samples, market information[,] concepts and ideas," defined as the "Confidential Information," that relates "to consumer mouse products," defined as "the Product."  Chance agreed in the NDA to preserve the confidentiality of the Confidential Information and to make no use or disclosure of it.

Chance further agreed not to "duplicate, produce, manufacture, or otherwise commercially exploit the Product, or develop any other product derived from or based on the Product." Chance proceeded to serve as the exclusive contract manufacturer of Contour's computer pointing devices for the next 14 years.

These products included the "Roller Mouse Pro" and the "Roller Mouse Free." To make these products, Chance used tooling (metal molds for the insertion of melted plastic) that it had built from designs provided by Contour. The Pro ran on firmware (the computer code programmed into a product that defines how it functions) developed for Contour by an outside engineering firm, while the Free ran on firmware developed by Contour itself and featuring a number of innovative improvements over the firmware for the Pro. Contour did not share the source code for the firmware with anyone, and shared the machine code for the firmware with no one but Chance.

Contour had originally envisioned the Free with a removable roller bar to allow for easier cleaning. But due to delays in engineering this feature, as well as staff turnover at Chance, Contour ultimately decided to defer including a removable roller until the next release in the Roller Mouse series. Contour told Chance of that decision in August 2008. Within a few months, however, Contour learned that Chance was marketing a mouse called

3

the "Ergoroller," which is similar to the Free, but with the elusive removable roller.  Contour then commenced this action, seeking, among other relief, a temporary restraining order to prevent the defendants from marketing the Ergo in the United States.  Following a hearing, at which both parties appeared through counsel, the court issued the restraining order.  Contour Design, Inc. v. Chance Mold Steel Co., 2010 DNH 011, 25.

Contour later filed an amended complaint, asserting, inter alia, that:  (a) the Ergo misappropriates Contour's trade secrets in the "concept, design and specifications" of the Free, in violation of New Hampshire's version of the Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B, (b) Chance has breached the NDA by marketing the Ergo, (c) Chance has misappropriated Contour's trade secrets, "including but not limited to design concepts, sketches, [and] drawings," in violation of § 350-B, and (d) Chance has manufactured "products derived from or based on" Contour's mouse products, in breach of both the NDA and an oral agreement.  The amended complaint alleged that Chance's breach of the NDA had damaged Contour in a number of ways, including that it would "have to expend large sums for tooling that it already effectively paid to Chance" during their relationship.

Contour then filed a motion for a preliminary injunction, seeking to prevent Chance from marketing "any product that is the

same or similar" or "derived from or based on" any product manufactured for Contour by Chance.  Contour argued, among other things, that Chance had been marketing two ergonomic mouse products, the "Professional" and the "Open," that were "identical to" Contour's Pro and Free "in every way and description," including their firmware and the tooling used to make them.

The motion was referred to Magistrate Judge McCafferty, who, after holding a day-long evidentiary hearing, recommended that the motion be granted in large part.  Contour Design, Inc. v. Chance Mold Steel Co., No. 09-451, 2010 WL 4774283, at *13 (D.N.H. Oct. 22, 2010).  Judge McCafferty found, in relevant part, that Contour had established a likelihood of success on its claim that the tooling and firmware for the Pro and the Free amounted to "confidential information" under the NDA, and that Chance had used that tooling and firmware to produce the Open and the Professional, despite agreeing in the NDA not to do so.  Id. at *7-*10.  In reaching this conclusion, Judge McCafferty rejected Chance's argument that the NDA applied only to confidential information in existence at the time it was executed.  Id. at *5-*6.  She also rejected Chance's argument that a licensing agreement between Contour and a Swedish company, Ergoption AB--which had hired Chance to produce the Open and the

Professional--"absolved Chance from its own contractual obligation[s] to Contour." Id. at *13.

This court adopted Judge McCafferty's report and recommendation over Chance's objection. Contour Design, Inc. v. Chance Mold Steel Co., No. 09-451, 2010 WL 4736428 (D.N.H. Nov. 12, 2010). Chance then appealed the preliminary injunction to the court of appeals, Contour Design, Inc. v. Chance Mold Steel Co., No. 10-2415 (1st Cir. Dec. 9, 2010), which heard oral argument on May 3, 2011.


