UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Contour Design, Inc.

     v.                             Civil No. 09-cv-451-JL
                                          Opinion No. 2011 DNH 214
Chance Mold Steel Co., Ltd.
and EKTouch Co., Ltd.

## FINDINGS OF FACT AND RULINGS OF LAW
## ON NON-JURY RELIEF

Plaintiff Contour Design, Inc. sued defendants Chance Mold Steel Co., Ltd. and EKTouch Co., Ltd.,[1] claiming that they misappropriated Contour's trade secrets, and that Chance breached a non-disclosure agreement with Contour (the "NDA"), by manufacturing and selling certain computer mouse products, known as the "Classic," the "Open," the "Professional," and the "Ergoroller."  This court has jurisdiction over this action between Contour, a Delaware corporation with its principal place of business in Windham, New Hampshire, and the defendants, Taiwanese corporations, under 28 U.S.C. § 1332(a)(2) (diversity).

Contour's claims were tried to a jury, which found that both Chance and EKTouch had misappropriated one or more of Contour's trade secrets and that Chance had breached the NDA, and awarded

---

[1]For ease of reference, this order will use "Chance" to refer collectively to Chance and EKTouch, except where it is necessary to distinguish between them.  The defendants have admitted in their answer that EKTouch has the same principals and business address as Chance.

Contour $7.7 million--the full amount of compensatory damages it ultimately sought--against each defendant.  Contour's amended complaint requested for additional relief as to which, the parties agreed, neither had any right to trial by jury.  See Fed. R. Civ. P. 39(a).  That relief included:

> • exemplary damages and attorneys' fees under New Hampshire's version of the Uniform Trade Secrets Act, which authorizes those remedies in cases of "willful and malicious misappropriation," N.H. Rev. Stat. Ann. §§ 350-B:3, II, 350-B:4, I; and

> • a permanent injunction preventing Chance from marketing or selling products that misappropriated Contour's trade secrets or breached the NDA.[2]

Prior to the jury trial, the parties submitted proposed findings of fact and rulings of law on Contour's claim for willful and malicious misappropriation.  See L.R. 16.2(b)(2).  During the jury trial, Chance submitted supplemental proposed findings and rulings to the effect that a non-competition provision contained in the NDA was unenforceable; Contour submitted a response.

---

[2]The pleadings also raised other claims that were not specifically put to the jury:  Contour sought a declaratory judgment that the NDA was valid and enforceable, while Chance counterclaimed for a declaratory judgment that it had not misappropriated any of Contour's trade secrets.  The jury rejected the factual basis of Chance's counterclaim, finding that both Chance and EKTouch had misappropriated one or more of Contour's trade secrets.  The court addresses Contour's claim for declaratory relief in ruling that the NDA supports a permanent injunction.  See infra Part VII.C.

Following trial, the court briefly stayed these proceedings to give the parties an opportunity to settle this matter (which was unsuccessful), and new counsel appeared on behalf of Chance. The court then directed the parties to submit a joint statement, setting forth their respective positions on "whether and when the court should conduct an evidentiary hearing and receive briefing" on the outstanding claims for relief.  Order of Aug. 18, 2011, at 1 (document no. 200).  After reviewing that statement, the court ruled that it would hear evidence on "all issues relating to the propriety of a [permanent] injunction" (except for any equitable defenses, because Chance had not raised any in its answer) and set forth a schedule for briefing that matter.  Id. at 2-4.

In response, Contour submitted a proposed permanent injunction order, together with a supporting memorandum; Chance submitted an objection; and a reply and a sur-reply followed.  In large part, Chance's filings argued that the permanent injunction should not extend to a particular product, the ErgoRoller, which Chance claimed it had independently developed, without reference to any of Contour's trade secrets or confidential information. Chance did not dispute, however, that the court should permanently enjoin its manufacture and sale of two other ergonomic mouse products, the Open and the Professional.

3

The court then conducted an evidentiary hearing at which it received testimony and exhibits on the appropriateness of the permanent injunction, as well as some additional evidence from Chance in defense of the willful and malicious misappropriation claim.  Based on that evidence, as well as the evidence received during the jury phase of the trial, and with the assistance of the parties' written submissions, the court makes the following findings of fact and rulings of law.  See Fed. R. Civ. P. 52(a)(1).  These findings and rulings result in judgment for Contour on its claim that Chance's misappropriation of Contour's trade secrets was willful and malicious, and the issuance of a permanent injunction preventing Chance from manufacturing or selling the accused products, including the ErgoRoller.

## **Findings of fact**

### **I.   The parties and their relationship**

1.   Contour, located in the southern New Hampshire towns of Salem and Windham, designs, manufactures, and sells ergonomically friendly "computer pointing devices," including the "RollerMouse" series.  The products from this line feature a wide roller bar incorporated into a component placed centrally below the keyboard, as opposed to the configuration of a traditional computer mouse, which has a narrow trackball incorporated into a

4

smaller component placed to one side of the keyboard.  To perform the "click" function on a RollerMouse, the user simply depresses the roller bar.

2.   In 1995, Contour had just completed some successful initial testing of the prototype for its first ergonomic mouse, called simply the "Contour Mouse."  Contour's president and founder, Steven Wang, began seeking a manufacturer for the product.  To that end, he traveled to Taiwan to meet with the principals of Chance, a small company there that made molds--also known as "tooling"--for the manufacture of computer mouse products, but not the products themselves.  Molds are essentially metal forms into which molten plastic is injected.

3.   At all relevant times, Mei-Ling Wang (who is no relation to Steven Wang) has served as Chance's general manager. Before its introduction to Contour, Chance had made molds for a number of major computer mouse manufacturers, including Apple and Logitech.  Mei-Ling Wang also runs EKTouch, a company with the same principals, business address, and phone number as Chance, and which sells products manufactured by Chance.

4.   During the meeting, Steven Wang explained that his "number one concern" was "to keep our design secret," since he had only just filed for patent protection.  On June 15, 1995,

Contour, through Steven Wang, and Chance, through Mei-Ling Wang, executed the NDA, a two-page written agreement.

5.    The NDA stated that Contour "has certain inventions, designs, methods, samples, market information concepts and ideas (the 'Confidential Information') relating to computer mouse products and related materials ('the Product').  [Chance] desires to receive some of the Confidential Information to evaluate the desirability of entering into a manufacturing and distribution agreement with [Contour] for the Product (the 'Evaluation')."

6.    Section 1 of the NDA contained what the parties have come to refer to as a "non-disclosure provision."  There, Chance agreed, in relevant part, "to make no use of the Product or any Confidential Information except in connection with the Evaluation without the prior written consent of" Contour, and "to make no disclosure of the Product or any Confidential Information to any party without the prior written consent of" Contour.

7.    Section 3 of the NDA contained what the parties have come to refer to as a "non-competition provision," though it is entitled "Proprietary Product."  Under this provision, Chance "acknowledges that the Product is proprietary to [Contour] and that it will not duplicate, produce, manufacture or otherwise commercially exploit the Product, or develop any other product

derived from or based on the Product, without the prior written
agreement of" Contour.

8.    The NDA contains certain other relevant provisions.
Under section 5, Chance "acknowledges that its breach of this
Agreement will cause [Contour] irreparable harm for which no
adequate remedy exists at law, and that upon any such breach or
threatened breach [Contour] shall be entitled to injunctive
relief."   Section 6 provides that "[t]he obligations of [Chance]
and each employee and consultant of [Chance] under this Agreement
shall expire 20 years from the date of this Agreement."   Finally,
section 8 states that "[t]he domestic law of the State of
Colorado, United States of America shall apply to the performance
and interpretation of this Agreement."

9.    Mei-Ling Wang testified on direct examination at the
jury trial that, prior to her signing the NDA, Steven Wang told
her it was "a general nondisclosure agreement" and that "the
appearance of his mouse is patented, and he asked me to keep that
confidential," but did not say anything else about the NDA.   But
on cross-examination--which was characterized by repeated self-
serving and non-responsive answers to counsel's questions--she
testified that Steven Wang told her that the NDA was "the general
document applied to the Contour Mouse" and to her "understanding"
that the NDA applied only to the Contour Mouse and no subsequent

product.  The court cannot credit Mei-Ling Wang's testimony that
Steven Wang told her that the NDA applied only to the original
Contour mouse.

10.  Mei-Ling Wang, whose native language is Mandarin
Chinese but who understands some English, also testified that she
signed the NDA without understanding its contents.  She explained
that she had signed the NDA with Contour even though she did not
understand it (and did not ask anyone to translate it to Mandarin
for her) because she was young and inexperienced at the time.
She acknowledged, though, by the time she signed the NDA, she had
already signed non-disclosure agreements with other companies,
including manufacturers who supplied Logitech and Apple.

11.  After signing the NDA in June 1995, Chance proceeded to
manufacture not only the Contour Mouse, but a series of ergonomic
mouse products for Contour.  These included the the RollerMouse
"Classic" (released in 2002), the RollerMouse "Pro" (released in
late 2004), and the RollerMouse "Free" (released in early 2009).

12.  Contour paid Chance for its work in manufacturing the
products on a per-unit basis.  Chance was not paid separately for
its work in developing or manufacturing the tooling used to make
the products--those costs were built into the per-unit price
agreed to by the parties in advance, based on their estimates of
how much the tooling would cost to produce and how many units

were expected to sell.  Over the course of their relationship,
Contour paid Chance more than $40 million.

13.  Developing the Classic, the first product in Contour's
RollerMouse line, took about two years.  Developing the Pro took
about one additional year, and developing the Open took about two
years beyond that.  As this chronology suggests, the development
of each of these products was a time-consuming (and expensive)
process.  Development generally started with Steven Wang's
decisions as to what new features should be incorporated in the
product, based in part on feedback from Contour's customers.
Steven Wang then worked through a back-and-forth process with an
industrial designer to achieve a "general look" of the product.
Contour sent the resulting drawings to Chance, which would build
a prototype of the product for review by Contour and the
industrial designer, who made changes:  that process usually
encompassed between four and six iterations of the prototype over
a six-month span.  Once Contour was satisfied with the product's
appearance, further changes were usually necessary to ensure both
that the product was both functional and "implementable," i.e.,
it could be manufactured through the use of tooling.  These final
changes resulted in a functional prototype ready for production.
Chance then made the molds for the product and began
manufacturing it.

14.  Hsiu "Frank" Nien, a moldmaker for Chance, testified that there are between 13 and 15 sets of molds used to make a RollerMouse product, which has more than 100 parts.  Making the molds for such a product takes between eight and ten months.

15.  Contour provided Chance with the firmware (the computer code programmed into hardware to define how it functions) for each of the RollerMouse products before Chance began manufacturing them.  Contour developed the firmware for each of those products without any involvement from Chance, and did not share the code for the firmware with anybody but Chance.

## II.  Development of Chance's Ergoroller product

16.  Contour originally directed Chance to make a prototype of the RollerMouse Free that incorporated two major revisions from the prior RollerMouse model (the Pro):  first, a roller bar that was removable, so it could be cleaned more easily and, second, an overall lower profile, so the mouse would better align with contemporary keyboards.  The idea of the removable roller bar was based on Steven Wang's discussions with a customer that said it wanted a roller that could be easily cleaned, but did not suggest how to implement that feature.  In ensuing back-and-forth discussions with the customer, Contour proposed making the bar removable, and the customer expressed enthusiasm for that idea.

10

17.   Contour believed that the best way to implement the removable bar was to place one end of the roller bar on an "axle," with one end held in a hinge and the other behind a "trapdoor."  When the trapdoor was opened, the axle could be turned upward on the hinge, allowing the roller to be slid off the axle for cleaning.