## II. **Analysis**

### A. **Contour's motion to exclude testimony by Frank G. McKenzie**

Contour moves to preclude any testimony by one of Chance's designated expert witnesses, Frank G. McKenzie, arguing that it would constitute improper legal opinion. McKenzie concludes, among other things, that:

> • "the NDA applies only to information pertaining to the product that Contour had in its possession on the effective date of the NDA," rather than information "that might have come into existence after the effective date";
>
> • "the NDA fails to indicate the kind of computer mouse product it covers," rendering it ambiguous;
>
> • "Contour's entering the NDA after having previously disclosed to Chance information about the product indicates that no confidential business relationship existed";

• even though the NDA does not require that "confidential information be marked 'Confidential' by the disclosing party . . . [a]ny information disclosed by Contour that was not marked 'Confidential' was not the subject of reasonable efforts to maintain its secrecy";

• the Uniform Trade Secrets Act "does not recognize that a concept or mere idea, without more, qualifies as a trade secret";

• "[c]ourts frequently refer to six common law factors in determining whether information reaches the standard of a trade secret"; and

• "the mere idea that an ergonomic mouse should have a removably [*sic*] roller, without any information regarding how a mouse with a removably [*sic*] roller could be designed and integrated with a computer, appears inadequate relative to" certain factors from the common-law test for trade secrets and, furthermore, "may have hypothetical economic value, but not the actual or potential economic value the Act requires of a trade secret."

(parenthetical and capitalization omitted).

There is little question that these opinions are inadmissible. "It is black-letter law that it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." Nieves-Villaneuva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997) (quotation marks and bracketing omitted). McKenzie's proffered opinions as to the reach of the Uniform Trade Secrets Act, and how courts otherwise define trade secrets, run afoul of this rule. As this court has observed, "'[e]xpert testimony proffered solely to establish the meaning of a law is presumptively improper.'" Bartlett v. Mut. Pharm. Co.,

742 F. Supp. 2d 182, 188 (D.N.H. 2010) (quoting United States v. Mikutowicz, 365 F.3d 65, 73 (1st Cir. 2004)). For the same reason, McKenzie also cannot opine as to the scope of the NDA, or its alleged ambiguity. "The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law for [the] court to decide." Birch Broad., Inc. v. Capitol Broad. Corp., Inc., 161 N.H. 192, 196 (2010).

Also inadmissible are McKenzie's proffered opinions that (1) "Contour's entering the NDA after having previously disclosed to Chance information about the product indicates that no confidential business relationship existed" and (2) that the concept for an ergonomic mouse with a removable roller is not a protectible trade secret. While "the bar on 'ultimate issue' opinions has been abolished in civil cases" by Rule 704(a) of the Federal Rules of Evidence, "that is not a carte blanche for experts to substitute their views for matters well within the ken of the jury." Dinco v. Dylex Ltd., 111 F.3d 964, 973 (1st Cir. 1997). McKenzie would seem to be doing exactly that by opining that the parties lacked a confidential relationship before they signed the NDA, or that one of Contour's claimed trade secrets is not in fact a trade secret. Both the court of appeals and this court have recognized that such testimony is generally inadmissible, notwithstanding Rule 704(a). See id. (opinion in

8

fraud case that "plaintiffs reasonably relied upon specific statements made to them"); Nieves-Villanueva, 133 F.3d at 99-100 (opinion in public employment case that appointments "were in violation of law"); Bartlett, 742 F. Supp. 2d at 198 (opinion in products liability case that manufacturer was "negligent").

Moreover, both of these opinions are at odds with this court's prior rulings.  In finding that Contour had shown likely success on its claim that the Ergoroller misappropriated its trade secrets, this court observed that the Trade Secrets Act "'extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use,'" Contour Design, 2010 DNH 011, 15 (quoting Uniform Trade Secrets Act § 1 cmt., 14 ULA 538), and that "courts have applied the Act 'to confidential disclosures of concepts, or as yet-untested, ideas for a new product,'" id. at 16 (quoting 2 Roger M. Milgrim, Milgrim on Trade Secrets § 9.05[4], at 9-487--9-488.2 & n.36 (Eric E. Bensen, ed., 2003 rev. ed. & 2009 supp.)).  The court further observed that, to maintain secrecy over proprietary information, "the Act does not require written confidentiality agreements, only 'efforts that are reasonable under the circumstances.'"  Id. at 19-20 (quoting Learning Curve Toys, Inc. v. Playwood Toys, Inc., 342 F.3d 714, 725-26 (7th Cir. 2003)).