18.   Development of the Free began in 2006.  After approximately a year and a half, Chance produced a prototype with a removable roller, but the prototype did not function acceptably because the bar moved too much.  Chance told Contour, in fact, that Chance was unable to implement the removable roller concept. Eventually, Contour decided to move ahead in producing the Free without the removable bar and with the profile about 1/4 inch higher than that in the prototype.  Contour told Chance of this decision in or around August 2008.

19.   At or around that same time, Steven Wang met in New Hampshire with an engineer Chance had recently hired, "Mhaco" Chiang, as well as with Mei-Ling Wang and other Chance personnel. Discussion focused on finalizing the design of the Free to get it ready for production, as well as "the next step," which Steven Wang described as a RollerMouse with a removable bar and a 1/4-inch lower profile.  Steven Wang and Chiang talked extensively about different ways to design that product.

11

20.  Contour began selling the RollerMouse Free in January
2009.  While, per Contour's decision, the Free does not have a
removable roller bar, it does have a metal axle running through
the center of the roller bar, with each end of the axle
positioned inside a trough.  The trough is itself placed on a
hinge so that, when the roller bar is depressed, the trough
swings downward, serving as the switch that activates the "click"
function.  The trough also holds the bar to an optical sensor,
mounted roughly in the center of the trough, that detects the
movements of the bar.

21.  Chance announced the introduction of its ErgoRoller
product, sold under the EKTouch name, at an industry trade show
in early March 2009.  By that time, Chance had produced a
"working sample" of the ErgoRoller.  In September 2009, Chance
committed to sell the ErgoRoller to a distributor in Sweden; by
October 2009, the ErgoRoller was pictured on EKTouch's website;
and, in March 2010, Chance had agreed to sell the ErgoRoller to
another Swedish distributor, Gunnar Drougge, see infra Part
III.34.  Thus, while there is no evidence that Chance began "mass
production" of the ErgoRoller before October 2010, as Mei-Ling
Wang testified, it was engaged in serious efforts to market the
product well before then.

22.   Chance's witnesses testified that they did not start working on the ErgoRoller until they stopped working with Contour on the RollerMouse Free at the end of the summer of 2008.  So, even though Chance did not begin working on the ErgoRoller until the fall of 2008, at the earliest, it was able to build a working sample within six months, and had committed to selling the product to a distributor within one year--even though, as Mei-Ling Wang explained, normally just "to do research and development of a product would take approximately two years."

23.   The dimensions of Chance's ErgoRoller are similar to those of Contour's RollerMouse Free, and the products have many of the same features, including the position of the buttons (though the ErgoRoller has five buttons while the Free has only four, and the ErgoRoller's buttons are differently shaped from those of the Free), the material used for the surface of the roller, the diameter of the roller, and the removability of the wrist rests as a single piece.  As a result, the "feel" of the ErgoRoller to a user is very similar to the "feel" of the Free to a user.  But the ErgoRoller is overall squarer and more compact in design than the Free, and its profile is lower.

24.  Most significantly, the ErgoRoller has a removable roller bar.  This was not achieved by placing the roller bar on a hinged axle, as in the original prototype of the RollerMouse

13

Free, but by placing the roller bar in a trough in which it slides and rotates freely, so that the bar can simply be lifted out of the trough for cleaning.  As in the Free, the trough of the ErgoRoller contains an optical sensor, mounted roughly in the center of the trough, that detects the movements of the bar. Steven Wang does not know of any implementation of this design in the market, aside from the Free and the ErgoRoller.  Also as in the Free, the trough of the ErgoRoller is mounted on a hinge so that, when the roller bar is depressed, the trough swings down, serving as the switch that activates the "click" function.

25.  In response to leading questions from Chance's counsel during the non-jury portion of trial, Mei-Ling Wang testified that the molds used to make the components of the Free would not be useful in making the components of the ErgoRoller, because each set of molds would be a different size and shape.[3]  She did not give the same testimony as to the electronically stored files used to produce the molds, though counsel attempted to elicit that testimony through leading questions as well.  Steven Wang testified at the jury trial that, as "the electronic

---

[3]Nien testified at the jury trial that Chance made the molds for the ErgoRoller, but did not describe that process any more specifically, and was not called to testify at the non-jury portion of the trial.  Nien also testified at the jury trial that, in coming up with the ErgoRoller, Chance drew on its experience in making RollerMouse products for Contour.

representation of the tooling," those files "are the critical parts to make any tooling changes or make a new set of tools." During the development of the ErgoRoller, Chance possessed the electronic files representing the tooling for the Free and still has them, despite Contour's demand for their return.

26.  Chiang, one of the engineers who had worked on the design of the RollerMouse Free, did the design work on the physical aspects of the ErgoRoller.  Again, Chiang was hired by Chance in July 2008, and had extensive discussions with Steven Wang about designing a version of the Free with a removable bar and a 1/4-inch lower profile, see Part II.19, supra.

27.  The parties have stipulated that both the firmware and the electronic components for the ErgoRoller were independently developed and not derived from any of Contour's products.

28.  Chance has since started selling another product, the "ErgoRoller Plus," that is identical to the ErgoRoller in all respects relevant here.  One of Chance's employees described the ErgoRoller Plus as the "former Contour Free" in an email to one of Chance's customers.


**III. Deterioration of the Contour-Chance relationship**

29.  Contour learned about Chance's ErgoRoller product in March 2009, as a result of its introduction at the industry trade

15

show.  After learning of this, Contour continued placing orders with Chance for a period because Steven Wang felt "defenseless," since Chance possessed all of the molds for Contour's ergonomic mouse products.  Contour ultimately stopped placing those orders around May or June 2009, after Chance began demanding payment for the products before they shipped, which was different from how the parties had done business in the past.

30.  Mei-Ling Wang, for her part, testified to a meeting in New Hampshire with Steven Wang in August 2008.  She said that, at this meeting, he told her he planned to compare the cost of manufacturing RollerMouse products at a firm in mainland China to the cost of manufacturing those products at Chance, in Taiwan.[4]

---

[4]During the non-jury portion of the trial, Mei-Ling Wang testified to additional details of this meeting, including that Steven Wang told her she needed to "think of [her] own way" to do business without Contour and that, "if other customers sought [her] out . . . of course, go with them."  The court does not find this late-emerging testimony about Steven Wang's comments at the meeting to be credible.  It is also worth noting that, while Steven Wang acknowledged having the meeting, he denied saying even that he had decided to compare the cost of manufacturing Roller Mouse products in China to that in Taiwan, or even having considered moving the manufacture of the RollerMouse products to mainland China prior to his discovery of Chance's ErgoRoller product in March 2009. Indeed, he testified that he had assured Chance many times that he would not do so.  For purposes of making findings and rulings on the non-jury claims, however, the court will assume that Steven Wang did tell Mei-Ling Wang during this meeting about his plans to look into the comparative costs of making the RollerMouse in mainland China.

31.  In 2004, Chance had started manufacturing plastic cases
that Contour had designed for the iPod, an Apple product.  By
2006, however, the market for those cases had become fiercely
competitive, prompting Steven Wang to try to reduce the
production costs.  To that end, Contour introduced Chance to a
potential manufacturer for the cases in mainland China, but
Chance was not interested in that solution.  So Contour went
about having the cases manufactured in mainland China without
Chance's involvement.

32.  Mei-Ling Wang explained at trial that, based on the
effect this shift had on Chance's business, Steven Wang's comment
in August 2008 left her "thinking if he has moved the RollerMouse
to China in 2008, then two years later we will have zero
business."  She recalled that "ever since" Contour had started
making iPod cases in China in 2006, Chance's "sales decreased
from $7.9 million to $4.2 million."

33.  Thus, Mei-Ling Wang testified:

> taking into consideration the long-term survival,
> considering there are 60 families we have to take care
> of, we have 60 employees . . . [,] we accumulated the
> experience that we have gained of doing the
> RollerMouses, we started to develop our own product,
> [the] ErgoRoller.

Mei-Ling Wang also testified that this meeting left her with a
"sour feeling" and that Steven Wang had "betrayed" Chance.

17

**IV.  Chance's "Classic," "Open," and "Professional" products**

34.  When Contour stopped placing orders with Chance in summer 2009, Chance still had some inventory of Contour products. Later in 2009, Chance was contacted by Gunnar Drougge, the owner of a company in Sweden, Ergoption AB, that had previously sold products for Contour.  Drougge reached out to Chance after seeing the ErgoRoller pictured on the EKTouch website.  See Part II.21, supra.  Drougge suggested to Chance that "we keep our contact secrete [sic] so that no harm comes to your business."

35.  In a series of emails with Chance personnel, including Mei-Ling Wang, Drougge declared, "I want to buy products from you so that I can take the existing sales of RollerMouse . . . .  If we can have a situation when Contour is out of storage of [R]ollermouse then there is a 'window of opportunity' where we can approach the customers and inform them that there is a new supplier of the RollerMouse."  Drougge explained that the urgency of further shipments "depend[s] on whether you have just sent a container to Contour or not.  If they have a good supply it will take [a] long time to convert customers away from Contour seeing we will then have missed the 'window of opportunity.'"

36.  During the back-and-forth with Drougge, Chance requested a letter from his lawyer, apparently in response to concerns about Chance's ability to provide Drougge with the

18

RollerMouse products.  EKTouch later received a letter, dated
February 5, 2010, from an attorney in Sweden purporting to
represent Ergoption.  The letter stated that "[t]he only
limitation is that Ergoption is not allowed to use in its line of
business the trademark RollerMouse . . . .  Therefore, Ergoption
can <u>without limitation</u> ask you to manufacture or have
manufacture[d] the RollerMouse product with the [intellectual
property] rights embodied within."  But the letter did not say
what rights <u>Chance</u> had vis-a-vis Contour's products.
Furthermore, neither the attorney nor his client, Ergoption, was
aware of the provisions--or even the existence--of the NDA
between Chance and Contour.

     37.  Mei-Ling Wang also testified that before Chance began
shipping products to Ergoption, she brought a copy of the NDA to
a lawyer in Taiwan, who told her "there will be no problem."  She
did not identify this lawyer or describe his or her advice more
specifically, nor did Chance supply any documentary evidence of
this interaction.  The court does not credit this testimony about
the Taiwanese lawyer's advice.[5]

_____

     [5]During the non-jury portion of the trial, Mei-Ling Wang
testified that her prior counsel of record in this case advised
her that, because the molds used to make Contour's products
belonged to Chance, it was permissible to sell those products to
Drougge.  There are two problems with this testimony.  First, it
was not disclosed until the morning that the non-jury portion of
the trial began, depriving Contour of the opportunity to take any

38.  Drougge recommended "sell[ing] the products under new names," the "Classic" (which, of course, was actually the same name as Contour's product), the "Professional," and the "Open," and asked for an initial shipment of the RollerMouse Pro, "printed with Professional and with no brand or company name on or under the plastic case."  Drougge also asked that Chance modify the products to resemble the ones Contour had on the market at that point, including by changing the functions of the buttons to match those on the upcoming version of the RollerMouse Pro and making the wrist rests out of the same material used in the RollerMouse Free.  Chance agreed to these modifications.

39. Chance began shipping the "Open," "Professional," and "Classic" products to Drougge in March 2010.  These products came from Chance's existing inventory of the Contour's Free, Pro, and Classic products.

---

discovery on this issue.  "A party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver."  Vicinanzo v. Brunschwig & Fils, Inc., 739 F. Supp. 891, 894 (S.D.N.Y. 1990).

    Second, the testimony is not credible in any event because, much like Mei-Ling Wang's account of the advice from the lawyer in Taiwan, it is unsupported by any documentary evidence.  While, at the non-jury trial, Chance introduced emails from its prior counsel purportedly corroborating her account, those emails simply memorialize a conversation in which Chance gave its counsel information they needed for "further consideration" of Drougge's proposal to buy Contour products from Chance.  They do not reflect any advice counsel ultimately gave Chance.