To allow McKenzie to testify to the contrary would be "unfairly prejudicial to [Contour] and confusing to the jury, because it would conflict with this court's legal rulings and, presumably, its jury instructions." Bartlett, 742 F. Supp. 2d at 199. So, even if McKenzie's opinions about the confidential nature of the pre-NDA relationship, or the trade secret status of the removable roller concept, were admissible under Rule 704(a), the court would still disallow them under Rule 403.[2] See id.

In any event, Chance states in its objection to Contour's motion to exclude McKenzie's testimony (and reiterated at oral argument) that he will not testify as to "whether a particular concept or idea <u>can</u> be a trade secret, but rather, on the product development process so that the trier of fact can determine whether the information disclosed by [Contour] to Chance <u>was</u> a

---

[2]There is also the question of whether, as Rule 704(a) requires, these opinions are "otherwise admissible" expert testimony under Rule 702, i.e., McKenzie is qualified to give them, they are based on sufficient facts and data, and they are the product of reliable principles and methods that have been reliably applied. While McKenzie has "practiced intellectual property law since 1973," he does not claim to be an expert on trade secrets law, and, in any event, does not explain his opinions to any degree. It is worth noting here that someone who unquestionably <u>is</u> an expert in trade secrets law--Professor Milgrim, who literally "wrote the book" on the subject--does believe that "concepts, or as yet-untested, ideas for a new product" can be protectible trade secrets, as quoted in this court's prior order. Chance has yet to provide any authority to the contrary (aside from McKenzie's unsupported opinion).

trade secret."  But, as Contour points out, McKenzie's proffered testimony as to the "product development process" is not relevant to whether its claimed trade secrets qualify as such.  "Like all evidence, expert testimony must be relevant to the issues in the case," Bartlett, 742 F. Supp. 2d at 187, i.e., tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401.  Chance has not shown how McKenzie's proffered testimony about the "product development process" satisfies this standard.

As this court has noted, New Hampshire's version of the Uniform Trade Secrets Act defines "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Contour Design, 2010 DNH 011, 15 (quoting N.H. Rev. Stat. Ann. § 350-B.1, IV).  Chance does not explain the relationship of the "product development process" to any of these elements.

Chance states in its surreply brief that "all product development proceeds according to several levels from an initial

11

idea to a final product," and that McKenzie's expertise in that area will assist the jury in deciding, "When does the trade secret attach during this process?"  But there is no particular point in the "product development process" at which trade secret status arises:  because, again, even "concepts, or as yet-untested, ideas for a new product" can qualify as trade secrets, no "product development process" is necessary for them to attain that status.  Indeed, "it is established that a trade secret can be discovered fortuitously (ergo, without costly development), or result purely from the exercise of creative facilities." 1 Milgrim, supra, § 1.02[2], at 1-250--1-255 (footnote omitted).

Arguably, the "product development process" could potentially have some bearing on trade secret status, e.g., the fact that a concept for a new product has yet to undergo that process could tend to show that it has no actual or potential economic value (though, again, it would not be dispositive on that point).  Cf. Learning Curve, 342 F.3d at 726-29.  But Chance does not characterize McKenzie's testimony that way and, regardless, he would not be qualified to give such an opinion, because he has no experience in the "product design process" for computer pointing devices or, for that matter, any kind of computer hardware.  McKenzie's experience, while substantial, is limited to the aerospace and automotive industries--and whether

12

an idea has actual or potential economic value before undergoing the development process depends heavily on the context, including the field of endeavor.  See id. at 728-29 (reasoning that lack of "development costs," while fatal "where there is nothing original or creative about the alleged trade secret," such as the compilation of customer lists, did not "preclude the existence of a trade secret" in an idea for a new toy).