40.  After Chance had exhausted this inventory, it began producing "new" versions of the Open and the Professional and selling them to Drougge.  The only difference between the "old" and the "new" versions of the Open and the Professional that Mei-Ling Wang was able to identify, however, was the firmware in the "new" versions of those products.  The "old" versions of the products used the firmware Contour had provided to Chance. During the jury phase of the trial, Mei-Ling Wang testified that the firmware in the "new" Open and Professional had been modified from the firmware for Chance's ErgoRoller, which was itself created by a company hired by Chance.[6]  In total, Chance sold fewer than 7,000 units of the Open and the Professional to Drougge, at a price of $60 each.

41.  Preben Bitsch, who works for a company that distributes Contour's products in Europe, testified that his company's sales of those products, including the Free, the Pro, and the Classic, "changed dramatically" in the spring of 2010, just after Chance began supplying its versions of those products to Drougge.  In

---

[6]Just prior to the start of the non-jury part of the trial, the parties stipulated that "the software in the second generation versions of the Chance Professional and the Chance Open were [sic] independently developed and was not derived from Contour product's or firmware."  That stipulation was not part of the record at the jury trial, however.

fact, two of his regular customers stopped buying Contour
products from him completely.

42.   In September 2010, in fact, Drougge informed Chance
that, unbeknownst to Contour, its "best dealers ha[d] all ready
[*sic*] switched over to our products for much of there [*sic*]
sales," and that he was selling the "RM Free" (which, of course,
was the name of Contour's product, not Chance's) "to customers
that Contour can NOT supply seeing they are out of storage."
Chance responded that it was "really good news that [Drougge had]
increase[d] sales and take[n] as many as [he could] of customers
from Contour."

43.   Steven Wang explained that the market for RollerMouse
products is relatively small, focused on consumers who have
suffered repetitive stress injuries from using a traditional
computer mouse, and that once such a customer is lost to a
different manufacturer, it is difficult to get him or her back.
Contour has only two competitors in the market for its Roller
Mouse products, and a market share of about 55 percent.

44.   Chance admitted at the jury portion of the trial, both
in its opening statement and in the testimony of Mei-Ling Wang,
that Chance used the same molds to produce the "new" Open and the
Professional as it had used to produce the Free and the Pro for
Contour.  Before using these molds, however, Chance scratched out

22

an inscription, "In Memory of Charlie," that had been placed in the mold for the RollerMouse Pro as a tribute to a Contour engineer who had died during its development.  Thus, the "new" versions of the Professional did not have the telltale inscription that appeared inside the "old" versions of the product that Chance had sold to Drougge.

45.  The Chance Professional, in both its "old" and "new" versions, is nearly identical to Contour's RollerMouse Pro in both appearance and functionality.  The Professional contains the same printed circuit board as the Pro, except, in Chance's version, white-out has been used to cover the words "RollerMouse Pro" where they appeared.

46.  Similarly, the Chance Open, in both its "old" and "new" versions, is nearly identical to Contour's RollerMouse Free in both appearance and functionality.  The Professional contains the same printed circuit board as the Pro, except, in Chance's version, white-out had been used to cover the words "RollerMouse Free" where they appeared.

47.  Mei-Ling Wang explained that it was in response to the letter from the Swedish attorney, see Part III.37, supra, that Chance put white-out over the word "Contour" where it appeared on the circuit boards inside the Open and the Professional.  But Chance also agreed to Drougge's subsequent request to send

23

versions of the RollerMouse products in boxes taped with plain
tape, rather than tape bearing the EK Touch name, so that
customers "will not report to Contour."

V.    **Contour-Chance litigation**

48.   Contour filed its initial complaint commencing this
action in late December 2009, together with a motion for a
temporary restraining order seeking to prevent Chance from
exhibiting the ErgoRoller at a then-upcoming trade show in Las
Vegas.  Chance appeared through counsel, filing an objection to
the motion in early January 2010.  Following a hearing, this
court granted the motion, finding, among other things, that
Chance, "by virtue of either the written confidential provision
of the NDA or Chance's verbal assurances to the same effect," had
a duty preventing it "from disclosing any of Contour's
confidential information to anyone else." Contour Design, Inc.
v. Chance Mold Steel Co., 2010 DNH 011, 23.

49.   Contour learned of the appearance of Chance's Open,
Professional, and Classic on the market in June 2010.  Contour
responded by filing an amended complaint in this action, and,
shortly thereafter, a motion for a preliminary injunction,
alleging, inter alia, that Chance's marketing and sale of the

Open and the Professional amounted to a violation of both the
non-disclosure and non-competition provisions of the NDA.

50.  Engaged at the time in a jury trial in another case,
this court referred the motion to Magistrate Judge McCafferty,
who, following an evidentiary hearing on August 26, 2010, issued
a report and recommendation that the motion be granted in part.
Contour Design, Inc. v. Chance Mold Steel Co., No. 09-451, 2010
WL 4774283, at *13 (D.N.H. Oct. 22, 2010).  Judge McCafferty
found that Contour had established a likelihood of success on its
claim that the tooling and firmware for the Pro and the Free
amounted to "Confidential Information" under the NDA, and that
Chance had used that tooling and firmware to produce the
Professional and the Open, despite agreeing in the NDA not to do
so.  Id. at *7-*10.  She also found that, even if the tooling and
the firmware for the Pro and the Free were not "Confidential
Information," Chance's manufacture of the Professional and the
Open still violated the NDA, which independently prohibited it
from making products "based on" Contour's.  Id. at *10-*11.

51.  Judge McCafferty recommended that Chance be
preliminarily enjoined "from showing, offering for sale, selling,
marketing, manufacturing, distributing, or displaying the Chance
'Open' and 'Professional' computer mouse products" or "any
product . . . that is the same as, similar to, or derived from"

25

those products.  Id. at *14.  She further recommended ordering
Chance to "recall any orders in transit" for, and "to recall from
any distributors and retailers all inventory" of, those products;
and to "return to Contour all Contour product information,
including but not limited to design information, specifications
and firmware, and the product tooling used to manufacture Contour
products."  Id.  But Judge McCafferty declined to extend the
preliminary injunction to the ErgoRoller, because, first, Contour
had not argued for that relief until after the hearing had
concluded and, second, the evidence before her "raise[d] serious
doubts about whether the removable roller concept had the
character of 'confidential information'" under the NDA.  Id. at
*4.  She did not, however, express any view on whether Chance had
used any of Contour's other claimed trade secrets or confidential
information in making the ErgoRoller.

　　52.  Over Chance's objection, this court approved Judge
McCafferty's report and recommendation in its entirety.  Contour
Design, Inc. v. Chance Mold Steel Co., No. 09-451, 2010 WL
4736428 (D.N.H. Nov. 12, 2010).  Chance then appealed the
preliminary injunction to the court of appeals, Contour Design,
Inc. v. Chance Mold Steel Co., No. 10-2415 (1st Cir. Dec. 9,
2010), and, although it sought to stay the litigation in this
court pending appeal (which this court declined to do) did not

26

ask either this court or the court of appeals to stay the
<u>injunction</u> itself.  The court of appeals ultimately affirmed the
preliminary injunction, in a decision rendered after the jury's
verdict in this court.  See <u>Contour Design, Inc. v. Chance Mold
Steel Co.,</u> 649 F.3d 31 (1st Cir. 2011).

53.  Even after this court approved Judge McCafferty's
recommendation that the preliminary injunction issue, Chance
continued making arrangements to sell the Open and the
Professional to Drougge.  On or around November 16, 2010, in
fact, Chance sent two units of the Open to Drougge and, over the
next few days, had discussions with him over email about making a
superficial change to the Open as "some thing that can be used to
say the products are NOT identical."

54.  On November 22 (ten days after this court approved the
recommended preliminary injunction), Chance informed Drougge
that, owing to that order, it could not sell the Open or the
Professional.  But Chance also told Drougge that it could still
sell the Classic because that product was "not include[d] in the
injunction"--even though the injunction required Chance to return
the tooling that would have been used to produce the Classic.

55.  Chance later provided Drougge with a statement for him
to give to his customers "regarding the RollerMouse
Pro/Professional and Roller Mouse Free/Open" products.  The

statement, signed by Mei-Ling Wang on behalf of Chance, asserts that it "considers the tooling/moulds as our company property and with no restrictions to produce, market or sell products made from the moulds as long as no patent laws are broken, except that there is a 'Preliminary Injunction' (temporary injunction) against the same issued by" this court "in a pending lawsuit filed by Contour."  The statement did not mention that the preliminary injunction required Chance to return those molds to Contour, or indeed, describe the order any further.

56.  For the reasons explained more fully <u>infra</u> at Part VI.A., the court finds that Chance engaged in willful and malicious misappropriation.

57.  For the reasons explained more fully <u>infra</u> at Part VII.B, the court finds that the electronic files that Chance used to produce the molds for making the Contour Free are "Confidential Information" under the NDA, and that Chance used that confidential information to make the ErgoRoller.

58.  For the reasons explained more fully <u>infra</u> at Part VII.C, the court finds that the ErgoRoller is "derived from or based on" Contour's "computer mouse products and related materials" under the NDA.

**Rulings of law**

**VI.   Willful and malicious misappropriation**

A.   Willful and malicous misappropriation exists

1.   Under the "Damages" provision of New Hampshire's
version of the Uniform Trade Secrets Act, "[i]f willful and
malicious misappropriation exists, the court may award exemplary
damages in an amount not exceeding twice any award made" as
"damages for misappropriation." N.H. Rev. Stat. Ann. §§ 350-B:3,
I, II.  If "[w]illful and malicious misappropriation exists," the
court further "may award reasonable attorneys' fees to the
prevailing party." Id. § 350-B:4, III .

2.   The New Hampshire Supreme Court has yet to interpret
the phrase "willful and malicious misappropriation" as it appears
in § 350-B.  That court has, however, interpreted the terms
"willful" and "malicious" as they are used in establishing the
standard for liability for enhanced damages in other
circumstances.  First, the New Hampshire Supreme Court has
observed that "although 'willful' is a word of many meanings
depending on the context, we have usually interpreted it to
exclude an act committed under a mistaken belief of the operative
facts," i.e., "[a] willful act is a voluntary act committed with
an intent to cause its results." Rood v. Moore, 148 N.H. 378,
379 (2002) (internal quotation marks omitted) (reading N.H. Rev.

29

Stat. Ann. § 540-A:2, subjecting landlord to enhanced damages if
he "willfully violates a tenant's right to quiet enjoyment").

3.  Second, the New Hampshire Supreme Court has ruled that,
under its decisions limiting enhanced damages to cases of
"wanton, malicious, or oppressive conduct," it is not enough for
the plaintiff to show the defendant's "intentional doing of a
wrongful act." Munson v. Raudonis, 118 N.H. 474, 478-79 (1978).
Instead, the court held, "we prefer to base such an award only on
a showing of actual malice.  There must be ill will, hatred,
hostility, or evil motive on the part of the defendant." Id. at
479 (citation omitted).