Aside from unsupported assertions in its surreply that "there is a certain process for product development that all manufacturing companies will follow," Chance does not address the seemingly great potential for variance between the degree of development necessary for a concept to have economic value in the automotive or aerospace industries as opposed to the computer hardware industry.  To the contrary, Chance insists that McKenzie's opinions do not depend on the perspective of any particular industry.  If that is an apt characterization, then McKenzie has nothing to offer other than a generalized account of the product development process which, again, simply has no relevance to the trade secret status of any information that Contour disclosed to Chance.[3]

---

[3]At oral argument, Chance proposed that, if McKenzie were not allowed to testify on this subject, then its counsel (who also has a background in engineering) should be permitted to make a "presentation" about the product development process to the

Finally, McKenzie's own attempt to explain the "relation of trade secrets to product development" (capitalization and emphasis omitted), as he puts it in his expert report, is premised on his assertions of what would be "standard practice" or what would "generally" or "usually" occur.  He says, for example, that when a product design is "developed jointly" by the manufacturer and the seller, "it is standard practice that [they] are recognized as joint owners of the design," with the result that they "usually grant mutual, royalty-free cross-licenses to make, use and sell the product."  Even putting aside the fact that, again, McKenzie has no knowledge of the "standard practice" in the computer hardware industry, the written agreements between the parties here did not have these allegedly "usual" provisions.

---

jury as part of Chance's opening statement.  While the court expressed a willingness to allow this if Contour agreed, such a "presentation" would seem to be irrelevant for the same reasons that McKenzie's proffered opinion is.  Chance has suggested, both in its surreply and at oral argument, that this information should be conveyed to the jury because of the "technical" nature of the case, but that does not solve the relevance problem.  The subject-matter of the case--technology for ergonomic computer pointing devices--is no doubt "technical," but neither McKenzie nor Chance's counsel is qualified to shed light on that.  And, insofar as Chance means to suggest that determining the existence of a trade secret is a "technical" exercise, the way to assist the jury is not through expert testimony, but through "appropriate jury instructions," as this court has noted in a similar context.  See Bartlett, 742 F. Supp. 2d at 197-98 (refusing to allow expert testimony as to the meaning of a highly complex scheme of federal prescription drug regulations).

That makes McKenzie's stated opinions irrelevant, if not misleading, because evidence of industry "custom . . . cannot be used to vary the express terms of a contract." Heaton v. Boulders Props., Inc., 132 N.H. 330, 336-37 (1989). Accordingly, Contour's motion to exclude McKenzie's testimony is granted in its entirety.[4]

## B.   Contour's motions in limine

Contour moves to prevent Chance from offering certain other evidence and argument at trial, including (1) any evidence which has not been produced in discovery that the firmware for the Pro and the Free differs from that for the Professional and the Open, (2) any argument that the NDA is ambiguous, and (3) any argument that Contour's agreement with Ergoption provides Chance with a defense against Contour's claims for misappropriation of trade secrets or breach of the NDA.  These motions are granted.

---

[4]The parties' briefing does not specifically address McKenzie's opinions that information Contour disclosed to Chance without marking it "Confidential" was not "the subject of reasonable efforts to maintain its secrecy."  This conclusion, however, suffers from the same deficiencies as McKenzie's opinion that the idea for the removable roller was not a trade secret: McKenzie explains neither how he is qualified to opine on this subject in a field in which he has no experience, nor the basis of his conclusion, so the opinion does not satisfy Rule 702.  See note 2, supra.

### 1.  Chance's allegedly independent firmware

First, Chance says that it does not intend to introduce the source code for the firmware from the Pro and the Free as evidence at trial.  Chance explained at oral argument, in fact, that it does not even possess the source code, which it claims was written by an outside engineer who refuses to turn it over to Chance.  So Chance has more or less assented to the relief sought by Contour's first motion in limine, which seeks to "preclude Chance from introducing evidence relating to allegedly 'new firmware' which it refuses to produce."

Importantly, though, this relief does not extend to evidence of the allegedly new firmware which Chance <u>has</u> produced.  That includes testimony by its employees that they hired and worked with the outside engineer to develop the firmware, and the opinions of its retained expert that, based on his observation of differences in the way Chance's and Contour's products operate, their firmware is not the same.  There is no question that this evidence was disclosed--in the deposition testimony of these witnesses, if not elsewhere, <u>see</u> Contour Design, 2011 DNH 069 8-9 & n.4,--and Contour has yet to challenge its admissibility on any other basis.