4.  Neither of the parties has addressed the meaning of
"willful and malicious" under § 350-B.  Accordingly, this court
assumes that the New Hampshire Supreme Court would interpret the
terms as they appear there in the same way in which that court
has interpreted them in analogous contexts.  See Nucar
Consulting, Inc. v. Doyle, No. 19756, 2005 WL 820706, at *14
(Del. Ch. Apr. 5, 2005) (employing the same approach in
construing the "willful and malicious misappropriation" provision
of Delaware's version of the Act).  A finding of "willful and
malicious misappropriation" under New Hampshire's version of the
Uniform Trade Secrets Act, then, requires a finding that the
defendant engaged in the acts of misappropriation with the intent

30

to bring about their likely results and with ill will, hatred, hostility, or evil motive.[7]

5.    As already noted, <u>see</u> Part V.56, the court finds that, under this standard, Chance engaged in willful and malicious misappropriation.  As an initial matter, the fact of the misappropriation is clear:  Chance provided Drougge with the very same products it had made for Contour, which were produced using the very same molds and (at least in their initial versions) contained the very same firmware.  Chance did so after having served as the exclusive manufacturer of Contour's mouse products for some 13 years, during which Chance had never sold those products to anyone but Contour.

6.    Chance embarked on a conscious effort to exploit the end of this long-term relationship by supplying Roller Mouse products to Drougge in a "window of opportunity" during which Contour could not supply those products to its customers.  This sort of treacherous opportunism supports a finding of willful and malicious misappropriation.  <u>See</u> <u>B & B Microscopes v. Armogida</u>, 532 F. Supp. 2d 744, 756-57 (W.D. Pa. 2007); <u>Elm City Cheese Co.</u>

_____

[7]This is also how courts in other states have generally interpreted their versions of the Uniform Trade Secrets Act. <u>See</u>, <u>e.g.</u>, <u>Learning Curve Toys, Inc. v. Playwood Toys, Inc.</u>, 342 F.3d 714, 730 & n.9 (7th Cir. 2003) (interpreting Illinois version of the Act); <u>Haught v. Louis Berkman LLC</u>, 417 F. Supp. 2d 777, 784 (N.D. W. Va. 2006); <u>Nucar</u>, 2005 WL 820706, at *14.

v. Federico, 752 A.2d 1037, 1056-57 & n.2 (Conn. 1999); Agilent
Techs., Inc. v. Kirkland, No. 3512, 2010 WL 610725, at *34 (Del.
Ch. Feb. 18, 2010).  Indeed, Chance's correspondence with Drougge
shows that it willingly--if not enthusiastically--joined him in
his clandestine campaign to take Contour's customers by selling
them unauthorized versions of the products it had developed (and
which had been made by misappropriating Contour's trade secrets,
rather than through any legitimate means of competition).

7.  To that end, Chance engaged in a series of efforts to
obscure the source of the products it sold to Drougge.  It
scratched off the telltale inscription, "In Memory of Charlie,"
from the molds.  It covered the product names where they appeared
on the circuit boards inside the products.  It used plain tape,
rather than EKTouch tape, on the boxes.  A defendant's attempts
to conceal its misappropriation support a finding that it was
willful and malicious.  See, e.g., Learning Curve, 342 F.3d at
730; Molex, Inc. v. Nolen, 759 F.2d 474, 479-80 (5th Cir. 1985);
Boeing Co. v. Sierracin Corp., 738 P.2d 665, 680-81 (Wash. 1987).

8.  Chance's statements, both in contemporaneous emails and
at trial, further show that it was acting with "ill will, hatred,
hostility, or evil motive" toward Contour.  In response to
Drougge's crowing over the fact that, unbeknownst to Contour, its
best dealers had switched over to Chance's products, one of

Chance's employees wrote that it was "really good news that [he had] increase[d] sales and take[n] as many as [he could] of customers from Contour." While Chance, in its closing argument at the non-jury phase of the trial, sought to downplay this statement as mere solicitousness from Chance toward its customer, the fact remains that Mei-Ling Wang herself expressed something between ill will and hostility toward Contour in her trial testimony, stating that she had a "sour feeling" after her final meeting with Steven Wang and that he had "betrayed" her. This admitted animosity toward Contour further supports a finding of willful and malicious misappropriation. See Elm City Cheese Co, 752 A.2d at 1037.

9. Chance persisted on its course of misappropriation even after this court issued the preliminary injunction ordering Chance, among other things, to stop selling the Professional and the Open and to return the molds used to make Contour products. Chance subsequently made additional sales of the Professional to Drougge, had discussions with him about making a superficial change to the Open as "some thing that can be used to say the products are NOT identical," and provided him a statement to distribute to his customers telling them that, because Chance owned the molds used to produce the Open and the Professional, it faced "no restrictions" on manufacturing or selling those

products (aside from the preliminary injunction, which the statement referenced but did not describe in any way--and which, of course, was based in large part on this court's finding that the molds in fact belonged to Contour, not Chance). This disrespectful--if not contemptuous--attitude toward the preliminary injunction also supports the conclusion that Chance was acting willfully and maliciously. See Mangren Research & Dev. Corp. v. Nat'l Chem. Co., 87 F.3d 937, 946 (7th Cir. 1996) (ruling that defendants' "irreverent" attitude toward potential liability showed willful and malicious misappropriation).

10. Finally, while Contour bears the burden of proving willful and malicious misappropriation, see 4 Roger M. Milgrim, Milgrim on Trade Secrets § 15.02[3][i], at 15-383 (Eric E. Bensen, ed., 2003 rev. ed. & 2011 supp.), the evidence just discussed meets that burden, and Chance has offered little in the way of a less culpable explanation for its behavior. In its proposed findings and rulings on the willful and malicious misappropriation claim, Chance argues solely that it relied on a settlement agreement between Ergoption (Drougge's company) and Contour, which Chance says it understood to allow it "to manufacture rollermouse products for Ergoption to sell in the geographic area of the Settlement Agreement using the molds for

34

Contour's Pro and Open."  There are at least two problems with
this argument.

11.  First, it lacks evidentiary support.  Neither Mei-Ling
Wang nor anyone else from Chance testified to having even seen
the settlement agreement between Contour and Ergoption at any
point before deciding to sell products to Drougge, let alone
developed the "understanding" of that agreement that Chance now
asserts.  Indeed, the settlement agreement itself was not
admitted into evidence at either phase of the trial.[8]

12.  Second, even putting that deficiency aside, the
agreement plainly governs the relationship between Contour and
Ergoption, not between Contour and Chance.  In relevant part, the
agreement (which was supplied to the court with Contour's
pretrial motions in limine, see n. 8, supra) granted Ergoption
"and its subsidiaries and affiliates" a license "to make [and]
have made" products within the scope of specified patents.  This
provision cannot be reasonably understood to authorize Chance, or
any other third party, to make those products, regardless of any

---

[8]In its pretrial order resolving the parties' motions in
limine, the court ruled that Chance could not "introduce the
agreement into evidence or [] argue its effect to the jury," but
noted that Chance "may make that argument to the court if it
wishes."  Contour Design, Inc. v. Chance Mold Steel Co., 794 F.
Supp. 2d 315, 326 (D.N.H. 2011) (footnote omitted).  Yet Chance
never tried to enter the settlement agreement into evidence, even
during the non-jury phase of the trial.

existing legal restrictions on the third party's ability to do so, including trade secrets law.[9]  Again, there is no evidence that Chance ever understood the agreement that way.  The existence of the settlement agreement (even if Chance was aware of it at the relevant time) in no way mitigates against the evidence of willful and malicious misappropriation here.

13.  In its argument at the close of the non-jury portion of the trial, Chance claimed that it was "trying conscientiously to figure out" the legality of selling the Roller Mouse products to Drougge and "was told that it was right," particularly by its prior counsel of record in this case.  As already noted, though, Chance cannot legitimately make that argument now, since it never disclosed this advice previously, and, in any event, this court disbelieves Mei-Ling Wang's testimony that she received any such advice from her prior counsel of record or the unidentified attorney in Taiwan.  See n. 6 and accompanying text, supra.

14.  While Chance did receive advice from Ergoption's attorney, that advice (at least so far as it appears in the trial record[10]) merely parroted the license provision of the settlement

---

[9]As the court of appeals observed in rejecting Chance's reliance on the settlement agreement in its appeal from the preliminary injunction, "nothing indicates that [the agreement] would free Chance from the NDA restrictions invoked in this case."  Contour Design, 649 F.3d at 33-34 n.1.

[10]During the jury portion of the trial, Chance was permitted to introduce, over Contour's objection, a redacted version of the

agreement, which, as just discussed, speaks to Ergoption's rights, not Chance's.  Moreover, Chance never told Ergption's attorney about the NDA and the duty it imposed on Chance to maintain the secrecy of Contour's confidential information--despite the fact that this court had already ruled by that point that the NDA imposed just such a duty.  Contour Design, 2010 DNH 011, 23.  Naturally, "[t]he defense of good-faith reliance on advice is not available to one who omits to disclose material information to advisors." Janeiro v. Urological Surgery Prof. Ass'n, 457 F.3d 130, 147 (1st Cir. 2006).  Chance has come forward with no evidence to cast doubt on the finding that it engaged in willful and malicious misappropriation of Contour's trade secrets.

B.   <u>Exemplary damages are awarded in the maximum amount</u>

15.  Having found willful and malicious misappropriation, the court must now decide the amount of exemplary damages to award Contour.  As already noted, "the court may award exemplary damages in an amount not exceeding twice any award made under paragraph I," N.H. Rev. Stat. Ann. § 350-B:3, II, which itself

---

letter that Ergoption's lawyer provided to Chance, <u>see</u> Part IV.36, <u>supra</u>.  But Chance did not try to introduce the unredacted version of that document at any point, including the non-jury phase of the trial.

authorizes damages for "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation," id. § 350-B:3, I. As its use of the word "may" indicates, the exemplary damages provision of the Uniform Trade Secrets Act leaves the amount within the discretion of the court (provided, of course, that it does not exceed twice the damages awarded for actual loss or unjust enrichment). See, e.g., ClearOne Commc'ns, Inc. v. Bowers, 643 F.3d 735, 758 (10th Cir. 2011); Boeing Co., 738 P.2d at 680; 2 Callman on Unfair Competition, Trademarks and Monopolies § 14:42, at 14-370 (Louis Altman, ed., 4th ed. 2004).

16. In this sense, the exemplary damages provision of the Uniform Trade Secrets Act "follows federal patent law," specifically, 35 U.S.C. § 284, which authorizes increased damages in patent infringement actions. Uniform Trade Secrets Act § 3 cmt., 14 ULA 635 (2005). So, in assessing exemplary damages under the Uniform Trade Secrets Act, courts have looked to case law applying § 284, most notably the decision in Read v. Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992). See ClearOne Commc'ns, 643 F.3d at 758-59; Biocore, Inc. v. Khosrowshahi, No. 98-2031, 2004 WL 303194, at *4 (D. Kan. Feb. 2, 2004); Olson v. Nieman's, Ltd., 579 N.W.2d 299, 316 (Iowa 1998).

17.   The Federal Circuit's <u>Read</u> decision endorsed a number of factors to consider in fixing the amount of enhanced damages:

(1) whether the infringer deliberately copied the ideas of another;

(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;

(3) the infringer's behavior as a party to the litigation;

(4) [the] defendant's size and financial condition;

(5) closeness of the case;

(6) duration of [the] defendant's misconduct;

(7) remedial action by the defendant;

(8) [the] defendant's motivation for harm; [and]

(9) whether [the] defendant attempted to conceal its misconduct.

970 F.2d at 827 (citations omitted; capitalization corrected).

18.   Many of these factors weigh in favor of a large enhanced damages award here.  As just discussed, Chance: deliberately copied Contour's products (factor 1); engaged in no meaningful inquiry into the scope of Contour's trade secret rights, and had no good-faith basis for believing that it was not violating those rights (factor 2); continued to engage in misappropriation, even after this court issued the preliminary injunction, and issued a misleading statement about its rights in light of that order (factor 7); was motived by ill will toward

39

Contour (factor 8); and engaged in a series of actions to try to hide the misappropriation (factor 9).