16

### 2.  Asserted ambiguity in the NDA

Second, as already noted, "whether a contract term is ambiguous[] is ultimately a question of law for [the] court to decide." Birch Broad., 161 N.H. at 196.  Chance concedes this point, but nevertheless argues that "the clarity, or lack of clarity, of the NDA will be relevant to the jury, for example, in determining the intent of the parties."

So far as the court can tell, though, the parties' "intent" is not relevant to any of their claims and defenses--with the possible exception of whether, as Contour alleges, Chance's misappropriation of its trade secrets was "willful and malicious" under N.H. Rev. Stat. Ann. § 350:B-3, II.[5]  But, as Chance acknowledged at oral argument, that is also a question for the

---

[5]In an objection to Contour's amended final pretrial statement, Chance suggests that Contour cannot proceed to trial on its claim for willful and malicious misappropriation because its original final pretrial statement did not refer to that claim.  Because the amended final pretrial statement was filed less than one week after the original final pretrial statement, however--and still more than a month before trial--Chance cannot possibly claim any prejudice from the addition of Contour's willful and malicious appropriation claim through the amendment. Indeed, Chance has been on notice of that claim since the filing of Contour's amended complaint, which specifically alleges it (and even Contour's original final pretrial statement expressly indicates that Contour is not waiving any of its claims).  So there is no basis for excluding Contour's willful and malicious misappropriation claim.  See Velcro Indus. B.V. v. Taiwan Paiho Ltd., No. 04-cv-242, 2005 WL 2573383, at *7 (D.N.H. Oct. 12, 2005) (refusing to strike material added by an amended final pretrial statement where the other side was not prejudiced).

court, not the jury.  See Uniform Trade Secrets Act § 3 cmt., 14
ULA 635.  So, while Chance is free to argue the ambiguity of the
NDA to the court in defending against the willful and malicious
misappropriation claim, it may not make that argument to the
jury.  Of course, it should be noted that this court has twice
rejected what appears to be the premise of Chance's ambiguity
argument, i.e., its reading of the NDA to limit it to information
in existence at the time it was executed.  See Contour Design,
2010 DNH 011, 19 & n.12; Contour Design, 2010 WL 4774283, at *5-
*6.  Unless Chance has something new and different to say on this
point, then, there seems to be little use in re-arguing its
interpretation of the NDA to the court at trial (except to
preserve the argument for appeal, which Chance obviously will be
given the opportunity to do if it wishes).

### 3.    Ergoption settlement agreement

Third, and relatedly, this court has also already rejected
Chance's argument that, notwithstanding the NDA, it is entitled
to produce the Professional and the Open for Ergoption as a
result of a license agreement between that company and Contour.
Contour Design, 2010 WL 4774283, at *13.  To be fair, Chance had
previously argued that preventing it from making those products
for Ergoption would amount to an unwarranted reformation of that

18

company's agreement with Contour, while Chance now seeks to argue that it was a third-party beneficiary of that agreement. Chance's new third-party beneficiary theory, however, does not entitle it to argue the effect of the Ergoption settlement agreement to the jury.

Most (but not all) courts treat third-party beneficiary status as a question of law for the court. See, e.g., AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 420 F.3d 751, 755 (8th Cir. 2005) (applying South Dakota Law); Pierce Assocs., Inc. v. Nemours Found., 865 F.2d 530, 535 (3d Cir. 1988) (applying Delaware law); Flex Homes, Inc. v. Ritz-Craft Corp. of Mich., Inc., 721 F. Supp. 2d 663, 671 (N.D. Ohio 2010); City of Phoenix v. Leo A. Daly Co., No. 07-110, 2007 WL 3046758, at *2 (D. Ariz. Oct. 17, 2007); but see, e.g., Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (applying federal common law). The New Hampshire Supreme Court does not appear to have expressly categorized the issue one way or the other. In Grossman v. Murray, 144 N.H. 345, 347-48 (1999), though, the court discussed whether trial evidence was sufficient "as a matter of law to establish a third-party beneficiary relationship," arguably suggesting that it views the issue as a factual one, at least when the evidence is not so one-sided as to permit its resolution as a matter of law.