19.  Chance's conduct of this litigation (factor 3) and the one-sidedness of the case (factor 5) also counsel in favor of substantial enhanced damages.  Chance resisted the entry of the preliminary injunction against its manufacture and sale of the Open and Professional, and later appealed that order, on grounds that were thin at best and, indeed, which it barely repeated at trial (where it admitted that some of those sales were "a mistake").[11]  Chance also filed multiple motions arguing that its appeal from the preliminary injunction had divested this court of jurisdiction over the case so that the litigation could not continue here pending the appeal, despite no supporting authority and overwhelming authority to the contrary.  See Contour Design, 2011 DNH 078, 24-25.  Most recently--four months after the jury phase of the trial and on the eve of the non-jury phase--Chance precipitously announced, without any real explanation, the existence of a witness and documents that had been previously undisclosed and, in the case of some of the documents, which Chance had said it did not possess and could not obtain.  See Contour Design, Inc. v. Chance Mold Steel Co., 2011 DNH 154.

---

[11]As discussed at the outset, Chance no longer even disputes that its sales of the Open and the Professional should be enjoined.

40

This all happened in a case, moreover, where Chance conceded using the molds it made for Contour and Contour's firmware to make competing products--and where the jury found in favor of Contour on all of its claims and awarded it the full amount of its requested damages.  In other words, the case was not close.

20.  While there is little evidence in the trial record as to Chance's size and financial condition (factor 4), it also supports a significant enhanced damages award.  Contour paid Chance more than $40 million over the course of their 13-year relationship, and, according to Mei-Ling Wang, Chance was a company with sales in the millions of dollars and 60 employees. Though more direct evidence of Chance's financial condition, such as its net worth, would no doubt have assisted the court in calibrating the enhanced damages award, Chance never presented any such evidence, even though, for the purpose of resisting exemplary damages, "the burden of showing net worth is on the defendant." Horney v. Westfield Gage Co., 77 Fed. Appx. 24, 34-35 (1st Cir. 2003) (citing cases).[12]

---

[12]This evidentiary gap distinguishes two of the cases that Chance cites for the proposition that the amount of compensatory damages awarded should factor into the amount of exemplary damages awarded (beyond serving to set the maximum as provided by the statute).  While those cases considered the size of the compensatory damages award in assessing exemplary damages, they did so in judging the sum of both awards relative to the defendant's ability to pay them.  See Biocore, 2004 WL 303194, at *5; Syntron Bioresearch, Inc. v. Fan, No. 33894, 2002 WL 660446,

21.  The only factor that arguably weighs against a large enhanced damages award is the duration of Chance's misconduct (factor 6).  Chance emphasized a related point in its summation at the non-jury phase of trial, arguing that it sold fewer than 7,000 units of the Open and the Professional in total, at a price of just $60 each, so that its total gain from its misappropriation was approximately $420,000 at most.  But Chance stopped selling those products only when this court issued the preliminary injunction (and did not immediately stop even then).  By that point, Chance had been selling the Open and the Professional to Drougge for some eight months--hardly an insignificant period of time.  See Ice Corp., 615 F. Supp. 2d at 1274 (finding that 5-6 months of misappropriation supported a large exemplary damages award).

22.  This period of misappropriation, moreover, completely postdated both the initiation of this lawsuit and this court's order temporarily restraining Chance from misappropriating

---

at *16-*17 (Cal. App. Ct. May 13, 2002).  The third case cited by Chance assessed exemplary damages not by applying the Uniform Trade Secrets Act, but Kansas's "general punitive damages statute," which specifically provides for the court to consider "the total deterrent effect of other damages and punishment imposed on the defendant as a result of the misconduct"--and imposed more than $9.5 million in exemplary damages on top of nearly $4.8 million in compensatory damages anyway.  Ice Corp. v. Hamilton Sunstrand Corp., 615 F. Supp. 2d 1266, 1271-75 (D. Kan. 2009), aff'd in relevant part, 432 Fed. Appx. 732 (10th Cir. 2011).  So that case does not help Chance either.

Contour's trade secrets (albeit through the ErgoRoller, rather
than through the Open or the Professional).  So this is not a
case where the defendant promptly discontinued its conduct after
receiving notice of its potentially wrongful nature, such that
its duration would count against enhanced damages.  Cf. Biocore,
2004 WL 303194, at *4.  And even if it were, the other factors
all weigh heavily in favor of a large enhanced damages sum, as
just discussed.  See Engineered Prods. Co. v. Donaldson Co., 147
Fed. Appx. 979, 992-93 (Fed. Cir. 2005).  As enhanced damages
under N.H. Rev. Stat. Ann. § 350-B:3, II, the court will
therefore award Contour double the damages awarded for
misappropriation of trade secrets under N.H. Rev. Stat. Ann.
§ 350-B:3, I.  For the same reasons, the court also awards
Contour its reasonable attorneys' fees.  See id. § 350-B:4, III.

## VII. Scope of the permanent injunction

23.  Contour seeks a permanent injunction that, in relevant
part, (a) prevents Chance from making or selling the Open,
Professional, ErgoRoller, or other products "similar to or
derived from" the computer mouse products which Chance previously
made for Contour, even "under a different trade name," (b)
prevents Chance from making molds to be used to manufacture any
such products, again, "under any trade name," (c) requires Chance

43

to recall any inventory of such products from distributors, and
(d) requires Chance to return to Contour "all information on"
such products, including any firmware used in their production.
Contour proposes that the injunction last until June 15, 2015,
the date that the NDA expires.

24.   As noted at the outset, Chance does not dispute that it
should be permanently enjoined from making or selling the Open
and the Professional, but it objects to the proposed injunction
on a number of other grounds, principally that it should not
apply to the ErgoRoller.  Chance argues that it developed the
ErgoRoller without resort to any of Contour's trade secrets or,
for that matter, its confidential information, so the product
violates neither trade secrets law nor the non-disclosure
provision of the NDA.  Chance further argues that the ErgoRoller
does not violate the non-competition clause of the NDA because
the product is not "derived from or based on" any of Contour's
computer mouse products and that, in any event, the clause
amounts to an unenforceable restraint on trade.  Finally, Chance
asserts that equitable considerations do not support the issuance
of a permanent injunction, and objects to particular provisions
of Contour's proposed injunction.  For the reasons fully
explained below, this court rejects Chance's arguments (with two
exceptions as to the content of the injunction).

44

A.  New Hampshire law applies

25.  As an initial matter, Chance argues that Colorado law,
rather than New Hampshire law, controls the interpretation of the
NDA, relying on its choice-of-law provision.  See Part I.8,
supra.  This court, sitting in diversity, applies the choice-of-
law rules of the forum state, New Hampshire.  See Klaxon Co. v.
Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Under those
rules, "[w]here parties to a contract select the law of a
particular jurisdiction to govern their affairs, that choice will
be honored," but only "if the contract bears any significant
relationship to that jurisdiction." Hobin v. Coldwell Banker
Residential Affiliates, Inc., 144 N.H. 626, 628 (2000) (quotation
marks omitted).

26.  The NDA is a contract between Contour (which the NDA
identifies as a Delaware corporation, and which has its principal
place of business in New Hampshire) and Chance (a Taiwanese
corporation), and was necessitated by Contour's soliciting
Chance, in Taiwan, to manufacture products there for sale
worldwide.  So the NDA bears no "significant relationship" to
Colorado, which means that this court cannot give effect to its
choice-of-law clause.  See CCR Data Sys., Inc. v. Panasonic
Commc'ns & Sys. Co., No. 94-456, 1995 WL 54380, at *4-*5 (D.N.H.
Jan. 31, 1995) (McAuliffe, J.) (refusing to apply New York law to

45

a contract dispute, even where the contract provided for it,
because there was "no nexus between the State of New York, these
parties, and this particular contract").

27.  Chance does not argue otherwise or, indeed, even
acknowledge the "significant relationship" requirement.[13]   In
any event, Chance has waived any argument for Colorado law by
failing to object to the following jury instruction (which the
court gave to avoid any potential for juror confusion over the
choice-of-law clause):  "You may have noticed that the NDA states
that Colorado law will apply to its performance.  You are to
disregard this.  All of the claims in this case are governed by
New Hampshire law."  When, as here, there is no objection to the
court's instructions to the jury, they become the law of the
case, even if--as Chance now argues--they were erroneous.  See,
e.g., La Amiga del Pueblo, Inc. v. Robles, 937 F.2d 689, 690-91
(1st Cir. 1991); Milone v. Moceri Family, Inc., 847 F.2d 35, 38-
39 (1st Cir. 1988).  The court will apply New Hampshire law here.

_____

[13]Indeed, Chance does not acknowledge New Hampshire choice-
of-law rules at all, citing instead to a case applying Illinois
choice-of-law rules, SCA Servs., Inc. v. Lucky Stores, 599 F.2d
178 (7th Cir. 1979), for the proposition that "[w]here the
parties have contractually agreed to a choice of law provision,
the court should apply the choice of law specified in the
contract, and failure to do so is a reversible error."  But the
automatic application of choice-of-law clauses is not New
Hampshire law (nor, for that matter, does it appear to be what
SCA Services says, but this court need not decide that).

B.   Chance used Contour's confidential information to develop
     the ErgoRoller

28.   Again, in the NDA's non-disclosure provision, Chance
agreed (with exceptions not relevant here) to "make no use of the
Product or any Confidential Information," defined as "certain
inventions, designs, methods, samples, market information
concepts and ideas relating to computer mouse products and
related materials."  As already noted, see Part V.57, this court
finds that the electronic files that Chance used to produce the
molds for making Contour's products are "Confidential
Information" under the NDA because they are "designs . . .
relating to computer mouse products and related materials."
Chance does not argue to the contrary.

29.   As also already noted, see Part V.57, this court finds
that, in making the molds for the ErgoRoller, Chance used the
electronic files used to make the molds for the Free.  Chiang,
the engineer who designed the mechanical aspects of the
ErgoRoller discussed finalizing the design of the Free with
Steven Wang in August 2008, before Chance had completed the
design work on the Free at the end of that summer.  During this
time--and thereafter--Chiang had access to the electronically
stored files used to produce the molds for the Free.  And the
dimensions, features, and mechanical functionality of the

47

ErgoRoller, while not identical to those of the Free, are palpably similar.

30.  As this court observed at the outset of this litigation, "'[t]hese showings--access and similarity--may support a trade secret misappropriation claim' because they suggest that the defendant derived its product from the plaintiff's trade secret, rather than from an independent source." Contour Design, 2010 DNH 011, 22 (quoting Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1361 (Fed. Cir. 2002)); see also, e.g., USA Power, LLC v. PacifiCorp, 235 P.3d 749, 761 (Utah 2010) (citing cases from various federal courts of appeals).  By the same logic, Chance's access to the electronic files used to produce the molds for the Free, and the similarity between that product and the ErgoRoller, support the conclusion that Chance used those files in generating the mechanical design of the ErgoRoller, rather than doing so independently as Chance claims.

31.  Moreover, Chance was able to produce a working sample of the ErgoRoller by March 3, 2009, just six months after Chance says it began working on the product, even though, as Mei-Ling Wang acknowledged, just "to do research and development of a product would take approximately two years."  Indeed, the design of the Free, which took more than two years, proved particularly

48

time-consuming.  So the unusually short development time for the
ErgoRoller--which represents an advancement from the Free in
that, of course, the ErgoRoller has a removable roller--further
suggests that, in designing the ErgoRoller, Chance used the
electronic files used to produce the molds for the Free.  Cf.
Electro-Miniatures Corp. v. Wendon Co., 771 F.2d 23, 26-27 (2d
Cir. 1985) (relying on defendant's "sudden ability" to make the
product embodied in plaintiff's confidential drawings, after
defendant had been previously unsuccessful in making the product,
as evidence that defendant used the drawings to do so).