19

Even if New Hampshire does treat third-party beneficiary status as a question of fact, however, Chance's third-party beneficiary theory here is not based on any evidence, but simply the language of the Contour-Ergoption agreement itself.[6] Specifically, Chance argues that a provision of that agreement granting Ergoption a license "to make [and] have made . . . products . . . within the scope of" certain patents for which Contour had applied confers third-party beneficiary status on Chance "because Ergoption has chosen Chance to manufacture products" under this provision.  This is an argument based on the interpretation of the Contour-Ergoption agreement, which, again, is an issue of law for the court.  See Birch Broad., 161 N.H. at 196.  Chance's third-party beneficiary theory, then, does not provide an avenue for it to introduce the agreement into evidence or to argue its effect to the jury--though, just as with Chance's theory that the NDA is ambiguous, it may make that argument to the court if it wishes.[7]

---

[6]This assumes that New Hampshire law, rather than Swedish law, controls this issue, but see infra note 7.

[7]The court would expect any such presentation to contain, at a minimum, (1) the patent applications which define the scope of Ergoption's license under the agreement and (2) since the agreement provides that it is governed by the law of Sweden, Swedish law on the subject of third-party beneficiary rights, see Restatement (Second) of Conflict of Laws § 205 cmt. d, at 663 (1971) (noting, by reference to § 187, that the law chosen by the

**C.   Chance's motions in limine**

For its part, Chance moves to preclude Contour from offering evidence or argument (1) that Chance has misappropriated Contour's firmware or wrongfully retained its tooling, (2) that Chance has violated the NDA, (3) about any damages Contour has suffered, and (4) about any engineering drawings that Contour provided to Chance during the course of their relationship. These motions are denied.

**1.   Allegedly unpled claims**

First, Chance argues that Contour cannot present any evidence or argument that Chance misappropriated Contour's firmware, or wrongfully retained its tooling, because those theories were not pled in the amended complaint.  The court disagrees with both the premise and the conclusion of this argument.  The amended complaint alleges that the parties' confidentiality agreements encompassed "technical information," that Contour disclosed "technical information" about "ergonomic mice" to Chance, and that Chance kept the "technical information of Contour in strictest confidence" until the alleged breaches. The phrase "technical information" is broad enough to include

---

parties in their contract "determines whether a third party beneficiary obtains enforceable rights under the contract").

firmware.  Similarly, as noted <u>supra</u>, the amended complaint
alleges, as an element of Contour's damages from the breach of
the NDA, that it would "have to expend large sums for tooling
that it already effectively paid to Chance."  The obvious
implication of this statement is that Chance wrongfully retained
Contour's tooling--otherwise, Contour would not have needed to
pay someone else to make the very same tooling.

     Even if these allegations did not fairly encompass Contour's
theories that Chance misappropriated its firmware and wrongfully
retained its tooling, those theories have been front and center
in this case since shortly after the amended complaint was filed.
As noted <u>supra</u>, they were the premise of Contour's motion for
preliminary injunction, which was filed just nine days after the
amended complaint; the focus of the hearing on that motion; and
the very basis of Judge McCafferty's order recommending that the
motion be granted.[8]  Contour also specifically listed both
firmware and tooling in its answers to interrogatories asking it

---

     [8]At oral argument on the motions in limine, Chance suggested
that, before Judge McCafferty, it had objected to Contour's
argument that Chance had misappropriated its firmmware on the
ground that it was not alleged in the amended complaint.  This
court's review of the parties' written submissions in connection
with that motion, and the transcript of the hearing, reveals no
such objection (though Chance did object, unsuccessfully, to the
testimony of Contour's witnesses on the ground that it had yet to
complete its discovery responses).

to identify its claimed trade secrets and confidential information, and each party has designated an expert witness to testify as to whether Chance misappropriated Contour's firmware (and taken the deposition of the other side's expert).  See Contour Design, 2011 DNH 069, 17-18 & n.10.