     32.  While, as in the case of its claim for willful and
malicious misappropriation, Contour has the burden of proving
that the ErgoRoller was created using its confidential
information, it has carried that burden through the evidence just
surveyed, and Chance, once again, has failed to elicit or point
to any evidence casting its behavior in a more innocent light.
Its brief opposing the permanent injunction argues that the
EgroRoller's mechanics were developed independently of any of
Contour's confidential information but relies on evidence that
never materialized at trial, viz., testimony by Mei-Ling Wang
that Chiang "never worked on a Contour product" and evidence
"supporting this testimony," including computer-aided engineering
"diagrams of the mechanical design."  Again, Chiang did work on

49

the Free, right before he started working on the ErgoRoller, and Chance never even sought to introduce any diagrams of the ErgoRoller's mechanical design, let alone any evidence (including any testimony by Chiang) that those diagrams were developed without reference to the diagrams of the Free's mechanical design.  The absence of any positive evidence that Chance independently developed the ErgoRoller's design--evidence which should be readily at Chance's disposal--further supports the finding that Chance in fact used the designs from the Free's molds in designing the ErgoRoller.  See Sokol Crystal Prods., Inc. v. DSC Commnc'ns Corp., 15 F.3d 1427, 1432 (7th Cir. 1994) (upholding finding of misappropriation based on access and similarity, "especially in light of the fact that any direct evidence on this point would also be firmly in the defendant's control," but defendant had failed to come forward with such evidence); SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1261 (3d Cir. 1985) (similar).

     33.  Chance also argues that, because the Free and the ErgoRoller are not identical in shape, the molds for the former could not be used to produce the latter.  But this does not rule out that the electronic files used to produce the molds for the Free could be modified to produce molds for the ErgoRoller, which is similar to the Free in both size and shape.  Steven Wang

50

testified, in fact, that the electronic files "are the critical parts to make any tooling changes or make a new set of tools." Mei-Ling Wang, for her part, testified only that the <u>molds</u> from the Free would not be useful in making the ErgoRoller.  She did not say the same as to the <u>files</u>, despite Chance's counsel's efforts to elicit that testimony through leading questions.[14] Nor, again, has Chance come forward with any evidence as to how it designed the mechanical aspects of the ErgoRoller--let alone how it did so in a dramatically shorter time than such work had historically taken.

34.  Accordingly, the court finds that in making the molds for the ErgoRoller, Chance used the electronic files used to make the molds for the Free, and, in turn, violated the non-disclosure provision of the NDA.

C.   <u>The ErgoRoller is "derived from or based on" the Free</u>

34.  Even if Chance did not use the electronic files from the Free (or any of Contour's other confidential information) in

---

[14]Similarly, during an argument over an evidentiary objection at the jury phase of the trial, counsel for Chance dismissed as "bogus" testimony by Steven Wang that the electronic files in Chance's possession could be used to produce new molds, but Chance never adduced any evidence to the contrary--not even in the testimony of Nien who, by all accounts, was a highly experienced mold-maker.  Again, Nien testified only that Chance made the molds for the ErgoRoller, without explaining how.

making the ErgoRoller, that product would still represent a breach of the NDA.  In the NDA's non-competition provision, section 3, Chance agreed not to develop any product that is "derived from or based on" Contour's "computer mouse products and related materials."  See Part I.7, supra.  As already noted, this court finds that the ErgoRoller is just such a product.  See Part V.58, supra.  Specifically, the ErgoRoller is derived from and based on the Free:  the dimensions, features, and mechanical functionality of the ErgoRoller are strikingly similar to those of the Free, and Chance itself has described the Free as the "former version" of its ErgoRoller product.

35.  Chance does not seriously dispute that the ErgoRoller is "derived from or based on" the Free, at least within the plain meaning of those terms.  Under New Hampshire law, of course, "the plain meaning of the language used in the contract" controls its interpretation, unless the language is ambiguous.  Birch Broad., Inc. v. Capitol Broad. Corp., Inc., 161 N.H. 192, 196 (2010).  Chance does not argue that the non-competition provision is ambiguous.[15]  Instead, Chance maintains that, "when read in

_____

[15]Instead, Chance suggests--as it has at various other stages of this litigation--that the NDA's definition of "Confidential Information" is ambiguous, so that it should be construed against Contour, as the drafter, to exclude the idea for the removable roller (even though the NDA specifically lists "ideas" among the categories of "Confidential Information" it protects).  But the court need not reach this argument because,

context," section 3 of the NDA "must be understood as protecting
Contour's confidentiality interests" only, because the other
"main substantive provisions of the NDA" all "link[] Chance's
obligations to Contour's confidentiality interests."[16]  This
argument turns principles of contract interpretation upside down.

36.  In New Hampshire, as elsewhere, courts interpreting a
written agreement "will examine and consider the entire writing,
seeking as best they can to harmonize and to give effect to all
the provisions of the contract so that none will be rendered
meaningless."  West v. Turchioe, 144 N.H. 509, 516 (1999)
(quotation marks omitted).  As Chance acknowledges, the NDA has a
clause, section 1, that serves to protect Contour's confidential
information by, among other things, expressly providing that
Chance shall "make no use of . . . any Confidential Information."

---

as just discussed, it finds that Chance developed the ErgoRoller
using the electronic embodiments of the molds for Contour's
products, which are clearly "Confidential Information" under the
NDA.  See Part VII.B.28, supra.  Furthermore, as Chance
acknowledges, New Hampshire does not follow the rule that any
ambiguous contract must be construed against its drafter.  See
Centronics Data Computer Corp. v. Salzman, 129 N.H. 692, 696
(1987).  Again, it is New Hampshire law that applies here.

[16]Chance also points out that "the contract is titled "Non-
Disclosure Agreement" and expressly characterizes itself as a
"Confidentiality Agreement" (capitalization omitted).  As this
court has recognized, though, the title of a contract "does not
invite the court to ignore the plain meaning of [its] language."
Amherst Country Club, Inc. v. Harleysville Worcester Ins. Co.,
561 F. Supp. 2d 138, 148-49 (D.N.H. 2008) (citing N.H. Ins. Guar.
Ass'n v. Pitco Frialator, Inc., 142 N.H. 573, 580 (1998)).

Section 3 would be superfluous, then, if it accomplished nothing other than preventing Chance from using Contour's confidential information to make competing products.  Instead, the court reads section 3 to mean what it says:  Chance cannot "duplicate, produce, manufacture or otherwise commercially exploit the Product, or develop any other product derived from or based on the Product."[17]

37.  Chance further argues that other documents executed by the parties, including a subsequent "manufacturing services agreement" (MSA) also support limiting section 3's prohibition to Chance's use of Contour's confidential information.[18]  As Chance points out, Article 9 of the MSA provides that "for a period of two (2) years after the expiration or termination of this Agreement, [Chance] will not, directly or indirectly, engage in

_____

[17]Chance also argues that the NDA "defines 'Product' in a way that expressly links it to Contour's confidentiality interests."  Insofar as this is intended to suggest that the NDA's definition of "Product" is limited by its definition of "Confidential Information," the court disagrees.  Again, the NDA recites that Contour has "certain inventions, designs, methods, samples, market information and ideas (the 'Confidential Information') relating to computer mouse products and related materials (the 'Product')."  Thus, the definition of "Product" restricts the definition of "Confidential Information"--not the other way around, as Chance would have it.

[18]Chance's brief in opposition to the permanent injunction also references a letter of intent between the parties (the "LOI"), but does not say anything further about that document. So this court sees no reason to reexamine Judge McCafferty's ruling that the LOI does not narrow the scope of the NDA. Contour Design, 2010 WL 4774283, at *5.

the manufacture, distribution or sale of any products that are
the same or similar to the Products." Chance argues that this
clause, rather than section 3 of the NDA, governs its non-
competition obligations to Contour because the MSA postdated the
NDA, and a "later contract supersedes inconsistent terms in an
earlier contract." The court disagrees.

38. Unlike the non-competition provision of the NDA, the
non-competition provision of the MSA did not start running from
the execution of the agreement, but from its termination (which
could be effected upon ten days' notice by either party) or
expiration (which did not occur until Chance delivered all of the
products called for by the agreement). The non-competition
provision of the MSA, then, did not commence until that agreement
expired or was terminated[19]--and Article 13 of the MSA
specifically provides that "[t]he expiration or termination of
this Agreement shall be without prejudice to the existing
rights." If, upon its expiration or termination, the MSA

---

[19]There is no evidence in the trial record as to when (if
ever) the MSA expired or was terminated, and therefore no
evidence as to when (if ever) its non-competition provision took
effect. Chance nevertheless argues that the MSA and its non-
competition provision expired "over a decade ago." Of course, if
this is true, Chance did not start making or selling products
competing with Contour's until 2009, even though (by its claimed
understanding of its obligations at this point) it could have
done so several years earlier. This course of dealing further
undermines Chance's circumscribed reading of the NDA.

obligates Chance not to compete with Contour for only two years,
rather than the longer period specified by the NDA, then the
expiration or termination of the MSA works to the prejudice of
Contour's rights under the NDA, which, as Chance emphasizes,
predated the MSA.  So the court rejects Contour's reading of the
MSA as inconsistent with the express language of Article 13.


C.    The NDA is enforceable in relevant part

      39.  Chance also argues that section 3 of the NDA is
unenforceable because it amounts to an unreasonable restraint on
competition.  Under Chance's view, a covenant not to compete is
"facially void" except in very limited circumstances, including
to protect the covenantee's trade secrets.  But Chance's position
is based on Colorado law, which, as already discussed, does not
apply here.[20]  See Part VII.A, supra.

      40.  Chance also argues that, even under New Hampshire law,
covenants not to compete are enforceable "only if the restraint

_____

      [20]In support of its position, Chance cites a Colorado
statute.  Colo. Rev. Stat. § 8-2-113(2).  The federal district
courts in that state, though, have disagreed over whether that
statute even applies to non-competition agreements--like the one
here--reached outside of the employment context, or whether such
agreements must simply pass the "reasonableness" test instead.
Compare, e.g., Energex Enters., Inc. v. Anthony Doors, Inc., 250
F. Supp. 2d 1278, 1281 (D. Colo. 2003), with, e.g., Nutting v.
RAM Sw., Inc., 106 F. Supp. 2d 1121, 1124 (D. Colo. 2000).  So it
is far from clear that even Colorado law would impose the severe
restrictions on the NDA that Chance invokes here.

is reasonable," and that section 3 of the NDA flunks this test because it is overbroad in scope.  This court agrees with Chance's premise, but not its conclusion.

41.  In arguing that section 3 amounts to an unreasonable restraint on trade, Chance overlooks two crucial limitations. First, the NDA and its non-competition provision did not arise out of an employee-employer relationship between it and Contour. Under New Hampshire law, as Chance points out, "a restraint on employment is reasonable only if it is no greater than necessary for the protection of the employer's legitimate interest, does not impose undue hardship on the employee, and is not injurious to the public interest." Moore v. Dover Veterinary Hosp., 116 N.H. 680, 684 (1976) (citing Restatement of Contracts §§ 513-515 (1932)).  But the NDA is not "a restraint on employment"--it is a restraint on the commercial activities of a business, Chance.[21]

---

[21]Chance suggests that, because Contour's proposed permanent injunction would enforce the non-competition provision of the NDA against not only Chance, but its employees, the provision must be analyzed under the standards for covenants not to compete in employment agreements.  That is wrong.  Section 3 of the NDA does not prevent Chance's employees from any work in the field of computer mouse products--it simply restricts them from doing that work for or on behalf of Chance (and even it will not be enjoined from working in that field entirely, as discussed infra).  The NDA, then, has no effect on the ability of Chance's employees to get jobs with other companies in the same business and does not threaten their livelihoods in the way that enforcing a non-competition clause in an employment agreement might.