Rule 15(b)(2) of the Federal Rules of Civil Procedure provides that:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.

In light of the fact that, as just discussed, Contour has been arguing that Chance misappropriated its firmware and wrongfully retained its tooling since just after the amended complaint was filed, and both parties have engaged in discovery on those issues, allowing Contour to pursue those theories at trial would clearly "aid in the presenting the merits" without unfairly prejudicing Chance's defense.

Indeed, Chance's motion to exclude these theories does not even hint at any prejudice, but merely argues that, because they were not pled, they cannot be tried.  That is inconsistent with Rule 15(b)(1), under which "an objection to a mere technical addition to the theory of the claim for relief or the facts on

23

which it is based . . . typically will not entail sufficient prejudice to warrant the denial of a motion to amend."  6A Charles Alan Wright et al., Federal Practice & Procedure § 1495, at 63 (3d ed. 2010) (footnote omitted).  So, even if the amended complaint does not allege Chance's misappropriation of Contour's firmware and its wrongful retention of Contour's tooling (and, as already discussed, the court believes it does), then Rule 15(b)(1) would allow Contour to amend its complaint to add those theories anyway.  Chance's motion to exclude those theories from trial is denied.

### 2.   Chance's appeal of the preliminary injunction

Second, Chance argues that Contour cannot try its claim that Chance breached the NDA because, in recommending that the motion for preliminary injunction be granted, Judge McCafferty found a likelihood of success on that claim, and Chance's appeal of the preliminary injunction is pending.  That, says Chance, "divests the district court of jurisdiction over the issues on appeal," including whether Chance breached the NDA.  Chance is incorrect.

"It is well established that an appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits."  Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171,

1174 (6th Cir. 1995); see also, e.g., Ex parte Nat'l Enameling & Stamping Co., 201 U.S. 156, 162 (1906) (holding that, after an appeal "from an interlocutory order or decree granting or continuing an injunction . . . [t]he case, except for the hearing on the appeal from the interlocutory order, is to proceed in the lower court as though no such appeal had been taken"); 11A Wright, supra, § 2962, at 438-39 ("[a]n appeal from the grant or denial of a preliminary injunction does not divest the trial court of jurisdiction . . . . [T]he case may proceed to a trial on the merits.") (footnote omitted).  Chance--which has unsuccessfully raised this argument before, in motions to stay discovery pending its appeal--has yet to provide any authority to the contrary.[9]  Its motion to prevent Contour from pursuing its claims for breach of the NDA at trial is denied.


### 3.   Claimed "partnership"

Third, Chance argues that Contour cannot present its claim for damages to the jury because the pretrial "testimony by

---

[9]Chance cites Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982), but that case deals with the jurisdictional implications of an appeal from a final judgment, not from an interlocutory order--and that distinction makes all the difference to the district court's continued jurisdiction.  See, e.g., Fairchild Semiconductor Corp. v. Third Dimension Semiconductor, Inc., No. 2009-1168, 2009 WL 790105, at *1 (Fed. Cir. Mar. 25, 2009).

witnesses for both [parties] is that [they] formed a partnership"
and "the question of damages under a partnership agreement is a
question of accounting for the court."  Chance is again
incorrect.  Under New Hampshire law (which both parties have
taken to control this issue), a partnership "must be voluntary
and must be based on an agreement between the parties."  Hilco
Prop. Servs., Inc. v. United States, 929 F. Supp. 526, 536
(D.N.H. 1996) (citing N.H. Rev. Stat. Ann. § 304-A:5).  While
"the requisite intent to form a partnership may be inferred from
the parties' actions," this is appropriate only "where the
parties have not documented their intentions in a written
agreement."  Id.; see also Stone & Michaud Ins., Inc. v. Bank
Five for Sav., 785 F. Supp. 1065, 1069-70 (D.N.H. 1992) ("when a
contract establishing the parties' relationship is clear and
unambiguous, intent is determined solely from the contract")
(quotation marks omitted).