42.   A number of courts have ruled that "covenants not to
compete that are made as part of an ordinary commercial contract
. . . are analyzed under a simple rule of reason," rather than
"through the prism of the employer-employee relationship."
Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodserv. Co.,
730 F. Supp. 1209, 1213-14 (E.D.N.Y. 1990); see also, e.g.,
Oberto Sausage Co. v. JBS S.A., No. 10-2033, 2011 WL 939615, at
*4-*5 (W.D. Wash. Mar. 11, 2011); Omni Consulting Group, Inc. v.
Marina Consulting, Inc., No. 01-511, 2007 WL 2693813, at *5 & n.8
(W.D.N.Y. Sept. 12, 2007); Energex Enters., 250 F. Supp. 2d at
1281; Winston Franchise Corp. v. Williams, No. 91-7963, at *7-*8
(S.D.N.Y. Jan. 10, 1992).  By and large, these cases have
reasoned that enforcing a non-competition agreement against a
business does not threaten "the loss of an individual's
livelihood" in the sense that enforcing one against an employee
could.  Baker's Aid, 730 F. Supp. at 1214.  Thus, rather than
subjecting covenants not to compete in the commercial context to
the rigorous scrutiny applied in the employment context, courts
will enforce them "so long as [they are] reasonable and [are] no
larger than necessary to protect the legitimate business
interests of" the covenantee.  Id.

43.  The New Hampshire Supreme Court appears to have come to
the same conclusion, albeit more than 100 years ago, in Bancroft

& Rich v. Union Embossing Co., 72 N.H. 402 (1903).  There, after
inventing an embossing machine, the plaintiffs entered into a
contract giving the defendants the exclusive right to make and
sell it but also preventing them from making or selling any other
embossing machines of that type for 20 years.  Id. at 404-05.
Rejecting the defendants' argument that this "was in general
restraint of trade and void," the court observed:

> inasmuch as public policy requires that a man should be
> free to sell in the most advantageous way what he has
> obtained by his skill or other means, the same public
> policy should permit him to enter into restrictive
> covenants into aid of the thing sold, provided the
> restriction, in the judgment of the court, is not
> unreasonable, having regard to the subject-matter of
> the contract . . . .  In the application of this
> principle, the question is whether the restraint
> affords more than a fair and reasonable protection to
> the party in whose favor it is imposed.  If it does
> not, the contract should be upheld.

Id. at 408-09.  Under New Hampshire law, then, this court will
assess the enforceability of section 3 of the NDA according to a
reasonableness standard, rather than the more searching standards
applied to covenants not to compete in employment agreements.

44.  Second, while section 3 on its face could be read to
prevent Chance from making or selling any "computer mouse
products or related materials," Contour is not seeking to enforce
such a restriction here.  Instead, Contour wants to enjoin Chance
from making or selling products that, in accordance with the
language of section 3, are "derived from or based on" Contour's

computer mouse products or related materials.  So, to decide
whether to grant that relief--and, necessarily, whether Chance
should be enjoined from making or selling the ErgoRoller--the
court need not decide whether the NDA could reasonably prevent
Chance from making or selling <u>any</u> computer mouse products.  The
court need only decide whether the NDA could reasonably prevent
Chance from making or selling products "derived from or based on"
Contour's "computer mouse products and related materials" (a
category that, as just discussed, encompasses the ErgoRoller).

45.  "The determination of whether a covenant is reasonable
is a matter of law for [the] court to decide." Tech. Aid Corp.
v. Allen, 134 N.H. 1, 8 (1991).  This court rules that section 3
of the NDA is a reasonable covenant not to compete, insofar as it
prevents Chance from making or selling products "derived from or
based on" Contour's computer mouse products and related
materials.  While, again, Chance suggests that this provision is
unreasonable because it goes further than necessary to protect
Contour's trade secrets, New Hampshire law recognizes that
"[l]egitimate interests that may be protected by contract include
confidential information other than trade secrets," as Judge
McCafferty has already observed. Contour Design, 2010 WL
4774283, at *7 (citing ACAS Acquisitions (Precitech) Inc. v.
Hobert, 155 N.H. 381, 396 (2007)) (quotation marks omitted); <u>see</u>

60

also ANSYS, Inc. v. Computational Dynamics N. Am., Ltd., 595 F.3d 75, 80 (1st Cir. 2010) (quoting Syncom Indus., Inc. v. Wood, 155 N.H. 73, 79 (2007)).  Insofar as section 3 of the NDA prevents Chance from making computer mouse products derived from or based on the confidential information embodied in Contour's computer mouse products, then, the provision serves Contour's legitimate business interests.[22]

46.    Furthermore, "[m]ost jurisdictions do not limit the scope of noncompetition agreements to trade secrets or confidential . . . information." Sys. & Software, Inc. v. Barnes, 886 A.2d 762, 764 (Vt. 2005).  Covenants not to compete may serve other legitimate ends as well, including to guard against a competitor's misappropriation of the time and expense the covenantee has invested in developing a product.  See, e.g., Oberto Sausage, 2011 WL 939615, at *5; Bakers' Aid, 730 F. Supp. at 1215.  Under strikingly similar circumstances, in fact, one court enforced the non-competition clause of a manufacturing contract that prevented the manufacturer from making or selling

_____

[22]It follows that section 1 of the NDA--which, as already discussed, independently prohibits Chance from using Contour's confidential information--is also an enforceable restriction. Chance does not argue to the contrary.  So, even if Chance were correct that section 3 were unenforceable, it would still be prohibited from making or selling the ErgoRoller under section 1 because, as this court has found, Chance used Contour's confidential information to make the ErgoRoller.

products "based on" designs that the manufacturer had prepared on the distributor's behalf. Baker's Aid, 730 F. Supp. at 1215. As in this case, the designs in Baker's Aid were "the end product of several months' engineering effort," so the non-competition clause served to protect the distributor's "'right to keep the work which it has done, or paid for doing, to itself.'" Id. (quoting Bd. of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 250 (1905) (Holmes, J.)); see also Oberto Sausage, 2011 WL 939615, at *5 (recognizing covenantee's "legitimate interest in preventing its competitor from taking a free ride on its substantial investment" in developing its products).

47.  In reaching this conclusion, moreover, Baker's Aid rejected the argument--similar to the one Chance has repeatedly made in this case--that the distributor had no protectible interest in designs for a product that was publicly available for sale and, as a result, could be reverse-engineered. 730 F. Supp. at 1215. The court explained that, while the manufacturer was free to put its own "time, effort and money" toward developing its own designs, by reverse-engineering or otherwise, the non-competition clause could legitimately protect against the manufacturer's attempt to "cut short this process by converting" the distributor's designs. Id.

48.  The court finds <u>Bakers' Aid</u> persuasive here.  In
preventing Chance from making or selling products "derived from
or based on" the computer mouse products it made for Chance,
section 3 serves Contour's legitimate interest in protecting
against the misappropriation of its substantial investment in
developing those products--an interest which is not undermined by
the fact that those products are publicly available for sale.
Again, engineering each RollerMouse product has taken roughly two
years.  Contour was entitled (as it did through the NDA) to
prevent Chance from short-circuiting this process by making
products derived from or based on the very same products it made
for Contour (as Chance did in the case of the ErgoRoller).

49.  The court further rules that, in preventing Chance from
making or selling products "derived from or based on" the
computer mouse products and related materials it manufactured for
Chance, section 3 is no broader than necessary to serve that
interest.  Chance remains free to make computer mouse products
that are not "derived from or based on" the ones it made for
Contour.  Again, prior to the onset of its relationship with
Contour, Chance's principal output was the tooling used to
produce mouse products for major computer hardware manufacturers.
The relevant provisions of the NDA leave Chance free to resume
that, or any other line of business, so long as it does not

63

involve making or selling products derived from or based on the
computer mouse products and related materials Chance made for
Contour.  For essentially the same reasons, in fact, the New
Hampshire Supreme Court upheld a remarkably similar
noncompetition clause in <u>Bancroft & Rich</u>, explaining that it
"does not restrain the [defendants] from manufacturing and
selling embossing machines of every description, but simply those
involving the specific feature which the defendants were to
manufacture and sell under the contract."  72 N.H. at 409.  The
relevant provisions of section 3 are reasonable and enforceable.

        50.  Chance also complains that the geographic and temporal
scope of its non-competition obligation are too broad.  As Chance
points out, there is no geographic restriction on the covenant
not to compete, but "courts have recognized that certain
businesses have no geographic boundaries" and have upheld
worldwide noncompetition provisions as a result.  2 Callman,
<u>supra</u>, § 16:30, at 16-120-16-121 (citing cases from various
jurisdictions).  This includes the New Hampshire Supreme Court in
<u>Bancroft & Rich</u>, which held that, whatever vitality a rule
against worldwide covenants not to compete had even at that time
(again, more than 100 years ago), "there would seem to be no
reason for its continued recognition and application, as a hard
and fast rule, to cases arising under the enlarged and materially

64

changed conditions in which trade and commerce are now carried on." 72 N.H. at 407.  The market for ergonomic computer mouse products is small, consisting of consumers who have suffered repetitive stress injuries from using a traditional computer mouse, wherever they can be found.  Under these circumstances, a worldwide prohibition on Chance's sale of (or making for sale) computer mouse products based on the ones it made for Contour is reasonable.  See id. at 409 (upholding a geographically unlimited covenant due to "the nature of the business, the admitted limited number of customers, and their location throughout various states of this country").

51.  Chance also attacks the duration of the non-competition provision which, under section 6 of the NDA, lasts for 20 years, arguing that "[n]o court has ever found a 20-year restrictive covenant reasonable."  But that sweeping statement is not even accurate as to the New Hampshire Supreme Court which, as just discussed, enforced a 20-year non-competition clause--and a geographically unlimited one at that--in Bancroft & Rich, holding, again, that such a clause is reasonable so long as it does not "affor[d] more than a fair and reasonable protection to the party in whose favor it is imposed." Id. at 409.

52.  Section 3 of the NDA passes that test, at least insofar as it imposes a 20-year prohibition on Chance's manufacture or

sale of computer mouse products derived from or based on the
products it made for Contour.  This restriction, again, serves
Contour's legitimate interest in guarding against the
misappropriation of its product designs.  Chance does not explain
how this interest diminishes with the passage of some arbitrary
period of time.  To the contrary, Chance concedes that, despite
the NDA's 20-year term, "if construed to protect Contour's
legitimate confidentiality interests . . . the NDA might pass
muster."[23]  It follows that enforcing the NDA to prevent Chance
from making computer mouse products derived from or based on
those it made for Contour passes muster as well.  See id.
(enforcing defendants' 20-year covenant not to compete by making
products of the same type as those invented by plaintiffs);
Bakers' Aid, 730 F. Supp. at 1214-15 (enforcing manufacturer's
10-year covenant not to compete by making products based on
specifications it had prepared for distributor).


D.   Permanent injunctive relief is otherwise appropriate

     53.  "According to well-established principles of equity, a
plaintiff seeking a permanent injunction must satisfy a four-

---

     [23]In a similar vein, Chance has also conceded that it can be
enjoined from making the Open and the Professional "forever,"
given its admission that it used Contour's trade secrets to make
those products.

factor test before a court may grant such relief." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  This test requires Contour to show:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would be served by a permanent injunction." Id.  Predictably, Chance argues that Contour has failed to demonstrate the existence of any of these factors here. Exercising its "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief," Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 1996) (quotation marks omitted), this court disagrees.