Here, the written manufacturing agreement between Contour
and Chance specifically states that their relationship "shall be
that of an independent contractor . . . .  Any action or act
committed by [Chance] shall not be attributed to [Contour]."
This unambiguously establishes that the parties were not engaged
in a partnership.  Furthermore, Chance has not come forward with
any of the evidence that New Hampshire courts look to in

determining the existence of a partnership in the absence of a contrary written agreement, e.g., the sharing of profits or losses, the right to participate in the control of the enterprise, or the common holding of property.  See Hilco, 929 F. Supp. at 537.  So far as the court can tell from the materials submitted at earlier stages of this litigation, in fact, Contour simply hired Chance to manufacture certain products, without giving it any right to share in the profits, control, or ownership of Contour's business in selling them.[10]

To support its partnership theory, Chance relies exclusively on the deposition testimony of a number of its and Contour's employees calling the parties "partners."  But such post hoc characterizations of the parties' relationship do not create a partnership, particularly in the face of a contemporaneous agreement to the contrary.

As Contour points out, "even if a business relationship is called a partnership by its participants (or, as is more often the case, even if the participants refer to themselves as 'partners,') the arrangement will not be treated as a partnership

---

[10]In an excerpt of a deposition transcript that Chance filed after oral argument, Chance's general manager testified that Contour promised Chance a 25 percent stake in Contour.  But there is no evidence that Chance ever received that ownership interest (nor, for that matter, has Chance ever claimed in this action that Contour broke its promise to convey a stake in itself).

for state law purposes unless it meets the state's statutory partnership definitional requirements." J. William Callison & Maureen Sullivan, Partnership Law & Practice: General & Limited Partnerships § 5.1 (2002 & 2010 supp.); see also Rockwood v. SKF, Inc., 2010 DNH 213, 50 (ruling that, without evidence the parties had formed a joint venture, the defendant's "merely calling the relationship a joint venture does not make it so") (quotation marks and ellipse omitted), appeal docketed, No. 11-1105 (1st Cir. Feb. 8, 2011). As just discussed, Chance has not shown that its relationship with Chance was a partnership under New Hampshire law. So its motion to prevent Contour from seeking damages, or any remedy besides an accounting, is denied.[11]

---

[11]The foregoing discussion assumes that, even if Contour and Chance had in fact been partners, New Hampshire would treat an accounting as the exclusive remedy here. One partnership law treatise observes that "[a]pplication of the exclusivity rule is declining and it is likely that courts will increasingly permit actions at law among partners" for damages. Callison & Sullivan, supra, § 13:4. Indeed, the treatise cites authority from a number of jurisdictions either refusing to apply the exclusivity rule altogether or recognizing exceptions for torts or breaches of independent provisions of the parties' agreements, both of which Contour has alleged here. Id. Because Chance has not shown that the parties formed a partnership, though, this court need not decide whether an accounting is the exclusive remedy between partners in New Hampshire (whose courts do not appear to have previously spoken on this issue one way or the other).

### 4.   Allegedly undisclosed engineering drawings

Fourth, and finally, Chance argues that Contour cannot introduce into evidence any engineering drawings that it allegedly provided to Chance during their relationship, because Contour did not produce any such drawings in discovery.  In response, however, Contour has submitted a number of drawings that it says it did produce to Chance during discovery.  Chance does not dispute this, but asserted at oral argument that many of these drawings were not executed by Contour, but an independent designer, and therefore could not embody any trade secrets belonging to Contour.  But that argument goes to the merits of Contour's claims, not the admissibility of the drawings. Chance's motion to exclude the drawings from evidence is denied.

## IV.  <u>Conclusion</u>

For the foregoing reasons, Contour's motion to exclude McKenzie's testimony[12] is GRANTED, Contour's motions in limine[13] are GRANTED, and Chance's motions in limine[14] are DENIED.

---

[12]Document no. 126.

[13]Document no. 139.

[14]Document no. 143.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  May 12, 2011

cc:  Anne M. McLaughlin, Esq.
     Jonathan M. Woodard, Esq.
     Jordan L. Hirsch, Esq.
     Laura A. Sheridan, Esq.
     Lawrence L. Blacker, Esq.
     Michael J. Summersgill, Esq.
     Robert J. Gunther, Esq.
     Peter G. Callaghan, Esq.
     Felix J. D'Ambosio, Esq.
     John R. Schaefer, Esq.
     Thomas J. Moore, Esq.