54.  First, Chance's breaches of the NDA have caused an irreparable injury to Contour for which, second, its remedies at law are inadequate.  There was evidence during the jury phase of the trial that, by supplying the Classic, the Professional, and the Open to Drougge, Chance caused Contour to lose customers to a competitor.  Steven Wang testified during the non-jury phase of the trial that, in the ergonomic mouse market in particular, once

a customer is lost to a different manufacturer, it is difficult
to get him or her back.

55.  As this court has already observed, in temporarily
enjoining Chance from marketing the ErgoRoller to Contour's
prospective customers, this "sort of competitive wrong cannot
readily be righted by money damages and is appropriately remedied
by injunctive relief." Contour Design, 2010 DNH 011, 12-13.
Moreover, the court of appeals has specifically recognized that
losing a product line to competitors amounts to irreparable
injury that can justify the issuance of a permanent injunction.
Ross-Simons, 217 F.3d at 13-14.

56.  If this were not enough, Chance agreed, in section 5 of
the NDA, that "its breach of this Agreement will cause [Contour]
irreparable harm for which no adequate remedy exists at law, and
that upon any such breach or threatened breach [Contour] shall be
entitled to injunctive relief."  As this court has also already
recognized, this provision, "while not dispositive of the issue,
lends further support to a finding of irreparable harm."[24]

_____

[24]Chance argues that the court cannot consider this
provision because, when Mei-Ling signed the NDA on Chance's
behalf, "Contour knew that [she] could not read English, and
[she] did not understand the document she was signing."  As
already discussed, though, the evidence is actually that Mei-Ling
Wang understands some English (and there is no evidence about
Contour's knowledge of her understanding of English) and this
court disbelieves her testimony that she did not understand the
NDA.  Moreover, Chance provides no authority for the proposition

Contour Design, 2010 DNH 011, 12; see also, e.g., Ticor Title
Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999).

56.  Evincing a serious misunderstanding of one of this
court's key rulings during the jury trial, Chance argues that
"[i]t would be nonsensical for this court to assume now that
future damages exist, after ruling that Contour failed to
demonstrate their existence" during the jury trial.  While this
court did rule that Contour's claim for damages expected to occur
beyond the time of trial could not go to the jury, the reason for
that decision was not that the claim was "speculative," or that
Contour had otherwise failed to prove those damages.  It was that
Contour had failed to carry its burden to discount those damages
to net present value, which is necessary to recover them under
New Hampshire law.  See Hutton v. Essex Group, Inc., 885 F. Supp.
331, 334 (D.N.H. 1994).  This court never ruled, then, that
Contour had failed to prove it would suffer harm in the future
and, in any event, Contour has proven that, as already discussed.

57.  Similarly, Chance argues that any damages Contour
suffered from Chance's breaches of the NDA "occurred in the past"
and have therefore already been remedied by the jury verdict.  As

---

that, in the absence of fraud, incapacity, or some other
recognized contractual defense, a party's failure to understand a
written agreement she nevertheless signs makes that agreement
unenforceable, particularly in the case of a contract between
businesses.

just discussed, though, the jury was not allowed to make any award for Contour's future losses (and not because Contour had failed to prove them), so those damages were in fact <u>not</u> included in the verdict.  Furthermore, while Chance emphasizes the trial evidence that Contour's "best customers had already defected due to Chance's conduct," it does not follow that <u>all</u> of Contour's customers have (indeed, if that were the case, Contour would very likely be out of business already).  In any event, all that is necessary to find the irreparable harm justifying a permanent injunction against a breach of contract is "some reasonable doubt about whether damages can be sufficient." Ross-Simons, 217 F.3d at 13 (quotation marks omitted).  Contour has met that standard.

     58.  Chance also argues that its future sales of the ErgoRoller will cause Contour "no legally cognizable harm," but this argument is based principally on Chance's contention that it "independently developed" the ErgoRoller, which this court has rejected as a factual matter.  Again, Chance's ErgoRoller is strikingly similar to Contour's Free (and Chance has marketed it as a new "version" of the Free).  So it stands to reason that future sales of the ErgoRoller will come at the expense of the

70

Free, constituting the requisite irreparable harm necessary to issue a permanent injunction against the ErgoRoller.[25]

59.   Third, the balance of harms favors Contour.  Again, Contour has shown that Chance's manufacture and sale of computer mouse products using its confidential information, or otherwise derived from or based on the products Chance made for Contour, have eaten into Contour's share of the small base of potential customers for such products, and that this will continue to occur unless those breaches of the NDA are enjoined.  Chance, on the other hand, has produced little if any evidence of the harm that relief will cause it.  While Chance anticipated testimony by Mei-Ling Wang at the non-jury trial that the ErgoRoller is Chance's only product, she did not in fact testify to that, nor is there evidence to that effect anywhere in the trial record.  Furthermore, as already discussed, Chance remains free to return to its business making molds for non-ergonomic mouse products or, indeed, any products not "derived from or based on" the computer mouse products Chance made for Contour.

---

[25]This reasoning also disposes of Chance's suggestion during the non-jury trial that, because Contour has yet to release its own ergonomic mouse with a removable roller, it must not be suffering irreparable harm from the presence of the ErgoRoller on the market.  The ErgoRoller causes irreparable harm to Contour by cutting into its sales of the Free (and in doing so in a way that damages cannot sufficiently remedy).

60.  In any event, as Contour points out, Chance cannot
avoid a permanent injunction by invoking the harm that will
befall it if it cannot sell the ErgoRoller, because Chance agreed
in the NDA not to make or sell such a product.  This makes "[a]ny
harm to Chance" from its inability to sell the ErgoRoller "the
direct result of . . . its contractual obligations to Contour,"
rather than the permanent injunction, and thus does not factor
into the balance of harms analysis. Contour Design, 2010 WL
4774283 (citing Vaqueria Tres Monitas, Inc. v. Irizarry, 587 F.3d
464, 486 (1st Cir. 2009)).

61.  Fourth, a permanent injunction will serve the public
interest because "'it is virtually axiomatic that the public
interest can only be served by . . . preventing the
misappropriation of the skills, creative energies, and resources
which are invested'" in the development of Contour's computer
mouse products. Contour Design, 2010 DNH 011, 13 (quoting
Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600,
612 (1st Cir. 1988)).  While Chance offers a passing objection
that New Hampshire law "favor[s] free competition over
restrictive covenants," this "principle yields when the
competition in question embodies the misappropriation of trade
secrets or other unfair forms." Id. at 14 n.9 (citing Concrete
Mach., 843 F.2d at 612).  Accordingly, the issuance of a

72

permanent injunction against Chance's future breaches of the NDA is appropriate here.

F.    The provisions of the proposed injunction are appropriate

62.   Finally, Chance objects to various provisions of Contour's proposed permanent injunction.  See Part VII.23, supra. With two exceptions, the court overrules those objections and adopts the permanent injunction in substantially the form proposed by Contour.

63.   First, and most significantly, Chance objects to provisions of the proposed injunction restricting its manufacture or sale of products that are "similar to" (a) the offending "Products" (defined as the Open, Professional, ErgoRoller, and ErgoSlider), (b) "Derivative Products" (defined as "where the form, fit, and function of a Product has been modified so that the resulting product is not an exact copy of the Product, but where the overall operation and use is the same"), or (c) "the computer mouse products previously manufactured" by Chance for Contour.  Chance argues, among other things, that Contour has not identified any basis for enjoining Chance from making or selling products that are "similar" to Contour's, insofar as those products do not misappropriate Contour's trade secrets or use its confidential information, or are otherwise "derived from or based

73

on" Contour's products.  The court agrees and, as a result, has modified the language of the proposed injunction accordingly.

64.  Second, Chance argues that the injunction cannot extend to its "agents, servants, and employees," as Contour proposes. This argument is without merit.  In fact, Rule 65(d)(2)(B) specifically provides that an injunction binds "the parties' officers, agents, servants, employees, and attorneys" who "receive actual notice of it, by service or otherwise."

65.  Third, Chance protests that the proposed injunction would prohibit it "from using a trade name that is the same or similar to those used by Contour," but that Contour has never articulated, much less proven, a trademark claim or any other theory that could justify relief.  This argument, however, is based on a misunderstanding of the proposed permanent injunction, which does not purport to restrict Chance's use of Contour's trade names, but rather to prohibit Chance from selling products that misappropriate its trade secrets, or violate the NDA, "under any trade name."

66.  Fourth, Chance objects to the provision of the proposed injunction that it recall offending products, because (a) Chance already did so in response to the preliminary injunction, (b) any harm to Contour from products that have already been sold was remedied by the jury's award of money

damages, and (c) the recall provision is vague because it does
not specify how Chance should recall products already in the
hands of "customers."  Again, however, Chance misunderstands
Contour's proposal which, on its face, requires Chance to recall
only "orders . . . in transit, not previously returned under the
preliminary injunction," and "from any distributors all inventory
. . . not previously recalled under the preliminary injunction"
(capitalization corrected).  These provisions, then, (a)
expressly relieve Chance from having to "redo" anything it
already did in response to the preliminary injunction, (b) serve
to prevent the very irreparable harm that Chance's breaches of
the NDA threaten, by stopping the offending products from
reaching their end users, and (c) does so only if they have not
already, and therefore does not raise any of the concerns Chance
raises over having to recall a product from customers (e.g.,
responsibilities for reimbursement, shipping costs, or lack of
customer compliance).

67.  Fifth, Chance argues that it should not have to return
to Contour "all information on" the offending products, including
"all copies of such information used to design and/or manufacture
. . . any derivatives of Contour products."  Chance complains
that this information will include its own "trade secrets and
other confidential information in the ErgoRoller's molds, CAD

75

files, firmware, and other materials," as well as the firmware
"for the second generation of its Professional and Open
products"--all of which, Chance says, it "independently
developed."  This court has found, however, that Chance did not
"independently develop" the molds for the ErgoRoller, but used
Contour's confidential information to make them in breach of the
NDA (and, again, Chance has never produced the "CAD files" it
claims to have used to make the molds).  Chance's objection to
surrendering the molds (and any related CAD files) for the
ErgoRoller to Contour, then, is without merit.  See 2 Callman,
supra, § 14:41, at 14-358--14-359 ("courts have ordered
defendants to destroy, or even surrender to plaintiffs, products
and patterns, photographs, drawings or designs of products made
by or pertaining to the plaintiff's secret") (footnotes omitted).

        68.  Chance is correct, though, that it "independently
developed" the firmware for both the ErgoRoller and the "second
generation" versions of the Professional and the Open, because
Contour has stipulated to that.  So there is no basis for
requiring Chance to surrender those versions of the firmware to
Contour.  The court will modify the proposed permanent injunction
accordingly.

## ORDER FOR JUDGMENT

In accordance with the jury's verdict, this court's allowance of Contour's motion for judgment of a matter of law at the jury trial, see Fed. R. Civ. P. 50(a)(1)(B), and these findings of fact and rulings of law, the Clerk of Court shall enter judgment for Contour forthwith on all counts of its amended complaint and both counts of Chance's counterclaim.  For the convenience of the parties, the court will enter the permanent injunction as a separate document.

Contour shall submit its application for attorneys' fees, together with all appropriate supporting documentation, within 60 days of the date of this order.  Chance may submit a response within 30 days of Contour's filing.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: December 16, 2011

cc:  Lawrence L. Blacker, Esq.
     Peter G. Callaghan, Esq.
     Daniel H. Fingerman, Esq.
     Daniel S. Mount, Esq.
     Kathryn G. Spelman, Esq.
     Kevin M. Pasquinelli, Esq.